Jerry **VALDIVIA, Alfred Yancy, and Hossie Welch, on their own behalf and on behalf of the class of all persons similarly situated, Plaintiffs,**

v.

Arnold **SCHWARZENEGGER, Governor of the State of California, et al., Defendants.**

No. Civ. S:94–cv–671 LKK/GGH.

United States District Court, E.D. California.

March 25, 2008.

---

Bingham McCutchen, Karen Kennard, Kristen A. Palumbo, San Francisco, California, Prison Law Office, Donald Specter, General Delivery, San Quentin, California, Stephen J. Perrello, Jr., San Diego, California, Rosen, Bien & Asaro, LLP, Michael W. Bien, Ernest Galvan, Mari L. Willits, San Francisco, California, Alex Landon, San Diego, California, for Plaintiffs.

Thomas S. Patterson, Deputy Attorney General, for Defendants.

Edmund G. Brown Jr., Attorney General of the State of California, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Senior Assistant Attorney General, Rochelle C. East, Supervising Deputy Attorney General, Vickie P. Whitney, State Bar No. 145316, Supervising Deputy Attorney General, Jessica R. Devencenzi, State Bar No. 232427, Deputy Attorney General, Sacramento, CA, for Defendants.

## *ORDER*

LAWRENCE K. KARLTON, Senior District Judge.

On February 25, 2008, the Special Master filed his report and recommendations regarding the use of hearsay evidence in parole revocation proceedings. *See* Permanent Injunction, at ——. The defendants have filed objections to the Special Master's report; the plaintiffs encourage the court to adopt it, with modification. The court declines both parties' requests and adopts the Special Master's report and recommendations.

Despite defendants' objections, the court agrees with the Special Master's interpretation of *United States v. Comito,* 177 F.3d 1166 (9th Cir.1999), *United States v. Hall,* 419 F.3d 980 (9th Cir.2005) and related hearsay cases in this Circuit, and their application to the defendants' parole revocation proceedings. His findings of fact are supported by the record. The Special Master's recommendations appear to the

court well-calculated to ensure the due process protections as expressed by the Supreme Court and the Ninth Circuit are respected. All of defendants' objections are overruled.

Plaintiffs' principally request that the Special Master's recommendations be amended to include concrete deadlines by which the defendants must accomplish certain remedial measures.[1] The court declines to do so and defers to the Special Master, in his conscientious attention to and intimate knowledge of the case, to ensure that the remedial measures ordered are completed expeditiously.

Accordingly, the court ORDERS:

1. The court ADOPTS the Special Master's Report and Recommendations Regarding Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction (Docket No. 1398);

2. The parties SHALL undertake the acts recommended by the Special Master at pp. —— –—— of the Report. The court defers to the Special Master to ensure these acts are timely accomplished. Should he believe necessary, the Special Master may move the court to require specific deadlines.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION REGARDING MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

CHASE RIVELAND, Special Master.

## INTRODUCTION

This Court entered a Stipulated Order for Permanent Injunctive Relief in this action ("Permanent Injunction") on March 9, 2004. Among its provisions is the following requirement:

> The use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in *United States v. Comito*, 177 F.3d 1166 (9th Cir.1999). The Policies and Procedures shall include guidelines and standards derived from such law.

*See* Ex. A at 6 (Permanent Injunction).

While Defendants distributed policies and procedures in 2004, the parties have not agreed as to their adequacy. Further dispute arose when, in 2006, Defendants wished to amend practices based on recent case law.

The parties met and conferred concerning this Permanent Injunction requirement in 2007. In August 2007, the parties determined that they wished to seek clarification of what the law requires in light of recent developments in case law. They chose to pursue a fact-finding hearing held by the Special Master with Report and Recommendation to the Court, and *de novo* review by the Court, as provided for in Paragraph IV.E of the Stipulation and Amended Order Re: Special Master Order of Reference.

On December 14, 2007, this matter came on for hearing. Documents were produced in response to two requests for production. Having reviewed the pleadings, arguments of counsel, and documents, the Special Master submits the following Report and Recommendation for the Court's consideration.

## FINDINGS OF FACT

1. Policies and procedures concerning the application of *Comito* and related case

---

1. The plaintiffs also request the court modify the Report to state that the denial of plaintiffs' motions are made without prejudice. It ap-

pears that this is apparent by the language employed by the Special Master and that such modification is unnecessary.

law were distributed to Defendants' staff in July 2004. Ex. B at 68:16—69:17 (Reporter's Transcript of 12/14/07 Hearing).

2. As illustrated in the examples below, these policies and procedures contain inaccurate statements concerning parolees' confrontation rights under the controlling law stated in *Comito,* 177 F.3d 1166. Ex. C (CDCR Resource Documents 1, 2, 3 ("RD")). For example, the "Hearsay" section of Resource Document 1 states that the *Comito* balancing test:

> balances the parolee's right to confrontation against the use of the hearsay evidence.

Ex. C, RD1 p. 8. As will be discussed *infra,* the test balances "the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Comito,* 177 F.3d at 1170. The same document describes a Deputy Commissioner's task as:

> determining that the parolee's right to confront is outweighed by the trustworthiness of the evidence.

Ex. C, RD1 p. 8. While trustworthiness is a factor that can lessen the parolee's interest, under *Comito,* trustworthiness alone cannot completely outweigh that interest. *See infra* at 859. In Resource Document 2, a summary of the right to confront and cross-examine adverse witnesses indicates:

> the [Deputy Commissioner] can deny the confrontation of an adverse witness if it is shown that the witness is unavailable for good cause, or determined to be either fearful or confidential.

Ex. C, RD2 p. 3. This omits any mention of the required assessment of the parolee's interest in confrontation and weighing it against the described good cause. A Resource Document 3 summary of the *Comito* balancing test reads:

> [the test] balances the parolee's right to confrontation against the need for the evidence to the disposition of the case and the trustworthiness of the information.

Ex. C, RD3 p. 2. This is the converse of the preceding example; it describes the assessment of the confrontation interest, but omits the good cause assessment prong of the test.

In these policies and procedures, there also are repeated references to all relevant evidence, or all hearsay evidence, being admissible. *See, e.g.,* Ex. C, RD1 pp. 2, 3, 4, 5, 12. While some references are accurately quoting statutes or regulations, the repeated references send a message contrary to the controlling law that some relevant or hearsay evidence should be excluded after conducting a balancing test.

3. Defendants assert that the distributed policies and procedures include guidelines and standards that comply with the mandate set forth in Paragraph 24 of the Permanent Injunction. Ex. B at 68:16—69:17. A review of those policies and procedures reveals that any guidelines and standards to be found therein are insufficiently detailed to provide the guidance contemplated by this Permanent Injunction requirement. Ex. C.

4. After the Ninth Circuit issued its opinion in *United States v. Hall,* 419 F.3d 980 (2005), Defendants informed Plaintiffs of their position that hearsay evidence that falls within a recognized hearsay exception may be admitted without applying the *Comito* balancing test. Ex. B at 6:25—8:20; Ex. A–Sealed at 1:7–12 (Reply Declaration of Ernest Galvan in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction).

5. The record indicates that Defendants have discussed changes to their policy concerning admission of hearsay exceptions but have not yet instructed their staff

to admit proffered evidence under a hearsay exception without applying the *Comito* balancing test. Ex. 2 to Ex. F (Reply Declaration of Loren G. Stewart in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction); Ex. B at 8:24—9:5. In training in March and April 2007, Deputy Commissioners were told that Defendants were exploring the possibility of changing this practice, but to continue to apply the *Comito* balancing test at that time. Ex. 4 to Ex. A–Sealed at 46 (CDCR *Valdivia* Compliance Report 9/26/07). In a November 2006 Deputy Commissioner academy session, instructors mentioned hearsay exceptions but did not make any explicit link to any effect they may have on the *Comito* balancing test. Ex. D at 2:1–3 (Declaration of Loren G. Stewart in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction).

6. Only a small majority of experienced Deputy Commissioners are lawyers, as is only one of the recent hires. Ex. B at 81:1–21. Taken together, this means that a minority of the Deputy Commissioners currently serving are lawyers. While a background in law is not a requirement (*see Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)), there is no evidence in the record that the non-attorneys have any familiarity with evidentiary law apart from the training Defendants provide.

7. Training provided to Deputy Commissioners consists of three to three and one-half hours of instruction in an academy shortly after their hire. Ex. E (Board of Parole Hearings Deputy Commissioner Training 12/20/07); Ex. D at 1:22–25. Continuing education was offered in and March and April 2007 for one and one-quarter hours. Ex. 5 to Ex. A–Sealed (Board of Parole Hearings Deputy Commissioner Workshop 3/27/07).

8. When Plaintiffs' counsel attended training sessions, they formed the opinion that the trainings "provided confusing and inconsistent messages regarding the standards and procedures to be followed under the controlling *Comito* case." Ex. D at 1:6–10, 2:4–13.

9. As described in the following paragraphs, all parties are aware that, in practice, there have been deficiencies in the application of *Comito* and related case law to evidentiary questions. Defendants have observed instances of Deputy Commissioners failing to apply the required balancing test, and other instances where the balancing conducted was inconsistent with the *Comito* standard. Ex. B at 71:21—72:16. One of Defendants' staff asserted that it was a common mistake for Deputy Commissioners to admit evidence central to the ultimate finding *because* it was central to the finding, when such evidence should weigh against admission because it heightens the parolee's confrontation interest. Ex. D at 1:25–28. A Deputy Commissioner confirmed that was his approach during an interview with Plaintiffs' counsel. Ex. B–Sealed at 1:23–24 (Reply Declaration of Anne Mania in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction).

10. Plaintiffs' counsel have observed Deputy Commissioners failing to apply the required balancing test, and other instances where, in Plaintiffs' counsel's assessment, the balancing conducted did not follow the *Comito* standard. Ex. 1 to Ex. B at 5–7 (Notice of Motion and Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction); Ex. B–Sealed. Plaintiffs' counsel have also observed confusion about the standard expressed by Deputy Commissioners and Associate Chief Deputy Commissioners as recently as March 2007. Ex. D at 2:4–13.

11. Documents concerning revocation hearings, submitted as evidence by Plaintiffs, contain two examples of a Deputy Commissioner incorrectly applying the relevant balancing test. One discussion reads:

> P's interest in confrontation weighed against the importance of witnesses' testimony to the final finding of fact is lesser than the reliability of the hearsay evidence and the corroboration of it.

Ex. 3 to Ex. C–Sealed at 5 (Reply Declaration of Kristen Palumbo in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction). No reason was given for the declarants' absence. *Id.* at 1. The established test is to balance the parolee's confrontation interest against the State's good cause for denying it; in the absence of any discussion of good cause for declarants' absence, the correct balancing test could not have been carried out. Additionally, importance of the evidence to the ultimate finding is a factor that heightens the parolee's confrontation interest, not a factor to be weighed against it. *See infra* at ——.

In another revocation hearing, the Deputy Commissioner acknowledged multiple prongs to the test but did not employ them. Ex. E–Sealed at 3:17, 4:21–24; Ex. F–Sealed; Ex. H–Sealed at 34:4–37:3 (Transcript of Revocation Hearing for Parolee 2).[1] She considered the reliability of the hearsay based on its status as, or similarity to, documents that would fall under a business records exception, as well as reliability established by corroborating evidence. Ex. H–Sealed at 34:4–37:3. The Deputy Commissioner did not discuss the strength of the parolee's confrontation interest, the importance to the ultimate finding, or the good cause for not produc-

ing the declarants, nor the relative weight among them. *Id.*

12. Transcripts of audiotaped revocation hearings, submitted as evidence by Plaintiffs, contain an example of a Deputy Commissioner dismissing a confrontation rights objection without applying the relevant balancing test. Ex. 1 to Ex D–Sealed at 8:1–12 (Reply Declaration of Shirley Huey in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction).

13. The administrator of the panel of attorneys representing parolees in hearings has disagreed with some applications of the *Comito* standards. Ex. 1 to Ex. A–Sealed at 34 (First Report of the Special Master on the Status of Conditions of the Remedial Order).

14. Interviewing some Division of Adult Parole Operations staff gave the Special Master the impression that they hold many uncertainties and misinformation regarding hearsay information and *Comito* requirements. Ex. 1 to Ex. A–Sealed at 34. Those staff perceived Deputy Commissioner decisions in applying the *Comito* standard to be inconsistent and sometimes inappropriate. *Id.* As recently as August 2007, many Division of Adult Parole Operations staff reported to Defendants' self-monitoring teams that they were confused about providing evidence under the standards. Ex. 4 to Ex. A–Sealed at 47; Ex. 3 to Ex. A–Sealed at 9–11 (CDCR *Valdivia* Monitoring Report Santa Rita County Jail).

15. The above-described confusion and inconsistency was observed and expressed three years into implementation of policies and procedures arising from *Valdivia* Permanent Injunction Paragraph 24 obligations. (Policies distributed in July

---

1. To the extent that any portions of Ex. G–Sealed have not been authenticated, the Special Master takes judicial notice of the transcript under Federal Rule of Evidence 201.

2004—Ex. B at 69:15–17; observations March 2007 and August 2007, *supra.*)

16. The scope of the problems detailed above is unknown at this time. Defendants have not tested Deputy Commissioners' understanding subsequent to training. Ex. B at 69:22—70:12. During self-monitoring visits and staff supervision, Defendants observe some Deputy Commissioners in hearings, as do Plaintiffs in their monitoring, but neither party has undertaken any systematic assessment of Deputy Commissioners' skill and accuracy in applying the legal standards concerning confrontation rights. Ex. B at 70:13—71:15.

17. A case presented as evidence by Plaintiffs includes a Deputy Commissioner sustaining a confrontation rights objection and postponing the revocation hearing in response. Ex. E–Sealed at 6:15–19, 7:6–10 (Declaration of Shirley Huey in Support of Plaintiffs' Notice of Motion and Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction); Ex. F–Sealed (Plaintiffs' Notice of Lodging of Revocation Hearing Transcripts); Ex. G–Sealed at 16:21–25, 23:25–24:20 (Transcript of Revocation Hearing for Parolee 3).[2] The parolee admitted a charge and did not admit two others. Ex. G–Sealed at 10:9–11:2.

His attorney argued the need to cross-examine several listed witnesses, including the alleged victim, percipient witnesses, and involved law enforcement; those witnesses were subpoenaed and did not appear. Ex. G–Sealed at 7:2–8:13, 16:21–25, 21:24–22:22. Concerning some of the witnesses, there was some discussion concerning contact efforts, nonappearance reasons, and assistance, but information was limited. Ex. G–Sealed at 7:9–8:13, 14:4–15:3, 16:10–17, 22:23–23:24. The reasons for the arresting or investigating officers' failure to appear were not discussed. *Id.*

The Deputy Commissioner did not apply a *Comito* balancing test to determine whether to admit the proffered hearsay derived from the absent witnesses. Ex. G–Sealed at 16:21–25, 23:25–24:20. He found good cause on the admitted charge and postponed the hearing as to the other two charges while encouraging the parties to secure the witnesses' appearance. Ex. G–Sealed at 23:25–24:20.

18. The scope is unknown for the practice of Deputy Commissioners postponing hearings in order for the State to present more competent evidence after a confrontation rights objection. Neither party has undertaken a systematic review. Ex. B at 37:7—40:21.

19. The mechanism available for reviewing a disputed evidentiary decision is a writ of *habeas corpus* to the Superior Court. Ex. B at 75:15–21. Regulations provide for a process for the Board of Parole Hearings to review decisions of Deputy Commissioners. The record is not clear as to whether this process is available to parolees. Ex. B at 77:8—79:2, 82:7–12.

## CONCLUSIONS OF LAW

### I. Parolees' Right to Confrontation

20. The Fifth and Fourteenth Amendments serve as the source of the rights of a parolee in a revocation proceeding; he is not entitled to the full protections of the Sixth Amendment. *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *United States v. Hall,* 419 F.3d 980, 985–86 (9th Cir2005). Among the more limited rights due process affords, however, is the right "to confront and cross-examine adverse witnesses

---

**2.** To the extent that any portions of Ex. G–Sealed have not been authenticated, the Special Master takes judicial notice of the transcript under Federal Rule of Evidence 201.

(unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593.

21. For purposes of a due process analysis, courts have treated parole revocation, probation revocation, and supervised release proceedings as essentially equivalent. *United States v. Martin,* 984 F.2d 308, 310 (9th Cir.1993) (citing *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) and Fed.R.Crim.P. 32.1). The authority cited *infra* will draw on each of the types of proceedings.

■ 22. In the Ninth Circuit, the prevailing method of determining whether to admit hearsay without the ability to confront the adverse witness is to apply a balancing test laid out in *United States v. Comito,* 177 F.3d 1166 (9th Cir.1999). The test requires the decisionmaker to determine the degree of the parolee's interest in confrontation and weigh that against the government's good cause for not producing the adverse witness. *Id.* at 1170. This is a very individualized determination based on the facts and circumstances of each case. *Id.* at 1172; *United States v. Martin,* 984 F.2d 308, 310–11 (9th Cir.1993).

23. Factors that heighten the parolee's interest include the importance of the proffered evidence to the ultimate finding and low reliability of the evidence. *Martin,* 984 F.2d at 311. Common factors going to the government's good cause include the efforts taken to produce the witness, the difficulty and expense of doing so, and concerns for the safety of a confidential informant. *Hall,* 419 F.3d at 988; *Gagnon,* 411 U.S. at 783 n. 5, 93 S.Ct. 1756; *Morrissey,* 408 U.S. at 487, 92 S.Ct. 2593. Other factors may be taken into account, such as the severity of the penalty potentially to be imposed. *Martin,* 984 F.2d at 312.

## II. Hearsay Exceptions

24. The parties disagree about the treatment of hearsay exceptions in revocation proceedings. When proffered evidence falls within a hearsay exception, Plaintiffs take the position that decisionmakers should take this into account by adjusting the weight given in the balancing test in accord with the reliability traditionally associated with such evidence. Ex. 1 to Ex. B at 13:23—14:4. Defendants take the position that proffered evidence falling within a hearsay exception can be admitted without more. Ex. 2 to Ex. B at 2:5–8. Defendants argue that (1) to do otherwise is to afford more rights to parolees facing revocation than to accused criminals facing prosecution and (2) the indicia of reliability inherent in such evidence establishes good cause for denying confrontation sufficient to render balancing unnecessary. *Id.* at 9:9–11, 2:8–12.

### *Authority for use of hearsay exceptions in revocation proceedings*

25. Neither the Supreme Court nor the Ninth Circuit has ruled directly on whether hearsay exceptions obviate the need for a balancing test in parole revocation proceedings. As discussed below, while some Ninth Circuit authorities suggest the court may favor admitting proffered evidence on the basis that it falls within a hearsay exception, the question has not been posed directly to the court; rather, the inference arises from *dicta* or from the types of evidence it allowed.

*Hall* gives perhaps the strongest indications of the Ninth Circuit's inclination concerning hearsay exceptions. In *Hall,* the court considered whether due process was satisfied when unsworn verbal allegations regarding two separate charges were admitted in a supervised release revocation proceeding. *Hall,* 419 F.3d at 986–89. The court began by employing the *Comito*

balancing test in analyzing the first charge. *Id.* at 986. It determined that the defendant's interest in confronting the unsworn statements as to that charge was fairly low because there was sufficient non-hearsay evidence to sustain the charge and the hearsay therefore added little to the ultimate finding. *Id.*

The court then went on to add a paragraph that is not anchored either in what precedes it or follows it. The court wrote:

> In addition, several pieces of evidence supporting the domestic violence allegation are admissible under hearsay exceptions. Although the Federal Rules of Evidence do not strictly apply to revocation hearings [citations omitted], long-standing exceptions to the hearsay rule that meet the more demanding requirements for criminal prosecutions *should* satisfy the lesser standard of due process accorded the respondent in a revocation proceeding.

*Id.* at 987 (emphasis added). The court then concluded its balancing without expressly employing the evidence subject to hearsay exceptions. *Id.* It did not discuss how such evidence would or should be used within a balancing test. It did not rule that evidence that falls within a hearsay exception obviates the need for *Comito* balancing. It made this assertion and then continued and completed the balancing test. The court did not discuss hearsay exceptions when it went on to apply the *Comito* balancing test to the evidence of the second charge. *Id.* at 987–89. The evidence subject to hearsay exceptions was not at issue in the appeal. Given the equivocal language (*"should* satisfy" due process) and the lack of a direct ruling, this *dicta* is arguably indicative of the court's inclinations, but cannot be said to be dispositive on the hearsay exception issue.

26. Other relevant Ninth Circuit cases cited by the parties preceded *Comito* and did not discuss hearsay exceptions as a whole. The cases implicitly raised the business document and public records exceptions by virtue of the types of contested evidence at issue; one of these cases explicitly mentioned the public records exception.

In *United States v. Walker,* 117 F.3d 417 (9th Cir1997), the court found it was harmless error to admit evidence of a single date from documentary hearsay that should have been subjected to a balancing test but was not. *Walker,* 117 F.3d at 420–21. The court's rationale focused on the reliability of the date in light of the defendant's failure to challenge the document's reliability and to present contrary evidence. The court noted, but did not rule, that the document was *"most likely* admissible as a public records exception." *Id.* (emphasis added).

In *United States v. Simmons,* 812 F.2d 561 (9th Cir1987), the court held that admission of hospital records at a probation revocation hearing was not plain error in light of the "traditional indicia of reliability that these records bear." *Id.* at 564–65. The court's analysis appears to attach to the specific evidence in the case—hospital records.

In *United States v. Miller,* 514 F.2d 41 (9th Cir1975), the court found no prejudice to defendant when the lower court admitted into evidence unauthenticated copies of state court criminal records, which showed that defendant had been convicted of criminal offenses while on probation. Although the defendant had objected to the introduction of the records at the revocation hearing, he had not challenged the accuracy of the information revealed by the records, nor had he offered any evidence to refute the claimed convictions. *Miller,* 514 F.2d at 42. Based on these facts, the

court found the unrefuted evidence reliable and admissible under *Morrissey* and *Gagnon*. *Id.* at 42–43.

*Martin* discussed the expectations of reliability that should be accorded urinalysis reports, implicitly as evidence commonly treated as a business records exception. *Martin*, 984 F.2d at 313–14. The court held that the defendant had a right to confront that evidence to impeach factors such as efficacy of procedures, experience, and qualifications. *Id.* at 312–14.

In nearly all of the cases discussed above, the court's language indicates that the narrow facts—a date, a court's record of convictions—are particularly significant to the holding. *Walker*, 117 F.3d at 421; *Miller*, 514 F.2d 41; *Simmons*, 812 F.2d at 564–65. One case suggests recognizing documents subject to one hearsay exception (*Walker*, 117 F.3d 417); another rejects categorically admitting even a subset of that same hearsay exception (*Martin*, 984 F.2d at 313–14). There does not appear to be a clear record for treating these rulings as generalizable. Indeed, the court in *Martin* wrote:

> [A]rbitrariness is achieved just as surely by the incremental creation of blanket exceptions as by the outright abandonment of fair procedure.

*Martin*, 984 F.2d at 314 n. 9.

27. All of the Ninth Circuit cases, including those appearing to advocate admission on the basis of hearsay exceptions, continue to recognize the *Comito* balancing test as the norm. None of these cases admits a contested piece of evidence expressly on the basis that it falls within a hearsay exception and without conducting a balancing test. Nor does any court rule directly on whether hearsay exceptions categorically establish admissibility. While the Ninth Circuit may use the cited cases as a basis to extend its holdings in the future, it has not yet done so.

28. The Second Circuit, on the other hand, does appear to hold that hearsay exceptions render the balancing test unnecessary. In *United States v. Jones*, 299 F.3d 103, 113 (2d Cir.2002), the court found it was not an abuse of discretion to admit evidence under the present sense impression and excited utterance exceptions. *Jones*, 299 F.3d at 113. The Second Circuit distinguished the case from preceding authority requiring a balancing test on the basis that hearsay exceptions applied. *Id.* Alternatively, the court wrote, in the Second Circuit's balancing test, the hearsay exceptions would serve to satisfy the required element of reliability. *Id.* at 113–14. In reaching that conclusion, however, the court relied on cases whose validity has now been called into question by a subsequent United States Supreme Court decision (see *infra* at ———– ———).

*United States v. Aspinall*, 389 F.3d 332 (2d Cir.2004), followed the rule laid out in *Jones*, applying it to documents potentially falling under the business records exception. *Aspinall*, 389 F.3d at 343–46. *United States v. Williams*, 443 F.3d 35 (2d Cir.2006), also cited this rule, although it went on to conduct a balancing test because the involved hearsay exception was not firmly rooted. *Williams*, 443 F.3d at 45–46.

29. One other Circuit offers reason to believe it might employ hearsay exceptions in parole revocation proceedings. In *Prellwitz v. Berg*, 578 F.2d 190 (7th Cir. 1978), the Seventh Circuit cited the *Morrissey* dictates of a:

> right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation),

but then wrote,

> forcing the state to show good cause for not producing the hearsay declarant

would unwisely extend the limited due process rights of a probationer at the revocation hearing. *Prellwitz,* 578 F.2d at 192. The basis for rejecting the *Morrissey* requirement was not made explicit. The Ninth Circuit, in *Comito,* expressly held that requiring the state to show good cause was critical. *Comito,* 177 F.3d at 1170.

The court in *Prellwitz* offered two reasons that admitting the contested evidence was proper: that the documents were a "conventional substitute for live testimony" permitted by *Gagnon* and that they bore indicia of reliability, using language suggesting this was premised on the business records exception. *Prellwitz,* 578 F.2d at 192–93. This case, however, preceded *Comito* by two decades, and as noted, employed rationale that *Comito* squarely rejected.

### Rights in relation to criminal defendants

30. It is a significant concern that procedures for parolees do not exceed the rights due criminal defendants. As noted above, it is well-established that the process due in parole revocation and similar proceedings is distinctly limited in relation to the rights of criminal defendants, and that due process for parolees arises from the Fifth and Fourteenth Amendments rather than the Sixth Amendment. *Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593; *Hall,* 419 F.3d at 985–86.

Defendants cite to two Supreme Court decisions, which held that evidence that falls within a firmly-rooted hearsay exception has sufficient guarantees of reliability to satisfy the Confrontation Clause requirements in criminal proceedings. Ex. 2 to Ex. B at 6:3–14, citing *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Defendants argue that, given the High Court's decisions, that same evidence should be sufficiently reliable to be admitted under the less rigorous protections in a revocation proceeding, a principle discussed in *Hall.* Ex. 2 to Ex. B at 6:3–14.

Plaintiffs argue that the principle announced in *White* and *Wright* was overturned in *Crawford v. Washington;* Plaintiffs are only partially correct. Ex. 3 to Ex. B at 5:7—7:2. In *Crawford,* the Supreme Court held that testimonial evidence could not be admitted without confrontation in a criminal trial unless the declarant was unavailable and the accused had had a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). But the Court expressly limited its holding to testimonial evidence, which, while not fully defined, included, at a minimum, prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations. *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Court left open the possibility that its earlier cases might still control as to other types of hearsay. *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. ("Where non-testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.") The Court expressly declined to say whether it would overrule *White,* one of the cases standing for the proposition that hearsay within a firmly rooted exception satisfies the Sixth Amendment Confrontation Clause. *Id.* at 61, 124 S.Ct. 1354.

The Supreme Court has subsequently ruled on one distinguishing aspect between testimonial and nontestimonial evidence in the context of statements to police. *Davis v. Washington* (2006) 547 U.S. 813 [165

L.Ed.2d 224, 126 S.Ct. 2266]. In *Davis,* the Court found that statements, which the trial court had treated as excited utterances and present sense impressions, were testimonial because they were made after the events and the primary purpose was to establish or prove past events potentially relevant to later criminal prosecution. *Id.* at 2272, 2273–74. It does not appear that the Supreme Court has issued any further decisions concerning the treatment of hearsay exceptions after *Crawford.*

Thus, it is unsettled whether, and which, hearsay exceptions now provide guarantees of trustworthiness sufficient to satisfy the demands of the Confrontation Clause. *United States v. Weiland,* 420 F.3d 1062, 1076 (9th Cir2005) ("If the evidence is nontestimonial, there is uncertainty as to whether the 'indicia of reliability' or firmly rooted hearsay exception test enunciated in *Ohio v. Roberts* survives *Crawford.*" [citations omitted])

It is undisputed that *Crawford* does not apply to parole revocation and similar proceedings. *See Hall,* 419 F.3d at 985. Given the uncertainty in the law in the criminal context, however, no analogy can be drawn as to the standard for admission in the more flexible revocation proceedings. In the absence of clarity about criminal defendants' rights, the Special Master cannot say whether the *Comito* balancing test would afford greater or lesser rights to parolees.

31. More persuasive is the argument that, when viewed in context, parolees continue to have significantly fewer rights in revocation proceedings. Ex. 3 to Ex. B at 4:20–27. Even if it were determined that not treating hearsay exceptions as *per se* admissible affords greater rights to parolees than criminal defendants, the advantage is limited to that aspect of the proceeding. Criminal defendants receive the full protections of the Confrontation Clause, other aspects of the Sixth Amendment, the rules of evidence, and the State's higher burden of proof, none of which is available to parolees facing revocation. *Id.*

### Reliability as an independent test

32. Defendants present several arguments concerning the role of reliability in determining the admissibility of hearsay. They argue that the indicia of reliability inherent in hearsay exceptions provide an independent basis for admission, rendering any balancing test unnecessary. Ex. 2 to Ex. B at 2:5–12, 7:12–13; Ex. 4 to Ex. B at 6:16–17. Alternatively, Defendants argue that indicia of reliability establish good cause for denying confrontation, either because reliability, alone, can satisfy good cause (Ex. 2 to Ex. B at 2:11–12; Ex. 4 to Ex. B at 2:17–19, 6:16–17, 8:18–23), or because reliability is one of the factors in determining good cause (Ex. 2 to Ex. B at 3:24–26, 10:18–19; Ex. 4 to Ex. B at 3:23–28). Assuming *arguendo* that reliability of evidence can establish good cause, Defendants do not explain whether, or how, such good cause automatically outweighs the confrontation right in every instance. Finally, Defendants also indicate that reliability may be a factor on *both* sides of the balancing test. Ex. 2 to Ex. B at 11:14–16.

33. The courts' use of reliability has been highly inconsistent. Some of the Ninth Circuit's earlier cases decided hearsay admissibility on reliability alone. *Miller,* for example, allowed in unauthenticated, but unrefuted, copies of court file contents, declaring them reliable without further discussion. *Miller,* 514 F.2d 41. *Simmons* noted a line of cases, including *Miller,* which determined admissibility of evidence using the reliability rationale. *Simmons,* 812 F.2d at 564. Although the court in *Simmons* identified *Morrissey* and *Gagnon* as calling for a balancing of the defendant's right to confrontation against the government's good cause for

denying it, it did not apply that test. The court affirmed the admission of certified hospital records on the basis of their traditional indicia of reliability. *Id.* at 564–65.

The Ninth Circuit next began applying the balancing test described in *Simmons* and treated reliability as an element of the good cause prong. *See Martin,* 984 F.2d at 312 (determining degree of good cause by looking to both the difficulty and expense of procuring witnesses *and* the traditional indicia of reliability of the proffered evidence). *Walker* reinforced the balancing test as a requirement but acted on the basis of reliability alone to find that admission without balancing was harmless error. The evidence at issue was solely a date and was unrefuted. *Walker,* 117 F.3d at 421.

The *Comito* decision followed, endorsing and developing the previously announced balancing test. *Comito* dictates considering reliability when assessing the confrontation right prong of the test:

> Comito's interest in confronting Connell directly was further strengthened by the nature of the disputed hearsay evidence. Unsworn verbal allegations are, in general, the least reliable type of hearsay, and the particular utterances at issue here bore no particular indicia of reliability.... Because the hearsay evidence was important to the court's finding, and because it involved the least reliable form of hearsay, Comito's interest in asserting his right to confrontation is at its apogee.

*Comito,* 177 F.3d at 1171.

The only subsequent Ninth Circuit case on point that the parties have identified appears to use reliability three different ways at different points in the opinion. In *Hall,* the court first used reliability in determining the degree of the parolee's confrontation right. *Hall,* 419 F.3d at 988.

Following *Martin,* the court then weighed reliability as one factor on the good cause side of the balance as well. *Id.* When summarizing that same section, however, the court seemed to say that reliability was a factor *separate* from good cause. *Id.* at 989. ("Although Hall had a strong interest in confronting Hawkins with regard to the false imprisonment charge, on balance, that interest is outweighed by the government's good cause for not producing Hawkins as a witness *and* the independent indicia of reliability that support Hawkins' statements to Officer Gross." (emphasis added))

34. Other, varied practices are evident in other circuits. The Second Circuit seems to *add* reliability to the balancing test, weighing both reliability and good cause against the right to confrontation (unless the evidence has already come in under a hearsay exception, as discussed above). *See United States v. Chin,* 224 F.3d 121, 124 (2d Cir.2000); *accord Aspinall,* 389 F.3d at 343; *accord Williams,* 443 F.3d at 45.

35. The cases that indicate that reliability alone suffices for admission are the United States Supreme Court cases whose validity has been called into question by *Crawford;* Seventh, Second, and Fourth circuit cases; and California state cases. *See, e.g., Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. Jones,* 299 F.3d 103 (2d Cir.2002); *Prellwitz v. Berg,* 578 F.2d 190 (7th Cir.1978); *United States v. McCallum, 677 F.2d 1024, 1026–27 (4th Cir.),* cert. denied, 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982); *People v. Maki* (1985) *39 Cal.3d 707, 217 Cal.Rptr. 676, 704 P.2d 743; People v. Abrams,* 158 Cal. App.4th 396, 69 Cal.Rptr.3d 742 (2007).

36. *Comito* established its balancing test after the cases in which reliability was

used as the sole basis for admission, save two California Court of Appeal cases. Given that the Ninth Circuit initially used a reliability approach, and then adopted a multifactorial test throughout the 1990s, it is reasonable to assume that the Ninth Circuit deemed reliability, alone, an insufficient basis for admission. Indeed, in *Comito*, the court rejected the argument that reliability was enough on its facts, given the defendant's heightened confrontation interest:

> The Government also argues that, even absent a showing of difficulty in obtaining Connell's testimony, the hearsay evidence bears sufficient indicia of reliability, by virtue of the other testimony and evidence presented at the hearing, to make it admissible. Given the substantial nature of Comito's interest in confrontation and the absence of good cause for the Government's failure to produce the adverse witness, the supporting or corroborative evidence noted by the Government cannot suffice to deprive Comito of his constitutional right to confrontation.

*Comito*, 177 F.3d at 1172. *Martin*, likewise, used very strong language in rejecting the sole reliance on reliability on its facts:

> In essence, the government urges us to hold that urinalysis reports are so inherently reliable that they may be introduced in any revocation hearing . . . . such a blanket rule would be tantamount to abandonment of the *Simmons* balancing test; we would effectively hold that the weight of the defendant's right to confrontation is irrelevant in revocations involving urinalyses . . .

*Martin*, 984 F.2d at 313. *Hall*, too, followed *Martin*'s rejection of a blanket rule based on reliability when the court analyzed the second charge against the defendant. *Hall*, 419 F.3d at 988. The court added that, even when the evidence in question was reliable and corroborated, the defendant's "strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated" and completed the balancing test. *Id.* Thus, the most recent Ninth Circuit cases all identify circumstances in which reliability alone is insufficient, illustrating the need for a balancing test.

### Conclusion as to hearsay exceptions

■ 37. The existing case law does not provide sufficient reason for varying from established precedent. The Ninth Circuit cases support the continued use of the *Comito* test and do not provide a clear path toward treating hearsay exceptions differently. Persuasive authority varies substantially from the Ninth Circuit's reasoning in ways that the Ninth Circuit, through its writings, seems disinclined to adopt. *See, e.g., Martin*, 984 F.2d at 313–314; *Comito*, 177 F.3d at 1170.

The *Comito* balancing test serves all necessary purposes well. It serves administrative flexibility, one of the primary goals of the revocation proceedings jurisprudence. It recognizes that hearsay exceptions have an important role in admission decisions, by increasing reliability and reducing the weight of the parolee's interest in the balance. It helps ensure that revocation decisions are based on verified facts, to both the parolees' and the State's benefit. Use of the test does not give parolees more rights than criminal defendants who are protected by the rules of evidence, the Confrontation Clause, and other guarantees not afforded to parolees. Without any mandate arising from the case law, any change would be within this Court's discretion. The Court should opt to retain the existing standard set forth in *Comito*.

In fact, *per se* admission based on hearsay exceptions would likely have unintended deleterious effects on justice, predictability, and administrative flexibility. Those cases favoring the categorical admission based on hearsay exceptions involved supervised release and probation revocation decisions that were made by judges. *See, e.g., Williams,* 443 F.3d 35; *Jones,* 299 F.3d 103; *Aspinall,* 389 F.3d 332; *Hall,* 419 F.3d 980. Fewer than half of Defendants' hearing officers (Deputy Commissioners) are lawyers. Ex. B at 81:1–21. The record shows that some of Defendants' staff, the Special Master, and observers already perceive confusion and unreasonable variability in the application of the existing balancing test. Findings of Fact, *supra,* ¶ 9–16. To introduce, as new concepts, the nuances of hearsay exceptions and all of their conditions, and to require facility in applying those tests as well as the *Comito* balancing test—including recognizing and managing hearsay that requires balancing that exists within evidence admissible under an exception—is an invitation to worsening predictable outcomes consistent with due process, not to mention undermining the administrative ease and flexibility meant to attach to these less formal proceedings.

### III. Corroboration for hearsay

38. In applying the balancing test, corroboration may increase reliability for proffered hearsay. Defendants argue that various types of proffered evidence may serve as corroboration, including other hearsay; Plaintiffs disagree. Ex. 2 to Ex. B at 9:26–28.

39. While neither party offers federal authority directly on point, Defendants cite *Hall* and *Comito* as examples where hearsay was used to corroborate other hearsay, suggesting implicit endorsement of the practice. Ex. 2 to Ex. B at 10:2–4.

In *Hall,* the court analyzed separately the alleged victim's unsworn statements concerning a domestic violence allegation and a false imprisonment violation. *Hall,* 419 F.3d at 986–89. Because the government's good cause was found to outweigh the defendant's interest in confronting the hearsay offered on the first charge, the evidence was admitted. *Id.* at 987. The court then considered corroboration for the hearsay offered on the second charge. The corroboration took the form of: the hearsay statements on the first charge that were admissible by virtue of surviving the *Comito* balancing test, four pieces of testimony based on direct observations, defendant's admissions, and four pieces of testimony recounting the alleged victim's unsworn verbal allegations to those witnesses. *Id.* at 988. Thus, the court used both hearsay and nonhearsay evidence to corroborate the hearsay at issue; it did not discuss the differences between the types of corroboration, nor did it rule on what types are permissible.

In *Comito,* the court examined whether nonhearsay and hearsay evidence supported the *charge;* the court did *not* consider whether the corroborating evidence should make the contested piece of hearsay admissible. *Comito,* 177 F.3d at 1168–69. In fact, it noted:

> [w]hile the additional evidence may also be subject in whole or in part to valid objections based on hearsay and Comito's right to confrontation, those challenges are not raised before us.

*Id.* at 1169. This *dictum* emphasizes that the court was only working with the record before it; the gratuitous inclusion suggests that the court might not otherwise have admitted or used that hearsay. This court also did *not* rule on what types of corroboration are permissible.

40. There are also persuasive California state cases that may be useful to con-

sider. The California Supreme Court considered corroborating evidence while applying a test similar to that employed in *Comito*. In *People v. Arreola* (2004) 7 Cal.4th 1144, 31 Cal.Rptr.2d 631, 875 P.2d 736, the California Supreme Court specified that corroborating evidence must itself be admissible:

> Thus, in determining the admissibility of the evidence on a case-by-case basis, the showing of good cause that has been made must be considered together with other circumstances relevant to the issue, including ... whether other *admissible* evidence, including, for example, any admissions made by the probationer, corroborates the former testimony
> ...

*Arreola,* 7 Cal.4th at 1160, 31 Cal.Rptr.2d 631, 875 P.2d 736 (emphasis added).

Similarly, one California appeals court ruled against California's Board of Parole Hearings in a challenge to the exact practice the Board now proposes. *See In re Miller,* 145 Cal.App.4th 1228, 52 Cal. Rptr.3d 256 (2006). In *Miller,* to corroborate the alleged victim's unsworn verbal statements to a law enforcement officer, the State offered hearsay statements of third-party witnesses and an uncertified medical report containing further unsworn statements by the alleged victim. *Id.* at 1238, 52 Cal.Rptr.3d 256. The court rejected this, writing:

> adopting such a criterion would eviscerate the need to provide indicia of reliability before hearsay evidence is received. Were this standard adopted, unreliable hearsay evidence could become reliable simply by attributing the evidence to several sources.

*Id.*

41. While the cases concerning corroboration raise uncertainties, on balance, it appears that these courts expect corroboration to come from competent evidence.

This is certainly consistent with traditions, and the Special Master recommends a ruling that corroboration may only be drawn from admissible evidence, which may include hearsay that has survived its own *Comito* balancing test analysis.

### IV. Continuing hearings beyond the *Valdivia* deadline

42. Plaintiffs allege that Defendants sometimes respond to a confrontation rights objection by postponing the hearing beyond the deadline prescribed by the Permanent Injunction, as an opportunity to provide more competent evidence. Ex. 1 to Ex. B at 19:9–24. It is undisputed that this practice occurs, though Defendants take the position that seeking further evidence for this reason can constitute good cause for exceeding the deadline. Ex. B at 92:4–8. Plaintiffs provided the revocation hearing record of a case in illustration. *See supra* at ——–——. The record contains no further evidence of the potential frequency or impact of such a practice. Ex. B at 37:7—40:21. Neither party provided authority for their positions.

43. There is merit to the arguments that a parolee has a right to expect a *final* hearing within 35 days, as required by Paragraph 22 of the Permanent Injunction, and that the State must meet or fail in its burden by that time, absent unforeseeable events. However, there is not sufficient evidence in the record to support a court order, so the Special Master does not recommend one.

### V. Representation for writs of habeas corpus

44. Plaintiffs take the position that, in order to enforce confrontation rights, parolees should have representation available for writs of *habeas corpus.* Ex. 1 to Ex. B

at 20:22—21:3. Plaintiffs assert that Defendants should be required to fund this representation because the complexity of the issues necessarily carries the risk of error, implementation has been problematic long-term, and the rights at stake are critical. Ex. B at 79:16—80:25; Ex. 1 to Ex. B at 20:15—21:16.

Plaintiffs note that Defendants committed to funding writ representation as to one other potential violation of the Permanent Injunction, designation of confidential information. Ex. 1 to Ex. B at 21:3–5. Appellate representation is not funded for any other Permanent Injunction provision, so this would be a significant departure from current practice and a substantial increase in Defendants' obligations. The risk of harm to individuals whose confrontation rights are denied unreasonably is, without a doubt, significant. Were those parolees entirely without a remedy, we would face a different situation, but they do have the remedy of writs of *habeas corpus*. It is likely that many parolees' lack of sophistication and resources hinder effective use of this system. But the parties did not present any authority compelling Defendants to take responsibility for counteracting this, or any reason to believe that the proposed funding would not be better spent on an internal system to identify and rectify these problems directly. The Special Master recommends denying the request for an order requiring Defendants to fund such representation.

## RECOMMENDATIONS

A. Defendants distributed policies and procedures as required by the relevant provision of the Permanent Injunction. Defendants provide some instruction on applying the legal standards and exercise some oversight. When Defendants took a position that their obligations had changed, it was based on a good faith interpretation of the case law. It appears that they have not instructed Deputy Commissioners to vary from *Comito* balancing. They negotiated policy revisions in good faith and sought clarification of the legal standards before proceeding further in negotiations. Therefore,

■ The Court should not find a violation of the Permanent Injunction.

B. Nevertheless, Defendants have not demonstrated that they are in compliance with Paragraph 24 of the Permanent Injunction. Confusion, inconsistency, incorrect application of standards, and failure to apply the required tests have been known for a prolonged period. Yet Defendants have taken no action to identify the scope of the problem and have not taken adequate steps to address the conditions that perpetuate potential misapplications of the law.

Those conditions include the fact that some hearing officers have little experience in the law, training has been limited, policies and procedures contain inaccurate statements of applicable law, and Defendants have not subsequently assessed Deputy Commissioners' understanding nor provided detailed standards, guidelines, or tools to support decisionmaking.

Failures in evidentiary decisions carry a high risk of harm, including the denial of due process and denial of liberty without evidence adequate to meet the State's burden of proof. Defendants have not demonstrated the capacity to independently remedy these deficiencies. Therefore the Court should order:

1. The parties must undertake forthwith, and sustain, efforts to revise policies and procedures, including guide-

lines and standards, that incorporate these principles:

○ Decisions about whether to admit proffered hearsay must be made on case-by-case basis. The weight accorded the balancing test factors, contested evidence, and supporting evidence will vary with facts and circumstances.

○ Parolees have a right to confront and cross-examine adverse witnesses unless the Deputy Commissioner specifically finds good cause for not allowing confrontation; these two factors must be weighed against each other.

○ The principal factors in assessing the weight of a parolee's confrontation interest are (1) the importance of the proffered evidence to the ultimate finding and (2) the nature of the facts to be proven by the proffered evidence, which tends to be treated as an assessment of reliability.

○ The parolee's interest in confronting the contested evidence is high if the evidence will be important to the ultimate finding or if the evidence is potentially unreliable.

○ If the proffered evidence would be admitted in civil or criminal proceedings under a hearsay exception, this increases its reliability and makes it more likely to be admitted because the parolee's interest is lessened.

○ If nonhearsay evidence corroborates the proffered hearsay, this also increases reliability and makes the hearsay more likely to be admitted. Hearsay *cannot* be used *to* corroborate proffered hearsay unless it, too, survives a *Comito* balancing test.

○ The severity of the penalty a parolee faces is also a factor that could affect his confrontation interest.

○ The Deputy Commissioner must assess the good cause for the witness not testifying. This includes, at least, inquiring into the efforts made to have the witness attend, whether attendance is difficult or expensive, and whether the witness is a confidential informant whose identity is unknown to the parolee.

○ Reliability of the hearsay is *not* a factor in determining whether the state had good cause not to produce a witness.

○ Deputy Commissioners may also take into account other factors on either side of the balancing.

○ The final decision whether to admit the proffered hearsay is reached by comparing the strength of the parolee's interest concerning this particular evidence to the state's good cause and determining which outweighs the other.

2. Defendants must provide a plan, within 60 days after policies and procedures have been negotiated, that contains the following components:

○ Training must be provided to Deputy Commissioners, to parole agents and such other Division of Adult Parole Operations staff as Defendants believe are appropriate, and to attorneys representing parolees in revocation proceedings.

■ Plans for initial training should give serious consideration to contracting for the services of professional trainers with experience in evidentiary law and/or administrative proceedings willing to adopt

curriculum that results from the parties' efforts. If Defendants propose not to employ this method, they must provide a detailed description of enhanced training that will be as rigorous as training that would be provided under such a contract, and the Special Master must approve such a proposal.

■ Plans for initial training must include expeditious timelines for delivering the training and must identify the amount and source of funding necessary to carry it out.

■ Continuing education on applying the legal standards concerning confrontation rights to revocation proceedings must be provided, annually at a minimum, for all of the above-described staff and contract attorneys.

○ Deputy Commissioners must meet minimum standards in order to conduct the complex task of revocation hearings. Defendants' plan must define those minimum standards; the methods by which Defendants will determine whether Deputy Commissioners have met the standards; and the methods by which Defendants will determine whether Deputy Commissioners conducting revocation hearings continue to meet the standards, assessed at regular intervals and, at a minimum, annually.

○ Defendants' plan must include conducting a qualitative assessment, at regular intervals, of whether Deputy Commissioners are applying the standards within an acceptable range of discretion. This effort should include at least these components:

■ Develop, either internally or in conjunction with the administrators of the attorney panel representing parolees in revocation proceedings, an information system solution to support assessments. That system must capture information sufficient for Defendants to conduct systematic examinations of substantive due process questions. It must also permit aggregate analysis, identification of trends, sorting and reporting by relevant factors, and individual case analysis.

■ For each Deputy Commissioner conducting revocation hearings, Defendants' reviewers must observe him or her in those hearings at least twice annually.

■ The assessment must include an examination of what further training or remediation is needed for an individual or for staff more generally. That training should be provided expeditiously.

■ A system of remediation must include following the CDCR progressive discipline system. It should emphasize further training and counseling to develop an individual's skills, and make use of letters of instruction and further methods when necessary.

○ Any components of this plan that can practically be implemented independently must be implemented shortly after the parties reach agreement. They must not be held in abeyance pending completion of the full plans required under these orders.

○ Development of these policies, procedures, training, and plans shall proceed under the guidance of the Special Master. The Special Master or a Deputy Special Master shall lead negotiation sessions.

Alternatively, the parties may agree to negotiate in the absence of the Special Master and provide monthly progress updates, unless and until the Special Master determines that progress is unsatisfactory under this arrangement, at which time the Special Master would become involved in the negotiations.

C. No order is warranted concerning deferring hearings to obtain more competent evidence.

D. Representation for appeals is not required under the Permanent Injunction and is funded for only one type of potential violation. While Defendants' practices concerning confrontation rights are deficient and do not appear remediable without further Court oversight, Defendants have proceeded in good faith and there is no evidence that deficiencies are so egregious that they cannot be addressed without first attempting the remedies ordered above.

■ Plaintiffs' request to require the state to fund representation for writs of *habeas corpus* challenging decisions to admit contested evidence should be denied.

Feb. 8, 2008.

INDEX TO EXHIBITS

872

Ex. A Stipulated Order for Permanent Injunctive Relief

Ex. B Reporter's Transcript of 12/14/07 Hearing, with its exhibits

Exhibit 1 - Notice of Motion and Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Exhibit 2 – Defendants' Opposition to Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Exhibit 3 – Plaintiffs' Reply in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Exhibit 4 – Defendants' Response to Plaintiffs' Reply to Opposition to Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Ex. C CDCR Resource Documents 1, 2, 3

Ex. D Declaration of Loren G. Stewart in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Ex. E Board of Parole Hearings Deputy Commissioner Training 12/20/07

Ex. F Reply Declaration of Loren G. Stewart in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction, with some of its exhibits
Exhibit 2 – Defendants' letter dated June 8, 2007

Filed Under Seal

Ex. A-Sealed Reply Declaration of Ernest Galvan in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction, with some of its exhibits

Exhibit 1 – First Report of the Special Master on the Status of Conditions of the Remedial Order

Exhibit 3 - CDCR *Valdivia* Monitoring Report Santa Rita County Jail

Exhibit 4 - CDCR *Valdivia* Compliance Report 9/26/07

Exhibit 5 - Board of Parole Hearings Deputy Commissioner Workshop 3/27/07

Ex. B-Sealed Reply Declaration of Anne Mania in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Ex. C-Sealed Reply Declaration of Kristen Palumbo in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction, with some of its exhibits
Exhibit 3 – Form BPH 1103 for Parolee 3

Ex. D-Sealed Reply Declaration of Shirley Huey in Support of Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction, with its exhibit
Exhibit 1 – Transcript of Revocation Hearing for Parolee 1

Ex. E-Sealed Declaration of Shirley Huey in Support of Plaintiffs' Notice of Motion and Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction

Ex. F-Sealed Plaintiffs' Notice of Lodging of Revocation Hearing Transcripts

Ex. G-Sealed Transcript of Revocation Hearing for Parolee 3

Ex. H-Sealed Transcript of Revocation Hearing for Parolee 2

REPORT AND RECOMMENDATION REGARDING MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION
31

EXHIBIT A

BINGHAM McCUTCHEN
KAREN KENNARD – 141925
KRISTEN A. PALUMBO - 215857
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

PRISON LAW OFFICE
DONALD SPECTER – 83925
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

STEPHEN J. PERRELLO, JR. – 56288
P.O. Box 880738
San Diego, California 92618
Telephone: (858) 277-5900

RECEIVED
NOV 1 9 2003
ROSEN BIEN & ASARO

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
MARI L. WILLITS – 209612
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone (415) 433-6830

ALEX LANDON – 50957
2442 Fourth Avenue
San Diego, California 92101
Telephone: (619) 232-6022

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JERRY VALDIVIA, et al.,

　　　　Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, et al.,

　　　　Defendants.

No. Civ. S-94-0671 LKK/GGH

**STIPULATED ORDER FOR
PERMANENT INJUNCTIVE RELIEF**

COPY

## I. INTRODUCTION

1. This action was filed on May 2, 1994. Plaintiffs, on behalf of themselves and the class they represent, challenged the constitutionality of parole revocation procedures conducted by the California Board of Prison Terms ("BPT") and the California Department of Corrections ("CDC").

2. The Court certified this case as a class action by order dated December 1, 1994. The Plaintiff class consists of the following persons: (1) California parolees who are at large; (2) California parolees in custody as alleged parole violators, and who are awaiting revocation of their state parole; and (3) California parolees who are in custody, having been found in violation of parole and sentenced to prison custody.

3. The Defendants are state officials responsible for the policies and procedures by which California conducts parole revocation proceedings.

4. On June 13, 2002, this Court granted partial summary judgment in favor of Plaintiffs, holding that California's unitary parole revocation system violates the due process rights of the Plaintiff class under Morrissey v. Brewer, 408 U.S. 481 (1972), Gagnon v. Scarpelli, 411 U.S. 778 (1973), and related authority. The Court held that California's parole revocation system violated the due process clause of the Fourteenth Amendment by "allowing a delay of up to forty-five days or more before providing the parolee an opportunity to be heard regarding the reliability of the probable cause determination." Valdivia v. Davis, 206 F. Supp. 2d 1068, 1078 (E.D. Cal. 2002).

5. The parties stipulate that this is not a "civil case with respect to prison conditions," as those terms are defined and applied in the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, and that therefore this Order is not governed by the PLRA.

6. The parties hereby stipulate that the Court shall ADJUDGE, DECLARE, AND DECREE as follows:

## II. PARTIES

7. The Plaintiff class consists of the following persons: (1) California parolees who are at large; (2) California parolees in custody as alleged parole violators, and who are awaiting revocation of their state parole; and (3) California parolees who are in custody, having been found in violation of parole and sentenced to prison custody.

8. The Defendants are state officials responsible for the policies and procedures by which California conducts parole revocation proceedings. Defendant Arnold Schwarzenegger is Governor of the State of California and Chief Executive of the state government. Defendant Roderick Q. Hickman is the Secretary of the California Youth and Adult Correctional Agency. Defendant Edward S. Alameida, Jr., is Director of the California Department of Corrections. Defendant Richard Rimmer is Deputy Director of the California Department of Corrections, Parole and Community Services Division ("P&CSD"). Defendant Carol A. Daly is a Commissioner and Chair of the Board of Prison Terms ("BPT"). Defendants Alfred R. Angele, Sharon Lawin, Booker T. Welch, Jones M. Moore, and Kenneth L. Risen are Commissioners of the BPT. Defendant Kenneth E. Cater is Chief Deputy Commissioner of the BPT.

## III. DEFINITIONS

9. The following terms when used in this Order shall have the meanings specified below:

(a) "Parolee(s)" shall mean any member of the Plaintiff class.

(b) "Day(s)" shall mean calendar days, unless otherwise specified.

(c) "Revocation process" or "revocation proceedings" shall mean all stages of the process by which parole may be revoked, including placement of a parole hold, notice, waivers, service of Return to Custody Assessments, and hearings.

(d) "Return to Custody Assessments" ("RTCAs") shall mean the practice by which Defendants offer a parolee a specific disposition in return for a waiver of the

parolee's right to a preliminary or final revocation hearing, or both.

(e) "Parole hold" shall mean any invocation by Defendants of their authority to involuntarily detain a parolee for revocation proceedings under Section 3056 of the California Penal Code. This term shall not apply to the detention of a parolee who has absconded from the State of California until he or she is physically returned to the State of California and is in its custody.

## IV. POLICIES, PROCEDURES, FORMS, AND PLANS

10. For all policies, procedures, forms, and plans developed under this Order, the parties shall use the following process: Defendants shall meet periodically with Plaintiffs' counsel to discuss their development of policies, procedures, forms, and plans. In preparation for such meetings, Defendants will provide Plaintiffs' counsel with copies of the proposed policies, procedures, forms, and plans in draft form no later than 7 days before the meeting. If the parties reach an impasse on any particular issues, they may bring the disputed issues to the Court in a motion to be heard on shortened time.

11. Using the procedure set forth above in Paragraph 10, Defendants shall do the following:

(a) Defendants shall develop and implement sufficiently specific Policies and Procedures that will ensure continuous compliance with all of the requirements of this Order. The Policies and Procedures will provide for implementation of the August 21, 2003 Remedial Plan Outline (attached hereto as Exhibit A), as well as the requirements set forth below in Paragraphs 12–24. Defendants shall submit the completed Policies and Procedures to the Court no later than July 1, 2004.

(b) By July 1, 2004, Defendants shall begin implementing the following steps in the parole revocation process, which shall be completely implemented by January 1, 2005:

(i) Defendants shall appoint counsel for all parolees beginning at the

878

RTCA stage of the revocation proceeding. Defendants shall provide an expedited probable cause hearing upon a sufficient offer of proof by appointed counsel that there is a complete defense to all parole violation charges that are the basis of the parole hold.

(ii) No later than 48 hours after the parole hold, or no later than the next business day if the hold is placed on a weekend or holiday, the parole agent and unit supervisor will confer to determine whether probable cause exists to continue the parole hold, and will document their determination.

(iii) If the parole hold is continued thereafter, no later than 3 business days after the placement of the hold, the parolee will be served with actual notice of the alleged parole violation, including a short factual summary of the charged conduct and written notice of the parolee's rights regarding the revocation process and timeframes.

(iv) For all parolees who do not waive or seek a continuance of a final revocation hearing, Defendants shall provide a final revocation hearing on or before the 35th calendar day after the placement of the parole hold.

(c) By July 1, 2004, Defendants shall serve on counsel for Plaintiffs an assessment of the availability of facilities and a plan to provide hearing space for separate probable cause hearings.

(d) By July 1, 2005, in addition to the steps listed above, for all parolees who do not waive or seek a continuance of a probable cause hearing, Defendants shall provide a hearing to determine probable cause no later than 10 business days after the parolee has been served with notice of the charges and rights (at the 3rd business day after the placement of the hold).

(e) Defendants shall complete implementation of the Policies and Procedures by July 1, 2005.

12. In addition to the provisions of the August 21, 2003 Remedial Plan Outline, the Policies and Procedures shall ensure that the following requirements are met:

13. At the time of appointment, counsel appointed to represent parolees who have difficulty in communicating or participating in revocation proceedings, shall be

informed of the nature of the difficulty, including but not limited to: mental illness, other cognitive or communication impairments, illiteracy, limited English-language proficiency, and the need for a foreign language interpreter. The appointment shall allow counsel adequate time to represent the parolee properly at each stage of the proceeding.

14. At the time of appointment, counsel shall be provided with all non-confidential reports and any other documents that the state intends to rely upon at the probable cause or final revocation hearing. After appointment, if the state learns of additional evidence or documents, and intends to rely on such additional evidence or documents, it shall produce them to counsel as soon as practicable before the hearing.

15. Defendants shall develop and implement policies and procedures for the designation of information as confidential that are consistent with the requirements of due process.

16. Non-confidential portions of parolees' field files shall be available to parolees' counsel unless good cause exists for failure to provide access to such files. Field file information shall be withheld from counsel as confidential only in accordance with the policies and procedures referenced in Paragraph 15.

17. Defendants shall develop standards, guidelines, and training for effective assistance of state appointed counsel in the parole revocation process.

18. Defendants will ensure that parolees receive effective communication throughout the entire revocation process.

19. Defendants will ensure that all BPT and CDC forms provided to parolees are reviewed for accuracy and are simplified to the extent possible through a procedure similar to that used to revise forms in Armstrong v. Davis, C94-2307 CW (N.D. Cal.). This process will include translation of forms to Spanish. Revised forms will be submitted to Plaintiffs' counsel for review prior to finalization, dissemination, or modification.

20. Upon written request, parolees shall be provided access to tapes of parole

revocation hearings.

21. Parolees' counsel shall have the ability to subpoena and present witnesses and evidence to the same extent and under the same terms as the state.

22. At probable cause hearings, parolees shall be allowed to present evidence to defend or mitigate against the charges and proposed disposition. Such evidence shall be presented through documentary evidence or the charged parolee's testimony, either or both of which may include hearsay testimony.

23. Final revocation hearings shall occur within 35 calendar days of the parole hold.

24. The use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in United States v. Comito, 177 F.3d 1166 (9th Cir. 1999). The Policies and Procedures shall include guidelines and standards derived from such law.

## V. STAFFING LEVELS

Defendants shall maintain sufficient staffing levels in the CDC and BPT to meet all of the obligations of this Order.

## VI. MONITORING

25. The parties shall cooperate so that Plaintiffs' counsel has access to the information reasonably necessary to monitor Defendants' compliance with this Order and the Policies and Procedures adopted in response thereto. Such information shall include but not be limited to: access to documents, tours, observation of parole revocation proceedings, observation of training sessions, interviews of staff, and interviews with parolees. Plaintiffs' counsel may notice depositions under the Federal Rules of Civil Procedure either: (1) if Plaintiffs' counsel are unable to obtain relevant information through interviews and informal document requests, or (2) after notifying Defendants of non-compliance with this Order under Section VII, below. Before

noticing a deposition, Plaintiffs' counsel must consult with opposing counsel about the deposition schedule so that the convenience of counsel, witnesses, and parties may be accommodated, if possible.

26. The parties shall meet regularly, and at least once every 90 days, to discuss implementation issues. At least once every 90 days, Defendants shall provide Plaintiffs' counsel with a report on hold-to-hearing time in substantially the same form, and with the same content as that currently used in Defendants' weekly "RSTS" meetings.

27. The parties shall agree on a mechanism for promptly addressing concerns raised by Plaintiffs' counsel regarding individual class members and emergencies.

## VII. ENFORCEMENT

28. The Court shall retain jurisdiction to enforce the terms of this Order. The Court shall have the power to enforce the terms of this Order through specific performance and all other remedies permitted by law or equity.

29. If Plaintiffs' counsel believe that Defendants are not complying with any of the acts required by this Order, the Remedial Plans, or Policies and Procedures produced pursuant to it, they shall notify Defendants in writing of the facts supporting their belief. Defendants shall investigate the allegations and respond in writing within 30 days. If Plaintiffs' counsel are not satisfied with Defendants' response, the parties shall conduct negotiations to resolve the issue(s). If the parties are unable to resolve the issue(s) satisfactorily, Plaintiffs may move the Court for any relief permitted by law or equity.

## VIII. ATTORNEY'S FEES AND COSTS

30. Plaintiffs are the prevailing party in this action. Plaintiffs' counsel may move for an award of reasonable attorney's fees and costs for obtaining relief for the Plaintiff class pursuant to 42 U.S.C. § 1988 or any other applicable law. Defendants shall pay Plaintiffs' counsel reasonable attorney's fees for work performed in connection with monitoring and enforcing this Order. The parties reserve the right to

address at a future date whether 42 U.S.C § 1997e(d) applies to an award of attorney's fees in this suit.

## IX. RESOLUTION OF CLAIMS

31. This stipulated order resolves all the claims in this case, except the following, to the extent that they are alleged in the Fifth Amended Complaint, if at all:

(a) Appeals. Plaintiffs assert that Defendants' administrative-appeals system for parole-revocation and revocation-extension decisions violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

(b) Revocation-Extension Proceedings. Plaintiffs assert that Defendants' policies, procedures, and practices for extending parole revocations based on alleged rules violations while in custody violate the Due Process Clause.

32 The parties anticipate that these issues will be resolved informally, without need for the Court's intervention. The parties will inform the Court if this does not occur.

**IT IS SO STIPULATED.**

Dated: November 12, 2003 ROSEN, BIEN & ASARO

By _____
 MICHAEL BIEN

Dated: November 12, 2003 PRISON LAW OFFICE

By _____
 DONALD SPECTER

Attorneys for Plaintiffs

Dated: **November 17**, 2003

BILL LOCKYER, Attorney General
of the State of California,
ROBERT R. ANDERSON, Chief
Assistant Attorney General,
FRANCES T. GRUNDER, Senior
Assistant Attorney General,
JONATHAN L. WOLFF,
Supervising Deputy Attorney
General

By _____
THOMAS S. PATTERSON,
Deputy Attorney General
Attorneys for Defendants

Dated: **November 17**, 2003

By _____
RODERICK Q. HICKMAN
Secretary, Youth and Adult
Correctional Agency

Dated: **November 17** 2003

By _____
EDWARD S. ALAMEIDA, JR.
Director, California Department of
Corrections

Dated: **November 17** 2003

By _____
CAROL A. DALY
Chair, California Board of Prison
Terms

STIPULATED ORDER FOR PERMANENT INJUNCTIVE RELIEF,
CIV. 2:90-cv7 LKK (JFM)

## ORDER

The Court finds that this is not a "civil case with respect to prison conditions," as those terms are defined and applied in the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. and that therefore this Order is not governed by the PLRA. Defendants, their agents, employees and successors in office are ordered to comply with all the terms stated above.

**IT IS SO ORDERED**

Dated: _____ _____, 2003

LAWRENCE K. KARLTON
Chief Judge, Emeritus

EXHIBIT A—ATTACHMENT

# Valdivia Remedial Plan

**Violation Occurs**

**Remedial Sanctions-If Appropriate (COP/SATCU/Alternate Placement)**

**Probable Cause Determination Review/Case Conference regarding PC 3056 Hold**

*Within 48 Hours of Hold Placement (If on Weekend/Hol no later than next Business day)*

*PCH Time starts 1st day after Notice and runs for 10 Bus days*

**Parolee Noticed of Charges (Activity Report)/ Interviewed and Provided Copies (Charges, BPT 1073, Notice of Rights)**

*3 Business Days of Hold Placement*

**Violation Report Submitted by Agent of Record** — *1-3 Bus Days*
**Violation Report Reviewed by Unit Supervisor** — *4 Bus Days*
**Rev Packet Reviewed by Parole Administrator (PAD)**

**COP/ Remedial Sanction**

**Decentralized Revocation Unit Revocation Packets Received - Data Entry (RSTS)** — *5-6 Bus Days*
**Attorneys Receive Revocation Packets and Consult with Parolee**

**Case Resolved**

**RTC Assessment by DC or PAD Offers Communicated to Attorneys** — *6-8 Bus Days*

**Expedited Hearing with Offer of Proof**

**Accepts/ COP/CTS/ NIC/ Remedial Sanctions/ Dismiss**

**Probable Cause Hearing DC or PAD/Attorney/Parolee Exculpatory/Documentary Evidence Presented** — *9-10 Bus Days*

**Rejection of offer (Witness Selection/Hearing Location/ADA Review)**

**Case Resolved**

**Revocation Hearing** — *On or Before 35 Calendar Days of Hold Placement*

Revised 8/21/03 (1130 Hours)

# VALDIVIA REMEDIAL PLAN POLICY OUTLINE

## VIOLATION OCCURS

There are a myriad of circumstances under which a Parolee can violate his or her conditions of parole. There are approximately 100,000 parole violations referred to the Board of Prison Terms each calendar year.

Currently about 60% of the reported violations are the result of arrests by local law enforcement. Of that 60% arrested by local law enforcement, many are charged in the local jurisdictions for crimes against the state, while others are not charged locally but instead referred to the Board of Prison Terms for administrative disposition.

The remaining 40% are arrests that involve the Parole officer, which may also result in local charges or referral to the Board of Prison Terms for administrative disposition.

The average parole violator's term in prison is five and one half months.

Approximately 66% of the cases referred to the Board of Prison Terms are resolved prior to the revocation hearing. Last year, the Board of Prison Terms conducted approximately 37,000 revocation hearings.

## REMEDIAL SANCTIONS

As part of the overall reform of the revocation process, the Parole and Community Services Division of the Department of Corrections will begin using remedial sanctions/community based treatment placement in January of 2004.

Some of the remedial sanctions/community based treatment programs that will be used are the Substance Abuse Treatment Control Units, Electronic Monitoring, Self-Help Outpatient/aftercare programs, and alternative placement in structured and supervised environments.

These remedial sanctions are not considered violations of parole because participation in the remedial sanctions program is voluntary and participation in the remedial sanctions program will not make the parolee presumptively ineligible for discharge at 13 months.

The goal is to reduce the number of returns to prison for violations of parole by up to 10% in 2004 and by up to 30% by 2006.

**IF REMEDIAL SANCTIONS ARE DEEMED INAPPROPRIATE AND A PAROLE HOLD IS PLACED ON THE PAROLEE, A PROBABLE CAUSE DETERMINATION/REVIEW WILL TAKE PLACE WITHIN 48 HOURS OF THE HOLD AND IF THE HOLD IS PLACED ON A WEEKEND OR HOLIDAY, THE PROBABLE CAUSE REVIEW WILL BE CONDUCTED NO LATER THAN THE NEXT BUSINESS DAY FOLLOWING THE HOLD BEING PLACED.**

Although this probable cause review for parolees is not required under any of the current, relevant case law, it is being put in place in an attempt to take a second look at those individuals who have been placed into custody to determine if the "present danger to public safety" concern still exists or if remedial sanctions/community based treatment is possible at this juncture.

As an example, a parolee who was strung out on dope may have "dried out" sufficiently that he or she is no longer a danger to him or herself or the public and may be an appropriate candidate for community based treatment in a structured, supervised program.

Under such a scenario, the parolee would be released to a community based treatment program with the understanding that a specific condition of his or her release is the completion of the program and any other special conditions of parole that the Parole Agent deems appropriate.

Current regulation and case law require any special conditions of parole to have a nexus to the parolees' commitment offense or behavior.

**PAROLEE IS GIVEN ACTUAL WRITTEN NOTICE OF CHARGES WITH A SHORT FACTUAL SUMMARY OF THE BEHAVIOR; THE NOTICE OF RIGHTS REGARDING THE REVOCATION PROCESS; AND THE BPT 1073 ADA DETERMINATION IS MADE VIA A FACE TO FACE INTERVIEW WITHIN 3 BUSINESS DAYS OF THE HOLD BEING PLACED.**

If the remedial sanctions are deemed inappropriate, within three business days of the hold being placed, the parolee shall be served actual notice of the charges against him or her accompanied by a short factual summary of the behavior; he or she shall be interviewed; an a ADA determination shall be made; the BPT form 1073 shall be completed, and parolee shall be provided with a written notice of rights regarding the revocation process and time frames. (Hereinafter referred to as "notice.")

The principles of "effective communication" apply to the revocation process. ADA accommodation must be provided for all parolees when necessary. In addition, all forms shall be printed in Spanish and English and a Spanish speaking person shall be available to interpret and explain the forms to the parolee where necessary.

**THE PROBABLE CAUSE HEARING SHALL BE CONDUCTED WITHIN 10 BUSINESS DAYS FOLLOWING THE DATE OF ACTUAL SERVICE OF THE NOTICE OF CHARGES, THE ADA DETERMINATION, AND THE NOTICE OF RIGHTS.**

Within the first 3 days after the parolee has been served with notice, the violation report must be completed and submitted to the Parole Unit supervisor.

On or before the fourth business day, the Unit Supervisor must review the report and: (1) determine if there is sufficient basis for the revocation to go forward; (2) determine if the report is accurate, complete, and contains the correct Title 15 violation sections; and (3) review the report and consider whether or not remedial sanctions/community based treatment is appropriate in lieu of proceeding with referral to the Board of Prison Terms with a recommendation that the parolee be returned to prison.

■

On or before the 4th business day, the revocation packet is reviewed by the Parole Administrator to determine whether or not there is a sufficient basis for the case to move forward and whether or not Remedial Sanctions/Community Based Treatment is appropriate at this juncture.

On or before the 5th business day, the revocation packet is forwarded to the decentralized revocation unit where the parolee is being held.

On or before the 6th business day, the parolee (including non-Armstrong class members) shall be appointed an attorney and the attorney shall be provided with a copy of the revocation packet, which shall contain a signed copy of the notice of charges, notice of revocation of rights, and a completed BPT 1073.

Attorney shall meet with the Parolee, provide the parolee with a copy of the revocation packet, and shall communicate any offer or offers made by the Board of Prison Terms Deputy Commissioner/Parole Administrator prior to the probable cause hearing.

In the event the parolee can make a sufficient offer of proof of a complete defense to the charges the Board of Prison Terms Deputy Commissioner/Parole Administrator, an expedited Probable Cause Hearing with Documentary and/or live testimony shall be scheduled. As an example, if the parole has uncontroverted documentary evidence that he or she was in Santa Rita jail when this violation allegedly occurred in Los Angeles, parolee shall be allowed to present such evidence at an expedited probable cause hearing between the 6th and 8th business day or at the earliest time possible thereafter if parolee is unable to produce such evidence by the 6th to 8th day.

On or before the 6th to 8th business day, a return to custody assessment (an offer) is made by the Deputy Commissioner/Parole Administrator, and the offer shall be communicated to the parolee's attorney.

On or before the 10th business day, a Probable Cause Hearing shall be held with the Deputy Commissioner/Parole Administrator, the parolee, and parolee's attorney.

The Deputy Commissioner/Parole Administrator conducting the hearing shall be the same Deputy Commissioner/Parole Administrator who made the return to custody assessment (offer) where practicable.

Parolee shall be permitted to present documentary evidence and hearsay testimony by way of offer of proof through his or her attorney in mitigation or as a partial or complete defense to the charges and/or the proposed disposition.

The Deputy Commissioner/Parole Administrator shall have the complete range of options to resolve the case. (Continue on parole, credit for time served, release from custody with pending charges, remedial sanctions/community based treatment, reduce the offer downward, dismiss some or all of the charges)

The Deputy Commissioner shall not have the authority to adjust the return to custody assessment upward at or during the probable cause hearing.

Parolee shall have the right to waive time as to any of these hearing time constraints with or without good cause.

Attorney shall have the right to a continuance upon the showing of good cause in the absence of his or her client's consent in cases of emergency or illness or upon such other showing that the Deputy Commissioner/Parole Administrator can make a finding of good cause.

There shall be a written record of this proceeding and the basis for any decisions made therein.

It is not necessary that the Probable Cause Hearing be audio/video recorded.

If at the conclusion of the probable cause hearing, the parolee has rejected the offer, parolee shall provide the Deputy Commissioner/Parole Administrator with a list of witnesses he or she would like to call at the revocation hearing. The location of the hearing shall be determined (within 50 miles of the violation), and the Deputy Commissioner/Parole Administrator shall make an independent ADA accommodation determination.

## REVOCATION HEARING

The revocation hearing shall be held at the earliest possible time and in no case later than 35 calendar days after the parole hold has been placed.

■

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **JERRY VALDIVIA, et al. v. GRAY DAVIS, et al.**

No.: **USDC E.D. #CIV-S-94-0671 LKK GGH P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On August 21, 2003, I served the attached

### DEFENDANTS' REVISED REMEDIAL PLAN

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, San Francisco, California 94102-7004, addressed as follows:

Michael W. Bien, Esq.
Rosen, Bien & Asaro
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Alexander L. Landon
Law Offices of Alex Landon
2442 Fourth Avenue
San Diego, CA 92101

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

Karen Kennard
Kristen A. Palumbo
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Stephen J. Perrello, Jr.
P.O. Box 880738
San Diego, CA 92168

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 21, 2003, at San Francisco, California.

_____
A. ALBANO
Declarant

_____
Signature

40006164.wpd

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: *Jerry Valdivia, et al. v. Gray Davis, et al.*

No.: USDC, Eastern District of California, Case No. CIV-S-94-0671 LKK GGH P

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On November 18, 2003, I served the attached

### STIPULATED ORDER FOR PERMANENT INJUNCTIVE RELIEF

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, P.O. Box 944255, Sacramento, California 94244-2550, addressed as follows:

Karen L. Kennard
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Alex Landon
Law Offices of Alex Landon
2442 Fourth Avenue
San Diego, CA 92101

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

Stephen J. Perrello, Jr.
Law Offices of Stephen J. Perello
P.O. Box 880738
San Diego, CA 92168

Michael W. Bien
Rosen, Bien & Asaro
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 18, 2003, at Sacramento, California.

| R. Wells | /s/ |
|---|---|
| Declarant | Signature |

10025232.wpd

## EXHIBIT B

# Reporter's Transcript – 12/14/07 Hearing

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

OFFICE OF THE SPECIAL MASTER

JERRY VALDIVIA, et al., )
 )
 PLAINTIFF, )
 )
 VS. )NO. Civ.
 )S-94-0671 LKK-GGH
ARNOLD SCHWARZENEGGER, et al., )
 )
 DEFENDANT. )
 )

 HEARING, taken on behalf of the SPECIAL MASTER at 315 MONTGOMERY STREET, 10TH FLOOR, SAN FRANCISCO, CALIFORNIA, commencing at 10 a.m., FRIDAY, DECEMBER 14, 2007, before CARRIE E. SEARS, Certified Shorthand Reporter No. 13200; and before LINDA VACCAREZZA, RPR, CRP, Certified Shorthand Reporter No. 10201.

BARKLEY
Court Reporters

APPEARANCES:

FOR THE PLAINTIFF:

> ROSEN, BIEN, & GALVAN
> Attorneys at Law
> 315 MONTGOMERY STREET, 10TH FLOOR
> SAN FRANCISCO, CALIFORNIA 94104
> BY: SHIRLEY HUEY
> ERNEST GALVAN
> LOREN STEWART

FOR THE DEFENDANTS:

> DEPARTMENT OF JUSTICE
> OFFICE OF THE ATTORNEY GENERAL
> Supervising Deputy Attorney General
> 13001 I STREET, SUITE 1101
> P.O. BOX 944255
> SACRAMENTO, CALIFORNIA 94244
> BY: VICKIE WHITNEY
> JESSICA DEVENCENZI

> DEPARTMENT OF CORRECTIONS & REHABILITATION
> BOARD OF PAROLE HEARINGS
> Associate Chief Deputy Commissioner
> POST OFFICE BOX 4036
> SACRAMENTO, CALIFORNIA 95812
> BY: PATRICIA CASSADY

> PRESIDING:

> CHASE RIVELAND
> RIVELAND ASSOCIATES
> SPECIAL MASTER
> P.O. BOX 367
> DEER HARBOR, WASHINGTON 98243
> BY: CHASE RIVELAND

> VIRGINIA L. MORRISON
> COLLABORATION SPECIALISTS
> Deputy Special Master

BARKLEY
Court Reporters

KENTFIELD, CALIFORNIA 94904
BY: VIRGINIA L. MORRISON, JD

ALSO PRESENT:

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS & REHABILITATION
COURT COMPLIANCE LEGAL TEAM
OFFICE OF LEGAL AFFAIRS
Chief
1515 K STREET, SUITE 520
SACRAMENTO, CALIFORNIA 95814
BY: KATHERINE NELSON

DEPARTMENT OF CORRECTIONS & REHABILITATION
OFFICE OF LEGAL AFFAIRS
Litigation Liaison
1515 K STREET, SUITE 520
SACRAMENTO, CALIFORNIA 95814
BY: DANIEL JOHN CARVO

ALSO PRESENT:

DYLAN SULLIVAN
SUJEAN YOUNGER

---oOo---

BARKLEY
Court Reporters

EXHIBITS

 PAGE

1 - Notice of Motion and Motion to Enforce Paragraph 111

 24 of the Valdivia Permanent Injunction

2 - Defendants' Opposition to Plaintiffs' Motion to

 Enforce Paragraph 24 of the Valdivia Permanent

 Injunction 111

3- Plaintiffs' Reply in Support of Plaintiffs' Motion

 To Enforce Paragraph 24 of the Valdivia Permanent

 Injunction 111

4 - Defendants' Response to Plaintiffs' Reply to

 Opposition to Motion to Enforce Paragraph 24 of

 The Valdivia Permanent Injunction 111

---oOo---

BARKLEY
Court Reporters

SAN FRANCISCO, CA; FRIDAY, DECEMBER 14, 2007

10:00 a.m.

TRANSCRIPT OF HEARING PROCEEDING

SPECIAL MASTER RIVELAND: We're meeting today after several starts and stops. The parties agreed to -- that we should hold this particular hearing, fact-finding hearing back in August after it became apparent that we had -- there was some disputes between parties around Comito issues. At that time there were initial hearing and briefings scheduled -- initially to have hearings in October and subsequently with the request of our team, the special master team, the request of the plaintiffs and subsequently the request of the, excuse me -- the request of the defendants and subsequently the plaintiffs. We put the hearing off until today with a new schedule that would suggest that we would have a report to the court no later than 30 days from today, could be earlier, but no later than.

The particular hearing was referenced in the original Order of Reference in paragraph Roman Numeral IV E and subsequently there was an agreement as to the -- as to the process that would be involved prior to that hearing in terms of briefings from plaintiffs and

BARKLEY
Court Reporters

defendants and the subsequent timeframes after our report is filed in court that there would be -- the parties would have 20 days after service to respond to our report to the court and, subsequent to that, 10 days to have replies or objections to the reports of the plaintiffs and defendants. And it indicated in that agreement that at that time, the parties will indicate if they wish that their oral argument is requested on either side.

What I'd eventually like to get to is probably use -- and we have a question from Ginny first, but I'd initially like to start off looking at the plaintiffs three major areas of statement of dispute. We'd like to take from either the defendants or the plaintiffs and taken that only because of -- I think the three are stated fairly succinctly and I suspect are the primary issues that we should be addressing, and in fact, if you look at the agreement indicated that there would be no necessity for discovery or testimony, and so basically, I think we're doing today is Ginny Morrison and I have both reviewed all of the submissions from plaintiffs and defendants. We have a variety of questions we'd like to get through today for clarification.

Ginny, you had a question I think that you wanted to start off with.

DEPUTY SPECIAL MASTER MORRISON: Sure. Folks

BARKLEY
Court Reporters

representing defendants, I wonder if you would describe how the issue of the treatment of hearsay exceptions arose, just in practical terms.

MS. WHITNEY: In the context of the Valdivia case?

DEPUTY SPECIAL MASTER MORRISON: Uh-huh.

MS. WHITNEY: I think that obviously pre-dates my time. You think back to, I believe December of 2006, a letter from Ben Rice at our office letting -- I think advising the plaintiffs that there was a position taken at the time that hearsay exceptions would be grounds to not have to do Comito balancing based on United States v. Hall, 9th circuit case; we've all become quite familiar with now. And so I -- that's the extent of the knowledge that I have about how the issue arose was as a result of that letter and I think obviously plaintiffs' counsel has some issues with some of the statements that that should be the correction that we make. .

DEPUTY SPECIAL MASTER MORRISON: Sure. And so certainly there was dispute that followed from that and I'm thinking about preceding the letter, how did it come up internally that you wanted to consider a change?

MS. WHITNEY: I don't know.

DEPUTY SPECIAL MASTER MORRISON: Okay.

SPECIAL MASTER RIVELAND: So --

BARKLEY
Court Reporters

MR. STEWART: If I may interject just to clarify for the record. I think in Ernie Galvan's reply declaration, I think he said that Mr. Rice mentioned this to him. I don't think it was a letter at the time. My understanding of it was the December 7th meeting when Ben Rice mentioned something to Ernie Galvan to this effect, but I think the papers clarify just so the record's clear.

MS. WHITNEY: I thought there was a letter as well from Ben Rice that mentioned that. It might be that's the case. I know it did originally come up verbally.

DEPUTY SPECIAL MASTER MORRISON: In a conversation. Okay. And then has --

MS. CASSADY: It was a result of the Hall case. Everybody was waiting and it wasn't really a change. Comito was kind of a disputed issue right from the gate on how it would be applied and defendants had been talking about the use of exceptions. The Hall case was kind of pending at the time, so everybody was waiting for the decision to come down.

DEPUTY SPECIAL MASTER MORRISON: Okay. All right. So when it came down, it came to your attention. You started talking about how does it apply. Okay.

And has your reading of how it applies been disseminated to the field?

BARKLEY
Court Reporters

MS. WHITNEY: It's been discussed, but it hasn't been implemented as a policy --

DEPUTY SPECIAL MASTER MORRISON: Okay.

MS. WHITNEY: -- and an approach that should be taken at this time.

DEPUTY SPECIAL MASTER MORRISON: Okay. Thank you.

SPECIAL MASTER RIVELAND: I must say that I was telling Ginny this morning that having read a lot of this stuff, not only your briefs, but cases where non-attorneys trying to figure all this out is rather challenging and it -- I think the one thing that's probably guaranteed is that no matter who resolves the definitions of Comito and the standards whether it's as a result of our report or a court decision or whatever that this is big challenges in the future for training and education and whatever, just to try to get compliance with whatever that definition is, but it certainly is an interesting subject.

If you could turn to page three of the plaintiffs' notice of motion and motion to enforce paragraph 24, which was dated --

MR. STEWART: I think it was October 3rd.

SPECIAL MASTER RIVELAND: October 3rd 2007, page three, line 19. In there it says, "First under the United States v. Comito in a hearing to which the rules of

BARKLEY
Court Reporters

evidence do not apply, may California return a parolee to prison based on -- parolee to prison based on out of court statements from persons the parolee never gets to confront or cross-examine merely because the statement might fall within a state or federal hearsay exception."

I think that generally outlines an issue, an issue in dispute. I think -- help me out little bit and I probably need more help than the average person hearing this. If -- first of all, a little confusing to me is is there agreement on what are state and federal hearsay exceptions between the parties?

MR. STEWART: I think, I would address it first. I think there is agreement. I haven't seen in our papers or in our meet and confers disagreement on what are state or federal hearsay exceptions. There might be disagreement if we were to sort of pare that down slightly to a category of well established state or federal hearsay exceptions. We're never discussed that in any particularity to my knowledge, but I think generally the hearsay exceptions set forth in the federal rules of evidence, 803 and 804, and in the California Evidence Code therein hearsay exceptions I think we would agree on the hearsay exceptions to which we're referring.

SPECIAL MASTER RIVELAND: Defendants, you agree?

MS. WHITNEY: Yes, we would agree and Chase, to

BARKLEY
Court Reporters

be honest, I'm not sure if we funnel that down to what are long-standing hearsay exceptions, I'm not sure we would have any disagreements to be honest. I think there are some cases that really illuminate that issue. For example; one example would be the business records exception and one case talks about excited utterances, things of that nature that I'm not sure that if we do funnel it down to what may be long-standing hearsay exceptions that we would have any disagreement. I think there are some cases that talk about that. I'm not sure that there's a full discussion throughout the cases as to what those would be, but I think there are some core ones that we could very easily agree upon, yes.

SPECIAL MASTER RIVELAND: If the -- let me just take two of those that are probably common in parole revocation hearings and police records. Where do the parties stand on the admission of police records as being part or not part of exemptions?

MR. STEWART: I think --

MS. WHITNEY: They're not.

MR. STEWART: I think we're in agreement that they are not a part of the exceptions. Plaintiffs' position is certainly that they are not part of hearsay exceptions.

MS. WHITNEY: There's no disagreement about that.

BARKLEY
Court Reporters

SPECIAL MASTER RIVELAND: And would be subject to balancing then?

MS. WHITNEY: Correct.

SPECIAL MASTER RIVELAND: In all instances?

MS. WHITNEY: Correct.

SPECIAL MASTER RIVELAND: And parole records?

MS. WHITNEY: Parole records we would submit that on the cases and such that so long again as there's an establishment that they are business records kept in the ordinary course of the business that those are within a long-standing hearsay exception. There may be portions of that that may be dissectible, but as an overall premise, I think the case law supports the fact that if, you know, there are cases that talk about one parole agent who testifies about things out of another parole agents' records and that those things are admissible as a long-standing exception to the hearsay rule. So I think that the defendants' position would be that those records would be admissible.

SPECIAL MASTER RIVELAND: Before you comment Loren, parole violation reports?

MS. WHITNEY: No.

DEPUTY SPECIAL MASTER MORRISON: No what?

MS. WHITNEY: We thought you were --

SPECIAL MASTER RIVELAND: We're just using one

BARKLEY
Court Reporters

example now at this point.

MS. CASSADY: She was discussing the record of supervision versus the parole violation.

SPECIAL MASTER RIVELAND: The violation report would be equitable to a police report?

MS. WHITNEY: Yes.

SPECIAL MASTER RIVELAND: And subject to balancing?

MS. WHITNEY: Correct.

SPECIAL MASTER RIVELAND: And the chronological reporting?

MS. CASSADY: Record of supervision, is that --

SPECIAL MASTER RIVELAND: Right.

MS. WHITNEY: I think it would depend on what it's being used for. If it's a business record and you can establish that exception, then yes, it is an exception -- hearsay exception and it comes in. You know, there are other things that it could be used for that isn't -- perhaps not necessarily defined as hearsay, which is the truth of the matter asserted if I'm just trying to show some dates or something that takes it out of being hearsay and there is no balancing required in that regard either.

SPECIAL MASTER RIVELAND: Okay. What I'm trying to find is where are we at on points of agreement or

BARKLEY
Court Reporters

disagreements.

MR. STEWART: I'd like to respond. This is definitely where plaintiffs and defendants part company. It's our position that parole records, including records of supervision, chronological records, that these supervision tools are tools that are taken in contemplation of use for prosecution. That's not to say criminal prosecution, but that is a document prepared for revocation because the business records hearsay exceptions is predicated on notions of reliability for records kept in the ordinary course of business, that is, a ledger kept by an accountant in a business office every single day and then it might show that, oh, you know, let's say a parolee was in the state of Chicago and he rented a car -- this is a classic case -- he rented a car in Chicago and there was a receipt with his signature on it in Chicago when he was under supervision in California and had no permission to leave. That's the business record exception. It was a record of -- that Hertz kept in the ordinary course of business and that record shows that the parolee was out of state and in violation of the terms of his parole.

By contrast, these records of supervision are maintained for purposes of finding violations as to that particular parolee and, of course, supervising the parolee, making a record of, a positive record of

BARKLEY
Court Reporters

supervision where that's the case, but I would dispute defendants characterization of these -- both the characterization of parole records as business records, but also the cases to which Ms. Whitney alludes don't explicitly say this is a business record exception. Perhaps they gain some level of reliability.

To not speak in generalities, I'm talking about the U.S. v. Miller case; a 1975 case on the 9th circuit talking about Prellwitz, the 7th circuit case on which defendants relied; and in those cases, the court did admit particular hearsay testimony. In both cases, it was an agent testifying to a record of supervision and the agent was not the agent of record who initially made the records of supervisions. The confrontation issue was you -- the agent of record who recorded the alleged violations wasn't there to be confronted, but in those cases, those two courts did allow the particular records of supervision in to show violations, but it was not explicitly under a business records hearsay exception rubric and to the extent that we're even talking about hearsay exceptions and their place in parole revocation, I mean, plaintiffs would contend that again this is just a little piece of the Comito balancing. This is not a per se admissibility question.

SPECIAL MASTER RIVELAND: Just one initial

BARKLEY
Court Reporters

comment is that Mayor Dailey would be please to know it's not the state of Chicago.

Defendants have any reaction on that?

MS. WHITNEY: Yes. I think the -- while some of the cases may not specifically state a business records exception, there are also equally cases that do say a business records hearsay exception applies to parole supervisory reports like that.

Ultimately, the point being out of Prellwitz, for example, which is a case that we rely on, which is a case that's relied on by U.S. v. Simmons in the 9th circuit. It talks about it -- it describes it in the terms and what we call the "buzz" words -- sorry, I'm not meaning to educate you here, but the business records exception has certain sort of "buzz" words that have to be used to establish that it falls within that exception and those "buzz" words are all mentioned in the Prellwitz case and any other case that really talks about it, including U.S. v. Martin, where they talk about even urinalysis reports and such. There are things that you have to establish for it to fall within that exception and so if it doesn't specifically say "business records exception," the "buzz" words are there and that's exactly what they're talking about. And when Prellwitz -- the court in Prellwitz admitted those records, it did not do a balancing because

BARKLEY
Court Reporters

they were within a hearsay exception which effectively is the business records exception.

When a parole agent is taking down and preparing a supervisory record, it is what would be a classic exception under the business record's rule because it is something kept in the ordinary course of business; it is something they should be doing within their scope of their business; there's reliability inherently established because of that and because Congress obviously creating these rules of evidence and exceptions and the judiciary, the courts, have already measured and determined that those types of records, when they fall within those particular "buzz" words and requirements, establishes the reliability and its admissibility in a sense is then deemed to be good.

MR. STEWART: I'm going to respond. I'd like to talk briefly about Prellwitz and Martin, the two cases that my opponent mentions because I think they actually illustrate the core of the problem here.

As I was reviewing all of the briefing, the copious writing from both sides on this dispute, I realized in some sense, we're talking past each other and I think we might be missing the point. The point from the Morrissey case is a conditional confrontation right. The defendants are quick to point out that that conditional

BARKLEY
Court Reporters

confrontation right is not absolute and in some circumstances hearsay should come in and that proceedings must be flexible. Absolutely, we don't dispute that.

The point, however, is that in different cases, particular charges that might seem very reliable in one circumstance might result in the admission of evidence, but in other circumstances, that same charge with that same evidence depending on the circumstances surrounding the charge, shouldn't come in and that's precisely why flexibility needs to be there. This balancing test that needs to be in the discretion of the most knowledgeable person who is the hearing officer.

The hearing officer needs to look at the evidence before him or her to make this decision, and as to the cases, the charges in Prellwitz involved -- Prellwitz was an individual who was under -- what was then probation before federal supervised release -- he had been reporting dutifully for almost a year of a three-year term of probation and then when Prellwitz stopped reporting in around 1968 -- he had been released in '67 or had accepted his probation terms in '67 -- he went running and he disappeared for over five years, about five and a half years from my calculation.

The question when he was later picked up on a traffic stop was did he abscond parole supervision

BARKLEY
Court Reporters

essentially, or in this case probation. What the probation officer testified to in the hearing was the initial probation officer who had made attempts to contact Prellwitz before he absconded was no longer available, so a new probation officer was then in the case and he said, "Well, I've got this record of supervision."

In that case, if you were to look at it from a balancing perspective, it's an easy decision for the commissioner. The commissioner looks at it and says, "What's the interst in confrontation here?" Well, you know, probably pretty low. This document is pretty reliable. The defendant hadn't yet called into question the actual contents of the document and in that case, you have the outcome where Prellwitz was found to have violated his probation.

In contrast Martin, and Martin is a very important case because again, reliability. In Martin -- Martin was in Hawaii --

SPECIAL MASTER RIVELAND: Let me interrupt you for just a moment.

MR. STEWART: Sure.

SPECIAL MASTER RIVELAND: We've read the briefs so we could deal with you just elaborating on them.

MR. STEWART: Sure, sure. I'll make it shorter. But with respect to Martin, it was urinalysis. There were

BARKLEY
Court Reporters

two urinalysis tests from Hawaii that went to Menlo Park PharmChem Laboratories.

SPECIAL MASTER RIVELAND: And was the tester that was the problem?

MR. STEWART: Precisely. So Martin would be one of these cases where it seems reliable and the 9th circuit explicitly said in Martin, they said, no. Reliability is not a catch-all. Nothing comes in completely because it's reliable." In fact, what needs to happen is there needs to be the balancing test and in Martin, in spite of its apparent reliability on the surface, the court said no, it shouldn't come in.

SPECIAL MASTER RIVELAND: Let me ask both sides around that point.

Would you each give me your definition of reliability. Well, I mean, there's a couple words in this whole thing that become very critical in terms of how we adapt something and reliability is certainly one of those issues that on the base of it, would seem to be legally clear and demanding; however, what the hell that is is a little unclear.

DEPUTY SPECIAL MASTER MORRISON: Certainly legally demanding we can all endorse. The clarity part, I don't know if ya'll are prepared to answer.

MS. WHITNEY: Actually United States v. Williams,

I think -- hold on. We have one. There's a case that actually defines it.

SPECIAL MASTER RIVELAND: Actually, I'm not -- you don't need to track that too far. I'm more interested in is there space for accommodation between the two parties on whatever the definition may be. Is it simply that there has to be a legal definition to it because you're going to have a variety of people applying this definition of reliability to a variety of decisions; decision to balance or not; decision to, if balance, whether to accept or not; and that definition of reliability may not be simply the one that's found in a case. It can't be a contradiction to them, but it could be whatever the parties choose it to mean also.

MS. WHITNEY: I would say, Chase, that from a certain perspective, I think you can have a somewhat focused definition of reliability, but I think you have to be careful not to restrict it too much because similarly to a judge in a court, what is inherently reliable or has a reliability connotation to it, is measured by the trier of fact, be it a judge or in our case Deputy Commissioners or whoever is -- in our case you.

But what is deemed to be reliable has to have some flexibility for the trier of fact to exercise their discretion and consider all of the circumstances that may

BARKLEY
Court Reporters

be in a particular case in front of them. If we become too constrained in what that definition is, then I think we are going to run into some problems in removing the ability for somebody to exercise discretion. We're going to fall outside of what Morrissey and Gagnon talk about in terms of the flexibility that should be afforded in the process. So I think that we should be able to arrive -- I would think that we should be able to arrive at a common definition, but I think we just have to be careful that we don't become too restrictive with those concerns in mind.

MR. STEWART: I would very much agree with that actually. I think the question of reliability of evidence does need to some extent to be determined from the context in which it's presented and the facts and circumstances. Again this is the Comitos and Martins, Walker, Simmons; the facts and circumstances surrounding the particular evidence is going to color its reliability whether very reliable or whether it might be called into question.

SPECIAL MASTER RIVELAND: And so you would agree, if I hear you correctly Loren, with Vickie in terms of there needs to be some flexibility in the part of the decision maker as to determining that, assuming that there's some general definition of the word reliability.

MR. STEWART: Yeah, it needs to be somewhat in the discretion of the decision maker.

BARKLEY
Court Reporters

SPECIAL MASTER RIVELAND: Okay. I'm probably going to have -- as you can see, all my tabs are questions I have, but they don't all fit neatly and are following this progression.

Let me move on to the second -- and green and yellow make no difference. One is not more important than the other I might add.

MS. CASSADY: Just a different day.

SPECIAL MASTER RIVELAND: Returning to the plaintiffs' document on line 23, page three. It says, "Second, under United States v. Comito, can the denial of confrontation be excused if the state lines up several un-confronted hearsay statements next to one another and allows each statement to corroborate its neighbors even though all are from witnesses who are never confronted or cross-examined by the parolee."

The question I would have to that would be initially to the defendants and the -- there were a couple of examples I guess in the submissions, but the question would be that if you have two or more instances of hearsay that are -- let me start out with an example of the sole production of evidence that would try to support revocation. Is it your opinion that it is sufficient?

MS. WHITNEY: I think it again depends somewhat on the circumstances. I think inherent within -- even if

BARKLEY
Court Reporters

you were to do the Comito balancing and you're looking at a particular piece of hearsay and I think a prime example of that is in the Hall case.

In Hall when the court -- the 9th circuit was looking at a particular piece of evidence, in order to even do the balancing, what they do is rely on or consider what other evidence there was that may corroborate i.e. give some reliability to the piece of hearsay that was under consideration. So I think that it is one of those things that can occur and it's going to depend on the circumstance of the case and I think there's a distinction to be drawn between admissibility of the evidence and the weight it should be given.

If a trier of fact is looking at a piece of evidence that -- to assess its admissibility, they can consider the circumstances surrounding it and that is -- includes other pieces of evidence, other testimony, other documents that may be out there that tend to give it some indicia of reliability. And even in Hall, that's what the 9th circuit did. It did look to other pieces of evidence, which included other pieces of hearsay evidence to corroborate a piece of hearsay. So the defendants' position would be that, again, considering the circumstances, that it might be appropriate to be able to look at other pieces of hearsay to see if they all match

BARKLEY
Court Reporters

918

up with each other.

SPECIAL MASTER RIVELAND: If you took -- let's say there were three and I apply the balancing act to all three and I find them all not to be -- each independently not to be admissible, are you then saying but if I put them together, I could find admission, find them to be admissible?

MS. WHITNEY: I think still you could find them to be admissible, but depending on the circumstances. Again, if we're talking about hearsay that doesn't fall within a hearsay exception. It's all going to be dependent on sort of the whole picture. Again, recognizing that in parole revocation hearings, you can have a lesser standard to look at, lesser procedures, but if you're talking about lining up three pieces of hearsay, if the trier of fact assess that, you know, if one piece is just completely inconsistent with another and they're all at cross purposes then quite clearly, none of them should be admissible because they're not -- there's no establishment of indicia of reliability and if you're talking about those three pieces of evidence in the context of them all being hearsay not subject to any exception, the Comito balancing should be occurring frankly. And in that Comito balancing, as part of those considerations, you're going to look at both sides of the

BARKLEY
Court Reporters

scale in a situation where you've got three pieces of hearsay that are not subject to an exception.

SPECIAL MASTER RIVELAND: But would I not have to do the balancing analysis on each one independently first?

MS. WHITNEY: You know, I think in a perfect world, you would see that, but I don't think that's a realistic scenario in the context of even a court proceeding because often times the judge will admit a piece of evidence conditionally to somebody tying it up or corroborating it.

Again, this is a distinction between admitting it and the weight that it's given. If you're saying conditionally I'm going to admit this evidence, I'm going to hold off ruling on the objection until I see what else comes out, that is perfectly within the discretion I think and allowable under the case law to have that consideration go forward because there may be, depending on the order of how things come in, there may be a piece later of non-hearsay that comes in that corroborates that piece of hearsay perfectly that then in the balancing that Comito talks about, you would admit it. So I think it's part of the overall equation of the circumstance.

SPECIAL MASTER RIVELAND: Okay.

MS. WHITNEY: But if you don't find anything that corroborates it, then I think the objection is, you know,

should be sustained and that piece should not come in. It should not be a part of the consideration in the ultimate determination that the Deputy Commissioner makes as to whether there is a violation or not.

MR. STEWART: And this is where, I think in plaintiffs' position, that the law compels and actually pragmatism requires a stronger rule than that. This is where looking at three pieces of hearsay in a fog and kind of intertwining them together and saying, "Poof, admissible" is problematic and under the confrontation due process right in the 14th amendment that we're talking about, each piece of hearsay that comes in over a confrontation objection should be examined individually. And if it comes in improperly, each piece of hearsay inflicts some constitutional injury and by admitting three pieces, it's only more grave of a violation than admitting one piece.

To the extent that Ms. Whitney is talking about kind of a conditionally hearing hearsay evidence to then find out what sort of corroborative evidence there is, then, you know, that's something that happens in federal court. This happens -- in general, there can be a sort of conditional admission pending what other evidence comes through.

SPECIAL MASTER RIVELAND: Right.

BARKLEY
Court Reporters

MR. STEWART: But as in the Hall case where six corroborative pieces of evidence came in, five of which were not hearsay from five testifying percipient witnesses, it's a very different situation than your hypothetical of three inadmissible hearsay pieces.

SPECIAL MASTER RIVELAND: Is this process of conditional admission used at all?

MS. WHITNEY: Yes.

SPECIAL MASTER RIVELAND: In the revocation process?

MS. WHITNEY: Yeah, and it's used in courts as well by judges all the time.

And Chase, let me just touch back on it. When the plaintiffs are talking about, you know, each piece of evidence if that comes in for consideration there's constitutional injuries inflicted, that's not necessarily the case because I think we have to keep in mind that even Comito says that the standard here is harmless error. It's not bigger than that. It was the error -- if the balancing was done, was the error harmless.

So we have to keep that in mind I think as the overall approach, but I would also point out that both Comito and Hall and any of the cases frankly, when they look at whether there was harmless error and then look at a piece of hearsay evidence, what they're doing in every

BARKLEY
Court Reporters

single case is not saying this particular evidence in a vacuum is inadmissible. They have to, by necessity, look at everything else and they do.

When in Hall, they're considering the statements that were made by the declarant, who is not in court the victim that they couldn't locate.

In that situation, everything they look to whether somebody was testifying or not -- and we probably have a disagreement about what even the testimony that was given by those folks is whether that's hearsay or not because still, the declarant isn't in court to be confronted; but nonetheless, what the court is doing in Hall and Comito and every one of these cases, is not just looking at the piece of particular hearsay and saying it's inadmissible, bye, it's gone. They're looking at it in the context of what are the other circumstances? What are the other conditions that were present in that particular case? What did the trier of fact have the ability to assess in making that determination? And by necessity, they have to consider all of the other pieces of evidence to determine if there's some indicia of reliability to this piece of hearsay and so I think you can't cut it and just say here's a piece of evidence that's coming into me -- and even in Comito -- an out of court statement by a declarant who is not showing up, the court there didn't

BARKLEY
Court Reporters

just say, well, that statement is hearsay, it's gone. It did an analysis and that analysis involved consideration of all of the other circumstances that were present in the case. So I think that is sort of the governing thing that we're seeing in every one of these cases; Comito, Hall, every one of them. It's not just in a vacuum in a piece of evidence. It's a whole consideration of everything that's coming in whether that gives it some indicia of reliability. How else could you determine if it had an indicia of reliability if you couldn't see the other pieces of the puzzle that were sitting there before that trier of fact.

MR. STEWART: I think I will make one distinction that I think is important to raise that in the appellate cases that we're reading and we're looking at harmless error analysis or we're looking at whether a particular Comito determination was prejudicial to the defendant, these are appellate standards. What we're trying to develop here is a principled rule for the trial court, or in this case, the hearing officer.

I just want to be clear that to sort of import what would be a harmless error rule into the hearings would be very, very problematic because in essence what happens then is that you're taking what is actually an appellate level of review and bringing it right into the

**BARKLEY**
Court Reporters

Deputy Commissioner's living room and then what you've got here in cases like Comito where the other hearsay testimony... what was considered was, in Comito, there was the stipulated testimony of the Las Vegas detective that was stipulated to preserve the evidentiary objection to that testimony.

You have in -- also in -- well, I'll leave it at Comito, but simply the distinction between trial and appellate courts, there is -- it's important not to go too far down the harmless error track.

DEPUTY SPECIAL MASTER MORRISON: And would you say more about how you see the difference in the setting that we're talking about; the standards in contrast?

MR. STEWART: I guess in -- so when we're talking about the hearing itself and the rule that defendants should set based on the Comito case is that in the Comito case, the court said in every situation where hearsay evidence is proffered or testimony of an adverse witness is proffered over a confrontation clause objection, the court must conduct this Comito balancing, must weigh the releasee's interest in confronting that adverse witness against the government's good cause for denying it and that standard is the standard that governs the admission of hearsay evidence in these Valdivia cases, in parole revocation proceedings.

BARKLEY
Court Reporters

The confrontation clause compels it and this question of harmless error on appeal isn't something that actually should come into the calculation of developing a principled policy for the decision maker.

SPECIAL MASTER RIVELAND: We're talking about DCs and I think I can end up with harmless error and I'm probably not going to get challenged. It may not be a bad way to go.

Let's say that my intention if I revoke Johnny is that I'm going to give time served. That probably would be seen as a harmless error. I revoked him based on possibly an illegitimate hearsay evidence.

MR. STEWART: But again, that's a decision for the appellate body in our rubric.

DEPUTY SPECIAL MASTER MORRISON: Do you all have thoughts about the point that he's raised?

MS. WHITNEY: Well, I don't think that we disagree fundamentally about that Comito, the language at all, and to be clear, my pointing out the harmless error was simply a response to the constitutional violations actually existing, or a presumption that they are, but I don't think we disagree about the standard on Comito what that should be.

I think again, the fundamental issue is can you -- and I certainly -- there's no disagreement that if

BARKLEY
Court Reporters

you have a piece of hearsay and it's not within one of these exceptions, you really need to do the balancing and that's what's required. So I don't think there's a disagreement about that. I think, fundamentally, this disagreement is about number one, hearsay exceptions; does that -- which is the issue; one, does that get us past having to do the full balancing and of course defendants take the position yes, it does, because it satisfies the inherent reliability aspect, and number two; in the context that we were talking about when all this arose, was, you know, can you consider other pieces of hearsay or how far does that line go when you're assessing one piece of hearsay. What do you consider and how far do you go in trying to distinguish that or to say if it's reliable enough under that balancing approach.

So I don't think fundamentally there's any disagreement about that, so I just want to be clear.

SPECIAL MASTER RIVELAND: The gravity issue is somewhat interesting and that I'm not sure that hearing the DC consider the gravity of the situation and the potential penalties the way I interpret it, I guess, in whether to include or allow entry of some hearsay evidence, and I'm assuming that means that using some of the cases that were referenced if there's a prison term, long prison term, as a potential punishment that greater

attention should be placed to that admission of hearsay evidence than if there's a minor penalty.

Is that agreed upon? That general, non-legal description of what I read into it?

MS. WHITNEY: Yes.

MR. STEWART: Yes.

SPECIAL MASTER RIVELAND: So one could interpret that two ways; one is that the higher the likely penalty the more aggressive the DC should be in doing the balancing analysis. What is unclear to me is does that then mean the reverse of that or the other end of that. If there's a minor penalty available if the revocation occurs, that I can be very free in allowing the entry of hearsay?

MS. WHITNEY: No, I don't think that's actually, you know, in -- to be specific, I think it's the Martin case that talks about that as one of the factors, and to be clear, Comito says that there are, you know, there are two primary factors are important ones and there are others. So there are a lot of factors that even are probably illustrated by any of the cases that we want to look at. I don't think that defendants take the position that just because, you know, there may be lesser penalty attached that, you know, you can just willy nilly let things fall by the wayside.

BARKLEY
Court Reporters

The standard approach is and should be that you still have to properly do your job and consider those factors if you're doing the balancing. I think even in the Martin case to be clear, you know, there were issues about the urinalysis report which had to do with the fact that nobody was there to provide any foundation for the testing service or what have you, and the consideration of the fact that the penalty or the automatic penalty took it out of the discretion of the person, the trier of fact in essence, to determine how long this person was going to serve for revocation and that was very problematic, which is obviously the genesis of that particular factor that Comito talks about.

So yes, I think in all instances no matter what, it's a penalty, it's some deprivation of liberty, it's a lesser than, of course, another proceeding, but yes, that that should be something that should be considered and nobody should willy nilly.

SPECIAL MASTER RIVELAND: So if I understand it then, you both would agree that if more serious or onerous the potential penalty, the more aggressive the DC should be should be in applying the standard.

MR. STEWART: When you say aggressive, you mean in conducting a thorough balancing?

SPECIAL MASTER RIVELAND: Yes. That that should

BARKLEY
Court Reporters

bring to their attention that they must be more thorough, even as careful as they can be.

MR. STEWART: And I would agree with that and disagree with the corollary of the lesser penalty and I agree completely on that. And the other portion just with Martin is it might seem that in Martin they were talking about a mandatory minimum of taking away the discretion and we say, well here in parole, we're talking about 1 to 12 months, which isn't -- maybe that's not much time -- but Martin actually was facing 4 to 10 months based on three violations he admitted to; this fourth violation kicked him out to a 16-month sentence. The range is really not all that different, so I think the consideration is the same and I think we agree on that.

MS. WHITNEY: And I think, Chase, that the way that the Deputy Commissioners are trained on this now is that, you know, the more possible time that can be imposed, the more significant the plaintiffs' confrontation right.

MS. CASSADY: Parolee.

MS. WHITNEY: Or parolee. Sorry. What did I say?

SPECIAL MASTER RIVELAND: Every time I say something stupid, Ginny kicks me under the table and I'm starting to get a little bruise.

BARKLEY
Court Reporters

MS. WHITNEY: Do you need padding.

MS. CASSADY: Do you need a break?

SPECIAL MASTER RIVELAND: Pretty soon.

MS. WHITNEY: Shin guards, maybe.

DEPUTY SPECIAL MASTER MORRISON: The record should reflect I have not touched the man.

SPECIAL MASTER RIVELAND: Let's at least introduce the third one that the plaintiffs had. It's on page four, beginning line one. It says, "Third, under due process and the Valdivia permanent injunction, are defendants ever entitled to make parolee choose between the right to a timely hearing and the right to confront adverse witnesses."

First of all, let me ask a question about this, both parties actually. Do we have any data that gives us numbers around this issue that says this happened 17,000 times last year or three times last year?

MS. WHITNEY: We're aware of none.

MR. STEWART: And we're aware of only the one that we put into the briefing. There aren't very many cases, but I believe it was parolee number three in the briefing; is that right?

MS. WHITNEY: Yes.

MR. GALVAN: If I may be heard momentarily on that. There actually is a table, an excel table that was

BARKLEY
Court Reporters

employed in the last compliance report cycle that counts the number of postponements and it does include totals for the number of postponements because of lack of appearance of a witness or the need for another witness. And we don't know what the correlation is between that number and how many in which a Comito objection was made and then the response was, "Okay, well let's -- your objection was heard. Let's have the hearing later," but we do know that it seems to happen with a -- fairly often that hearings are postponed to get more witnesses.

So I think one could infer that there's some significant fraction of those where the Comito objection was made and was at issue. We've in the past asked defendants track that so we can use it for monitoring. I think they said it would be overly burdensome to track the Comito objections and count them, but if that were done, then one could -- we would have better data.

DEPUTY SPECIAL MASTER MORRISON: Let me ask a corollary question. Has anyone undertaken a systematic look at whether this is happening?

MS. WHITNEY: No, and can I just -- I just want to respond quickly because I feel I have to and that is -- for the record, I need to object to all of the statements at this point because, number one; whatever that excel spreadsheet is is not a part of this motion. It's nowhere

found in any of plaintiffs' papers, so I don't know what it is. I don't have it in front of me to look at it. I can't possibly assess what it says or doesn't say. Number two; is the fact that everything is being said about it is pure speculation and I think that goes to the core of what we said in our opposition, which is that we've created this issue that not only have we never met and conferred on, but it's not -- if it's just one case that they know or think is there for sure and everything else is based on speculation, I think it just denotes something that doesn't require any action or any decision at this particular point because it's under the old adage, if it's not broke, don't fix it, and I think that how we've answered to this third parolee and our opposition points out that there were various considerations, not the least of which was the parolee's own witnesses to be present that caused for the continuance and the fact that in that particular parolee's case, he was already revoked on something else, so his, quote, liberty interest, while he was -- for the few days -- for the period of delay to have the hearing was not impacted at all and that's fundamentally what we're looking at here, then I think the case is really something that doesn't speak to the broader issue of this range for resolution.

SPECIAL MASTER RIVELAND: Let me ask --

BARKLEY
Court Reporters

MR. STEWART: Can I just respond very briefly on this point.

In the Ernie Galvan reply declaration, we did attach defendants' Valdivia compliance report. This is paragraph six to the Galvan reply declaration. I'm not 100 percent sure if that particularly referenced excel spreadsheet is an exhibit to that report, but I do think it may be in the record.

SPECIAL MASTER RIVELAND: Okay.

DEPUTY SPECIAL MASTER MORRISON: Okay. And also to clarify a point that was raised, but not closed out. Defendant said no they had not undertaken a systematic look at whether this practice was happening. Have plaintiffs undertaken a systematic look as to whether this is happening?

MR. STEWART: I think you might be better equipped to answer this.

MR. GALVAN: No, we've not. We get this complaint fairly regularly and we raise it and we have raised it in paragraph 27 inquiries, but we haven't pulled it out to determine the prevalence of it.

DEPUTY SPECIAL MASTER MORRISON: Thank you.

SPECIAL MASTER RIVELAND: Let me ask a question of plaintiffs. I'm assuming that each instance where there is a continuance that there's an attorney

BARKLEY
Court Reporters

representing a parolee unless the parolee has refused.

MR. STEWART: That's correct.

SPECIAL MASTER RIVELAND: So we have the counselor's representation in this process and extending the hearing. So what's the problem?

MR. STEWART: I think in our view -- and that's what we say in the moving papers -- the problem is that in some cases the Deputy Commissioners are unwilling to either exclude the evidence that might result in dismissal of serious charges or exclude the evidence or subject it to a Comito balancing probably would result in the same exclusion of evidence, which then might let somebody off of a perceived parole violation.

I think that you're correct that the parolees are represented by counsel. Counsel do make these objections as in Parolee three case in the record and the commissioner's as in the record. Parolee's three case the commissioner stated on the record that he would -- and I'm paraphrasing -- but would grant the objection to the extent that he would continue the hearing to permit confrontation at a later time. He didn't say it exactly like that, but that is not the rule under Comito and that's the problem.

SPECIAL MASTER RIVELAND: Let me ask a question because I'm not acquainted with criminal law in the State

BARKLEY
Court Reporters

of California, but if I'm a criminal defendant and for some reason -- I assume there -- for a felon charge there's certain time frames that have been to be met in order to bring me to trial unless I waive -- and if my attorney representing my issues continues that case for whatever reason, I'm assuming that's done under criminal law in the State of California, is it not? And is the assumption in that case that because I'm legally represented that I'm making a fair decision even though I'm continued in custody?

MR. GALVAN: I may address that. The distinction between the two scenarios are the Superior Court judges are not being instructed by a supervising authority to put the defense counsel in a position of you will have -- we will have this hearing again after your speedy trial date has expired because the prosecution's witnesses were not here, and if you don't agree to that, I will accept the statements of the prosecution witnesses through un-confronted hearsay of another witness and you'll never get to cross-examine the witness. No criminal defense attorney in the State of California has ever been put to that choice.

SPECIAL MASTER RIVELAND: I'm not sure -- help me understand.

MR. GALVAN: The difference between these two

BARKLEY
Court Reporters

scenarios are that in a criminal trial in the Superior Court, if you are in fact at the last day, the last day that the trial could legally be held under the state's speedy trial act, and a key prosecution witness has failed to show up, there is no higher authority of the Superior Court judge, there is no -- as there is of the hearing officer. The problem -- the reason we're here on this issue is that we contend it's the policy and procedure of the board to instruct these hearing officers to -- when they're on the last day if they face a Comito objection, to not exclude the evidence and put the state to its burden based on what it has properly before it and have the hearing there on that day and let the chips fall where they may, but rather, put defense counsel to a choice saying you can have your speedy trial, or you can have your confrontation, but you cannot have both.

In the Superior Court, if you were on the last day in a criminal trial, defense counsel would not be put to a choice between both rights. The Superior Court judge would not be able to tell defense counsel, "Look, you're right, the witness is not here. And you're right, you have a right to cross-examine them, but I'm going to hold your client's trial past the speedy trial deadline so they can get the witness here. Do you waive? And if you don't waive, by the way, I'm going to put -- I'm going to let

this other witness read to the jury what the absent witness said and you're not going to get to cross-examine." That choice could never occur.

SPECIAL MASTER RIVELAND: ·Okay. Let me follow that back just a minute now. Is it not possible that that could lead to unintended consequences? If, for example, there is a policy that says that if the witness doesn't show up, PO, the police officer, whomever· the witness may be, and the DC feels that there's hearsay evidence, do you admit the hearsay evidence and you revoke somebody because you can't go beyond the 35 days and let the parolee stay in custody until whatever happens.

MR. STEWART: And --

SPECIAL MASTER RIVELAND: I mean, isn't that possible in an unintended consequence then, rather than my continuation for three to five days or whatever the time frame.

MR. STEWART: And that's correct, but only if that proffered hearsay evidence comes through the Comito balancing and it should be admitted pursuant to Comito. So you're absolutely right that if·the deadline is firm and parole revocation as it is in speedy trial act and state court, it's going to -- it's all going to come to a head on day 35 and perhaps --

SPECIAL MASTER RIVELAND: So, is that true if

44

BARKLEY
Court Reporters

it's the parolee's witnesses that don't show up too?

MR. STEWART: Well -- and I heard a little bit of this in your question before. If the parolee -- my understanding is that if the parolee is asking for more time, the parolee can't sort of burn the candle at both ends. The parolee can't say I want more time and I want my charges dismissed because I didn't have a hearing in time. Essentially the parolee asking for more time is waiving that time as the timeframe, especially the Valdivia timeframe.

SPECIAL MASTER RIVELAND: And is there no circumstance under which the parolee could waive their time in your opinion beyond that, beyond the witness issue?

MR. STEWART: Oh, no. I think the parolee can waive time. Actually, I'm not familiar with defendants' policy on -- if there are restraints --

MR. GALVAN: The injunction said they could waive time for good cause shown.

MR. STEWART: For good cause shown. So that could hypothetically include a situation where the parolee and parolee's counsel were completely unprepared or didn't have a witness present or -- and of course that good cause shown would all be in the determination of the hearing officer.

BARKLEY
Court Reporters

SPECIAL MASTER RIVELAND: Or if counsel felt that they could destroy the evidence presented by potential witness.

MR. STEWART: An adverse witness you're saying?

SPECIAL MASTER RIVELAND: Yes.

MR. GALVAN: We don't we don't dispute that situation. We don't dispute that continuances are properly sought and granted when parolee's counsel has a free choice. Our dispute is when parolee counselor are required to trade one right for another. When parolee's counsel are told by the hearing officer, "No I will not put the state to its case on day 35 based on what they brought here today. I will require you to waive --

SPECIAL MASTER RIVELAND: But isn't that happening even if it's -- isn't generally the parolee's counsel agreeing to delay the hearing --

MR. STEWART: No.

SPECIAL MASTER RIVELAND: -- because the state doesn't have their witness?

MR. STEWART: No, no, no.

SPECIAL MASTER RIVELAND: How do we know that?

MR. STEWART: Well, the very Comito objection made in parolee three's case that is defense counsel objecting to the lack of the adverse witness present.

SPECIAL MASTER RIVELAND: But we don't know

BARKLEY
Court Reporters

frequency or how often that happens?

MR. STEWART: Well, no, but on a very basic level under speedy trial act considerations and state court and I think it's the same considerations in parole revocation, on any kind of a delay is attributable to one side or the other. And when you're talking about a defendant in a speedy trial act consideration waiving time because they need their friendly witnesses and they don't have them present. That time is not counted against the speedy trial act clock. Same thing in parole revocation, but when it's an adverse witness, they absolutely can't require the defendant and the defendants' counsel to waive time simply to guarantee confrontation. Speedy trial act says, "No, dismiss the case," and it is absolute in state court, I'll tell you.

SPECIAL MASTER RIVELAND: You mentioned a word I'd like to pursue, but it will be after a ten minute break and that's good cause. Another one of those fascinating words that I don't understand you folks learned in law school. We'll take 10 minutes.

(Whereupon a brief recess was held from 10:56 a.m. to 11:25 a.m.)

SPECIAL MASTER RIVELAND: Let's see. 11:25. We'll proceed with our hearing.

Loren had indicated -- he used the phrase "good

BARKLEY
Court Reporters

cause," and I guess I'd like to ask the question of each party, not necessarily what you find to be the full legal listing, but your descriptions of what good cause would be.

MR. STEWART: Can I ask a clarifying question? Are we talking in the context of denying confrontation to good cause to deny confrontation as in the Comito balancing test?

SPECIAL MASTER RIVELAND: Yes.

MR. STEWART: Okay. All right. Good cause is another one of those problematic terms of art that varies based on the circumstances and the facts. This is what the cases say. Comito itself says that sometimes good cause might be proven only by administrative expense of procuring a witness. Good cause sometimes can be very little, but other times, it can be great. It's hard to define. I guess, as an approach to it generally, the government needs to show good cause as to why they were unable to procure an adverse witness to be confronted. Good cause sometimes would be that -- examples are a police officer who is an adverse witness might be unreachable -- and I've seen lots of examples; training, vacation.

To be clear, I think our position is some of these should be planned. If a police officer is on

BARKLEY
Court Reporters

vacation where the revocation window is 35 days and presumably a vacation is not, that might not be good cause, but good cause needs to basically be the government showing why they've been unable to produce the adverse witness to be confronted. I think it's hard to get much deeper than that.

In some cases where the adverse witness has made out-of-court unsworn statements where as Comito says the confrontation interest of the parolee is at its apogee. In those cases the good cause has to be extremely high to outweigh the parolee's interest in confrontation. I think, you know, if you'd like to prod me with questions or try to get deeper into this or if defendants would like to add to what I'm talking about.

MS. WHITNEY: No. I think just the simple statement is that the reasons that can constitute good cause vary from circumstances. Simply put, that's not a very helpful standard, but I think that's what it is as in both Comito and Hall and even Martin. There are certain factors that the courts have said can constitute good cause, which include the reasons that Loren has indicated being, you know, the expense of providing for difficulty of procuring the witness to the hearing; things of that nature, but I think what those cases really talk to is again is just going to vary depending on the circumstances

to look to see is that a good reason why the witness was unavailable and therefore, confrontation wasn't necessary or was overcome by that showing.

In Hall, for example, it says in determining the government's good cause for not producing a witness, we look to both the difficulty and expense of procuring witnesses and the traditional indicia of reliability borne by the evidence. So those are some factors there that we look at.

So in a nutshell, there's no clear cut delineation or listing of what all those factors can be because it does vary on the circumstances.

SPECIAL MASTER RIVELAND: Well, I hear you sort of saying the same thing actually.

MS. WHITNEY: Yes.

MR. STEWART: Yes.

SPECIAL MASTER RIVELAND: And it seems to me that the challenge of good cause is not that one could come up with a clear definition of it, but enough of a definition that training can occur; the DC's; otherwise your simple statement of judgment puts it all over the board. There has to be some baseline eventually for training purposes to --

MR. STEWART: Right.

SPECIAL MASTER RIVELAND: -- give guidance.

BARKLEY
Court Reporters

MS. WHITNEY: Right.

SPECIAL MASTER RIVELAND: Not full mandated direction, but to give guidance to a DC and how they're going to approach the issue.

MR. STEWART: One thing that I think has been effective that we have seen in defendants' training is the defendants do use case examples in their training. They particularly use in what is resource document number one -- that I think is not part of the record, but just to reference it -- they use the Comito case long excerpts of it. I think that cases are illustrative are helpful to coloring out what might constitute good cause.

In Comito, verbal -- unsworn verbal allegations, the good cause wasn't enough. In Hall, by contrast as the court says, unsworn verbal allegation, but as the court said in Hall, as part of good cause, the government ran the percipient witness's Social Security number, went to the homeless shelter where she was last seen; they really did a lot and in that case, that good cause showing overcame the individual parolee's confrontation interest. To the extent as we've said in our papers that these cases are helpful. Other cases, recent cases involving -- one involving a California parolee In re David Miller case is one where one of the parolee defense panel attorneys pursued a habeas writ. It got to the court of appeal,

BARKLEY
Court Reporters

resulted in another decision showing sort of where in Comito the good cause or lack of good cause should fall and I won't reiterate in any length, but in the papers, plaintiffs suggested that this might be a good way to help chart the waters of Comito and good cause if defendants were to alter their contract with the parolee defense panel to help fund more of those types of cases.

DEPUTY SPECIAL MASTER MORRISON: Part of what we were thinking about in this area is process; how to get those questions answered. I don't want a list right now, but when you all have been talking about what each of you considers good cause, have there been things where you've felt like you were at an impasse?

MS. WHITNEY: I would say probably not just because I think as we've discussed here today, there are some very common ones that we fully agree on. I think the problem is that -- and I don't know that anybody's really asked for this in the context of this issue -- but I don't think we can certainly come up with an exhaustive list --

DEPUTY SPECIAL MASTER MORRISON: No.

MS. WHITNEY: -- of those, and I don't think there's any disagreement about that. So I think the issue of the legal obligation versus what can be trained on it are sort of two separate things. The legal obligation I think we can readily agree on and do agree on that good

BARKLEY
Court Reporters

cause can vary depending on the circumstances. We know that there are some concrete ones that the courts have, in the 9th circuit have focused on as part of that look, but there are things beyond that. I don't believe we've tried to -- and correct me if I'm wrong -- that we've tried to go beyond that to look at what other circumstances might be considered in good cause showing and or that we've had any disagreement about the fact that there are some certain ones, but the circumstances can cause a variance of those.

MR. STEWART: I'd agree that we -- I don't think we've gone far down this road. I don't think we have come to an impasse on certain good cause situations. I think there might be some, but we didn't brief this. I don't think we need to go there.

DEPUTY SPECIAL MASTER MORRISON: I know you didn't brief it.

MS. WHITNEY: Hence the questions.

MR. STEWART: Well, I think that probably -- I think the disagreements would come about where plaintiffs' counsel see a greater burden on the -- particularly the parole agent to procure the presence of the witness regardless of what would be a more inconvenient-like rubric. The police officer on vacation is kind of a classic example and I'm not even certain of your policy on

BARKLEY
Court Reporters

this, but I do think I've seen in some cases and that the board typically will say that that is good cause for the denying confrontation and sometimes it ends up in the delay of a hearing or the continuance of a hearing.

I think generally that plaintiffs' counsel's perception of this is that there needs to be great obligation on the parole agent because the confrontation interest is highly significant. The agent has -- there's 35 days from the placement of the hold until a hearing and in that time frame -- go ahead.

DEPUTY SPECIAL MASTER MORRISON: That's what I wanted to accomplish.

SPECIAL MASTER RIVELAND: Let me follow on that though. We talked before about that the consideration of hearsay should be more onerous if indeed the penalty as a result of revocation is significant.

Is there a flip-side to that that if -- let's use the example. Let's say that I have a violent history, numerous convictions for violent crimes and I've been on parole. I'm now being held pending revocation and it's pretty clear that from all my history and my present potential violation, that I'm potentially dangerous to one or more people either a specific potential victim or many as the case may be. And DC is faced with a situation that you just described. There's the police report and the

police officer is either injured, ill, or on vacation and won't be available at best for two weeks.

Is there any incumbency of potential harm to the community that should be given consideration in whether I set aside to reschedule a hearing until my potential -- until my witness is available?

MR. STEWART: I mean, I think that --

SPECIAL MASTER RIVELAND: What I'm questioning, I guess, is a pure point of law versus harm to be done only speaking of harm to be done as potential to the community or an individual in the community rather than harm to be done to the parolee.

MR. STEWART: I think in plaintiffs' conception of it, yes, there absolutely should be some consideration of the fact that a parolee may be violent, pose an individual or generalized threat, but the result -- the solution to that is not extending the timeframes beyond a constitutionally -- or beyond the Valdivia injunction timeframe. The solution to that is not denying confrontation. A solution is in the hands of the person who knows this parolee the best; the agent. The agent needs to take it upon him or herself to see that this case is speeded along in a prioritized fashion so that the hearing agent is not then placed in this decision -- the hearing agent isn't put in a position of deciding between

BARKLEY
Court Reporters

safety and these constitutional rights.

SPECIAL MASTER RIVELAND: But those are the circumstances where the police officer simply is not available, is either injured or in the hospital.

MR. STEWART: And I think that there maybe would need to be some distinction between vacation, injury, illness. There are things that come up that are unforeseen and there are things that are foreseen and I think where the agent can plan and can ask on day four from the placement of the hold whether the police officer has upcoming vacation. There is no excuse for failing to know that.

An officer -- where a hearing is scheduled on day 31 and an officer is injured on the job or an officer gets sick, maybe that's a different scenario and I'm not sure that I'm prepared to make that concession firmly. It's not really something that we had explored or briefed for this, but that's the -- sort of what's foreseeable, what's not, and what is foreseeable regardless of the danger to the community, the onus is on the agent to make the case happen in the constitutionally mandated timeframe.

SPECIAL MASTER RIVELAND: You have some things --

MS. WHITNEY: Can I just tie up one thing? I did want to point out that I know that counsel has talked about the Miller case, which is a California state case,

**BARKLEY**
Court Reporters

and during the context of some of our discussions previously in meetings, we also talked about another California case called Shepherd and in the Shepherd case it often discusses -- and I realize it's under state law, so take it for what you will -- but having said that, the court in Shepherd talks about again whether good cause exists is determined on a case by case basis and so I think that even California courts consider that to be the same as the federal level and the court goes on in Shepherd to say that broadly good cause exists and they list three particular instances. One, is the declarant is unavailable under the traditional hearsay standard as defined in California's Evidence Code; two, when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense. Again, that's consistent with even what Gagnon and Morrissey say; and third, is -- or when the declarant's presence would pose a risk of harm including in appropriate circumstances, mental or emotional harm, to the declarant. And it goes on to say that good cause showing must be considered together with other relevant circumstances including the purpose for which the evidence is offered, the significance of the evidence to the factual determination upon which the alleged violation is based, and whether other evidence including a

BARKLEY
Court Reporters

probationer's admissions corroborates the evidence.

So I think that fundamentally talks about, again, the notion that it's going to vary on the circumstances and there are a number of things that obviously would formulate the good cause analysis that any trier of fact is going to do, which would include even a judge in a judicial setting.

MR. STEWART: Just one point only because we're on the record. Just in that last passage that Ms. Whitney quoted, that part of the corroboration there the court does say and whether other admissible evidence just to be clear.

MS. WHITNEY: Did I miss a word?

MR. STEWART: You just skipped the admissible part because that is part of what we're talking about in co-corroborate hearsay.

MR. GALVAN: Can I ask for another ten minute break at this point?

SPECIAL MASTER RIVELAND: 10 minutes.

(Whereupon there was a brief recess to change court reporters.)

BARKLEY
Court Reporters

THE FOLLOWING PORTION WAS TAKEN BEFORE

LINDA VACCAREZZA, COURT REPORTER

12:04 P.M.

SPECIAL MASTER RIVELAND: Okay. I think it's generally agreed upon that we'll work through the lunch period, and I just have a few things that I would like to follow up on. They are rather random, so excuse anything that doesn't seem to be in logical sequence.

In the defendant's opposition to motion on page -- I don't see a page number. Am I missing that?

MR. STEWART: It should be at the foot.

MS. DEVENCENZI: Maybe it's a copying issue.

SPECIAL MASTER RIVELAND: Maybe.

Anyway, in sort of the midst of -- starting at Line 7, you reference the 9th Circuit case, Re: Segal. And you talk about, in descending order, the amount of process which is due: the first being in criminal prosecutions; the second being probation revocations with imposition of sentence therefore suspended; the third being probation revocation hearings with sentence established and parole revocation hearings; and, Number 4, prison disciplinary proceedings.

I guess the question I have about that is --

and maybe one or both of you, of the parties, could help me understand a bit better -- what is your -- what is the difference between Number 2 and Number 3, the probation revocations with imposition and terms of standards to be applied?

MS. DEVENCENZI: I can answer that. Number 2, a probation revocation hearing with the imposition of the sentence heretofore suspended. When they put an individual on probation, they sometimes do a suspended sentence.

So like, for example, three-year state prison. When they violate their probation, that three years of state prison is imposed.

So that is a greater amount of due process due given the greater amount of time.

SPECIAL MASTER RIVELAND: What are the differences in terms of application of any standards between Number 2 level and Number 3 level? What is more onerous in regard to the category of Number 2?

MS. WHITNEY: Number 2 imposes a higher level of standards, higher level of due process, because you just pick up in the sentence sort of where you left off when you went on out on probation.

SPECIAL MASTER RIVELAND: But in terms of relationship to Comito, what are the differences? The

BARKLEY
Court Reporters

suggestion is that the most onerous applications would be in Number 1.

MS. WHITNEY: Correct.

SPECIAL MASTER RIVELAND: The criminal.

The second, with probation with a suspended sentence. And there's some, at least, assertion that there's a difference between the two in terms of application of Comito.

MS. WHITNEY: If you just give me a minute. Sorry. I wasn't prepared for this question, Chase.

MR. GALVAN: If I may, I may be able to address that.

MS. WHITNEY: Can you give me a minute? He is asking it to me.

MR. GALVAN: Sure.

MS. WHITNEY: It's Mempa v. Rhay is the case out the U.S. Supreme Court that discusses the standard for that.

The Mempa case, frankly, comes up with just the decision primarily that a lawyer must be afforded at that proceeding. So that's one of the impacts of the process, or the due process, that the U.S. Supreme Court applies in that proceeding.

So in that sense, at least, as affording counsel -- and let me see. There's more here.

BARKLEY
Court Reporters

While I'm looking, Ernie, go ahead.

MR. GALVAN: Okay. With regard to Comito confrontation, this is a whole separate area of the law, which I will confess to not know very much about.

My understanding is -- and if it would be helpful to the Mastership to have further briefing, we can do it. But my understanding is that at criminal sentencing, the rules of evidence, and of 6th Amendment confrontation, are different than they are at the guilt phase of a trial. And so some types of hearsay can come in unconfronted in a criminal sentencing.

There's a whole other level of complexity that's been added to this in the last few years, because after Booker, sentencing -- facts on which a sentence is based have to have been found beyond a reasonable doubt by a jury.

And how that affects the whole hearsay confrontation analysis at sentencing, there's probably been a lot of work done by other people on that, and I would guess no one in this room.

So there may -- it may be an interesting area of inquiry to compare the due process confrontation limits on hearsay admissions in the Morrissey parole

BARKLEY
Court Reporters

revocation hearing with those at a criminal sentencing hearing. Although, I think what you would likely end up with is an apples-and-oranges conclusion.

SPECIAL MASTER RIVELAND: Well, it seems to me fairly clear, within my limited definition of clear, for me, the criminal proceeding portion of it and the prison disciplinary process. The question, I guess, is more related to Number 2 and Number 3, simply as relates to Comito, not in terms of other due process rights.

MS. WHITNEY: There is no relationship to Comito in regard to those. What Mempa v. Rhay says is that it somewhat equates. Because the issue when you're basically putting the person back into prison for the rest of their term for which they were initially sentenced, it says that that is basically a continuation of the criminal proceeding from which it emanated. So it likens it more closely to what is step one, which is criminal prosecutions, because it is along the continuance of the criminal proceeding itself.

The distinction is, again, that Morrissey and Gagnon, in our case, say that parole revocation itself is not a part of the criminal proceeding. It should not be considered as part of that. So that's the

BARKLEY
Court Reporters

distinction that Mempa v. Rhay draws with this type of proceeding. And by "this type," I mean the probation revocation with the imposition of a sentence theretofore suspended.

In Mempa v. Rhay, it's just a continuation of the criminal proceeding because the person is put right back in to serve the remainder of their sentence.

For parole revocation, it's a very different situation. They are out on parole, they are serving differently. The criminal proceeding itself has been cut off already.

So consistent with Morrissey and Gagnon, the parole revocation aspect of it, as compared to one where they were just stepping back into their prison sentence, having it been suspended is very distinctive. It's not the same thing.

So in terms of Comito, Comito itself doesn't have anything to do with either criminal prosecutions or with the step number two, where there's a suspended sentence.

Does that answer your question?

SPECIAL MASTER RIVELAND: Yeah. Or with prison disciplinary hearings?

MS. WHITNEY: Correct. Correct.

BARKLEY
Court Reporters

SPECIAL MASTER RIVELAND: Which I might add from experience are all over the board. Speak about due process challenges. I guess here's one that's wide open, too. I'm not ignoring my questions. I simply -- some have already been covered.

Let me ask the question, and we have talked about this quite a bit already. But I'm a little curious as to the degree of dispute in the issues of the denying of -- based on specific circumstances and the issues of whether it's inconvenience or monetary value or expense or whatever.

Is there more -- is there a dispute there, or is it a matter of definition on that good cause issue?

MR. STEWART: I would think it's a matter of definition and of context. I think both Ms. Whitney and I have sort of agreed that what constitutes good cause in a particular circumstance might not constitute good cause in another circumstance. So there's the contextual piece, that piece. And then there's just the fact that we haven't really fleshed out in much detail the different scenarios of potential good cause to make agreements or uncover disputes on those issues.

SPECIAL MASTER RIVELAND: Would that be important to do, or is the agreement sufficient?

BARKLEY
Court Reporters

MS. WHITNEY: To be honest, I think that it's not a necessity that we define out that, and I think it's actually contrary to kind of what the law or the legal obligations says. I think we can certainly talk about, as a training issue, sort of how we look at things, or as Loren had pointed out, with what some live examples of cases show. That's a training issue.

But in terms of the legal obligation, I think it's actually important not to define out and limit ourselves as to what constitutes good cause, because I think certainly we agree on a few of them that the cases really illustrate or talk about. But beyond that, I think just the statements that the courts talk about varying on the circumstances, that it sort of defies being able to define it down to a particular list that's going to govern in all circumstances.

And were we to try to do that, I think we would also limit it so much that we would take away from the flexibility that Morrissey and Gagnon talk about should be a part of the overall consideration here.

MR. STEWART: I think I agree with Vicky, in general. I think that the -- you know, Paragraph 24 of the injunction, it's not just that Comito is the

BARKLEY
Court Reporters

gatekeeper as to admission of hearsay; it's also that the policies and procedures would be developed in accordance with Comito.

I think that we agree that that language in Comito about good cause varying on the circumstances and the facts is accurate. I think to the extent that we would reach any agreements, it would be that, you know, Comito, that Hall, that certain cases on certain facts reach certain outcomes.

And that's something that pretty clearly is, from the text of the cases, not any interpretation. But I agree that beyond that, I think it would be sort of ill-advised to try to define with great specificity what constitutes or does not constitute good cause.

MR. GALVAN: If I may add one caveat to that. In order to come into compliance with Paragraph 24 of the injunction, the policies and procedures developed by the defense must include, and the words in the injunction are, guidelines and standards derived from such law, Comito and the controlling law.

So I don't think that the defendants could reach compliance just by saying good cause is what you're balancing for, and you'll know it when you see it. I think that they do have to work on coming up with some guidelines and standards.

BARKLEY
Court Reporters

How specific those guidelines and standards have to be, no one really knows. But I think it has to be more than just saying good cause. So I think there does have to be some effort to define things and come up with guidelines and standards.

SPECIAL MASTER RIVELAND: You're using the term "guidelines and standards." Does that differ from what I heard Vicky saying, which is developing training -- I mean, is guidelines for the training for training purposes and/or decision making? I hear you about in the same place.

Is that incorrect or correct?

MS. WHITNEY: I thought that was correct but --

MR. GALVAN: No, I'm saying they are likely to be the same thing.

DEPUTY SPECIAL MASTER MORRISON: Following on that, is it correct that guidelines and standards have not been distributed to date?

MS. WHITNEY: On what in particular?

DEPUTY SPECIAL MASTER MORRISON: On the application of Comito.

MS. WHITNEY: Yes, they have.

DEPUTY SPECIAL MASTER MORRISON: Okay.

MS. WHITNEY: They have. The issue, I think, is there are standards and guidelines that have been

disbursed, there is training that occurs. Whether some in particular -- let me just address this -- but whether in particular a deputy commissioner, one out of 100, or however many out of 100, does something that's off the mark, perhaps is something that, again, is within the discretion that you're going to see in judicial scenarios just the same.

You can train them, but what they do sometimes is sort of beyond control. So, yes, the standards and the guidelines have been disbursed, they have been talked about, as Loren alluded to as well. There are examples, talking, for example, about the facts of Comito in that, as part of that training. But, yes, that is the case.

DEPUTY SPECIAL MASTER MORRISON: Okay. What years were the guidelines and standards distributed?

MS. CASSADY: In the manual. '04, July 1.

DEPUTY SPECIAL MASTER MORRISON: So just staying on that track for a second, you've mentioned training that you've done, and I think the material shows that there's been multiple trainings.

What testing have you done of the DC's understanding of those trainings?

MS. WHITNEY: I don't believe there's been any testing like sitting them down and -- I'm not sure

exactly what you're looking for, but I don't think there's been any formal, quote, "testing" --

DEPUTY SPECIAL MASTER MORRISON: Okay.

MS. WHITNEY: -- to see whether anybody understands or not.

Certainly, if something comes to the attention that there's been not a right decision or a good decision, that people can -- you know, the board can look at that and say, you know, yea or nay, this wasn't carried out the right way. But there's not been any testing of that formal kind, of testing of their knowledge.

DEPUTY SPECIAL MASTER MORRISON: Okay. Has there been a system of doing observations in the field about how DC's are applying Comito?

MS. WHITNEY: Yes.

DEPUTY SPECIAL MASTER MORRISON: Okay. Would you describe that some?

MS. WHITNEY: Well, I think it's the monitoring team goes out and observes revocation hearings. I myself have gone out and observed some revocation hearings. I think that's -- Plaintiffs obviously, and counsel, go out and observe and report back to us on things. I think there's sort of a lot of that. Different aspects going on at the same time.

BARKLEY
Court Reporters

DEPUTY SPECIAL MASTER MORRISON: Okay. And in those types of observations, is it structured to cover every DRU?

MS. WHITNEY: Yes, I believe so. I think they -- yeah, I'm just not sure where the questioning is going. I may be wholly unprepared for that discussion.

But, yeah, my understanding is that they obviously go from place to place in monitoring tours and such. And obviously if something is -- if ACDC -- and I don't mean the rock group, even though I like them -- but if an ACDC is out obviously observing their own staff at times, that's another way of monitoring what's been going on. Not only Comito, but every aspect of the revocation hearing itself.

DEPUTY SPECIAL MASTER MORRISON: In the course of those observations -- or you mentioned a central kind of information coming to you to check on a decision, right? You might review tapes, right?

MS. WHITNEY: That may be some part of it. Yes.

DEPUTY SPECIAL MASTER MORRISON: Okay. In doing that, have you seen instances where the balancing wasn't done, the balancing test of Comito?

MS. WHITNEY: I'm sure there are some instances where a particular deputy commissioner hasn't gotten

BARKLEY
Court Reporters

it right, and there are some instances where that decision may have been overturned or overruled or whatever.

And there are situations where a DC, in the context of a hearing, will be doing Comito balancing, find that unavailability, and such weigh against or in favor of excluding the evidence and dismiss charges accordingly as well. So I think there's some of everything. Yes.

DEPUTY SPECIAL MASTER MORRISON: Okay. So you were describing one scenario where they might do it in a way that you wouldn't want them to.

Has it also come to your attention that sometimes they don't do the balancing test?

MS. WHITNEY: Possibly, yes. Yeah. There may be some instances of that, I'm sure.

DEPUTY SPECIAL MASTER MORRISON: Okay. Okay. Thank you.

MS. WHITNEY: Yeah. Just as some of the judges in these cases haven't, but --

DEPUTY SPECIAL MASTER MORRISON: Exactly.

MS. WHITNEY: So, yeah. I mean, it's not only us, it's judges, too, that do that. So, yes, absolutely.

DEPUTY SPECIAL MASTER MORRISON: Of course.

SPECIAL MASTER RIVELAND: And sort of following on

BARKLEY
Court Reporters

that train, frequently in governmental organizations, when there are decisions to be made that aren't heavily structured, where there is a lot of discretion, means for quality control or some kind of administrative review somewhere, other than simply monitoring teams or whatever, where either side can say X didn't happen, and one of the plaintiff's solutions for that, of course, is the provision of funds to CalPAP to be able to appeal a case in court.

That's sort of a legal decision, not an administrative action. On other issues, decisions alone, defendants have been working for quite some time, I think, on a decision-review process.

Narrowing that review to Comito issues alone, is there any thought being given to what an administrative process might be to assure quality control?

MS. WHITNEY: As to Comito itself? Just limiting to Comito?

SPECIAL MASTER RIVELAND: Limiting or to include Comito.

MS. WHITNEY: Well, I think that there's overall considerations that are given to a process to review things that may have happened. That hasn't reached full fruition yet, and how that's going to be hammered

BARKLEY
Court Reporters

out -- I'm not sure what you're asking me.

SPECIAL MASTER RIVELAND: Let me start in a different way.

MS. WHITNEY: This is kind of outside the motion.

SPECIAL MASTER RIVELAND: Let me do a parallel kind of thing.

MS. WHITNEY: Yeah.

SPECIAL MASTER RIVELAND: In the process that's enumerated in the remedial order, the agreement is that there are a variety of people who make decisions: The parole officer makes the first decision to pursue revocation; the supervisor reviews that decision; the ParAd reviews the supervisor's decision; and the DC deals with that decision in both probable cause as well as at final hearing.

So we have a chain of administrative review over discretionary decisions.

MS. WHITNEY: Right.

SPECIAL MASTER RIVELAND: And at any level, that decision can be reversed, affirmed, or whatever the case may be.

It seems at the moment in Comito, or in revocation hearings, that there's limited administrative review. I mean, there's the access to a superior court to da, da, da. But to assure quality

of a very discretionary decision process, what kind of things would go on to do that, both present or future?

MS. WHITNEY: I guess I'm not prepared to answer that question in the context of the motion, Chase, to be honest with you. I think what I can tell you is that in the context of any administrative proceeding, be it with this state agency or another, some of them have administrative processes, where they review internally. And then after that final, you can file with the superior court if you want to challenge the decision. Or there are ways that you can file a writ with the superior court even outside of the administrative process in some cases.

So in terms of a review of a bad decision in a revocation hearing, I would say to you that the check on that, or the quality control on that, is going up to superior court for review of the decision in whatever aspect it's being challenged on, and that that is a sufficient level review, just as it is in a legal proceeding.

If a superior court judge makes a decision that is questionable, or you have a basis to want to challenge it, you would then file that up with the Court Of Appeal and proceed through that process, and

BARKLEY
Court Reporters

that judicial review of those decisions is in fact itself a quality control function, because as in the case of In Re Miller, which the Plaintiffs have cited to, if the superior court or, you know, an appellate court determines that there was an error that was made below, they are going to create that rule or that quality check, in essence, to say if you're doing this in the future, you need to be doing it this way.

And that's the sort of the quality control aspect of the judicial process, I think, with respect to those types of challenges.

SPECIAL MASTER RIVELAND: So that would suggest to me that the total quality review you see is a legal one.

For example, the process I outlined as part of the remedial order in the State of California is very similar to the same process used in many jurisdictions -- parole officer, parole supervisor, frequently another supervisor or ParAD type person, da, da, da, da, going to a hearing.

The purpose -- and it's not directed by the court or agreed to necessarily. It's simply the quality control that the agency itself puts on discretionary decision making, and not something imposed by a federal or state court.

BARKLEY
Court Reporters

And the question then becomes, in my mind, or to ask is, is the only -- the legal process offers the opportunity, whether in any kind of hearing, that the legal rights of an individual are protected. But it's not necessarily implemented for the purpose of quality control of what an executive agency does.

MS. WHITNEY: Right. Understood.

SPECIAL MASTER RIVELAND: So my question is: Is there any thought given, or any process available, for administrative review for quality purposes aside from legal appellate options?

MS. WHITNEY: Right now, Title 10 does provide some review after the decision, and there are -- the standard in Title 10 provides for that review, at least currently in the regulations.

MS. CASSADY: 15.

MS. WHITNEY: I'm sorry. Title 15. I'm getting those confused a lot these days.

But Title 15 provides that the Board itself can review decisions and to -- and have certain things that they have to look for. So that is in place currently, yes.

So in the context of considerations of things beyond that, obviously, yes, there is consideration being given to that, to develop a process for that.

BARKLEY
Court Reporters

Yes.

MR. STEWART: I think, just so Plaintiffs can be heard briefly on this, I think we appreciate the approach because there should be a sort of multi-faceted or outside-the-box approach to what the proper solution is to problematic Comito outcomes.

Our confidence in any kind of an administrative review process right now is low, of course, because we have legal disagreements on what the proper standards are. So, hence, the motion, of course, and bringing the enforcement motion.

With respect to the Title 15 review, I believe it's Section 2041, and that's just a section that allows the Board to review any decision made by a Deputy Commissioner within ten days of the decision. The Board can change, in one direction or the other, any decision that's -- there's no mechanism in that section for a parolee to challenge a particular revocation outcome.

I think in practice, the parolee defense panel has sent e-mails to the Associate Chief Deputy Commissioners to try to use it as a source of underground appeal that we don't really acknowledge exists. It sort of exists; it's not quite clear.

The point is that right now, the only

BARKLEY
Court Reporters

mechanism for challenging an adverse Comito decision as a practical matter is state habeas. And in the case of most petitioners, they don't have the time, they don't have the resources.

I say the time because their revocation -- generally their revocation terms are fairly short, and by the time all the process goes ahead, they have already served out their time for most petitioners. Aside from a principle of "I was wronged," there is no practical benefit to pursuing a state habeas. The In Re Miller case is an exception, in part, because one of the more talented parolee defense bar attorneys, Jennifer Jennings, took that case on and followed it through to the Court of Appeals. That's rare, very very rare.

DEPUTY SPECIAL MASTER MORRISON: And let me ask. You've raised in this motion the idea of funding those kinds of writs.

What would make a violation of this aspect of the revocation process rise above other types of violations such that it should be funded?

MR. STEWART: I think, as we have put forth in our papers, I think the ongoing problem with this -- and when I say "ongoing problem" with Comito, it's not just the dispute since I wrote a letter on December 15

BARKLEY
Court Reporters

to defendants about this -- December 15th, 2006, to be clear, one year ago tomorrow.

It's not just that it's been a year -- it's been documented for quite some time, and in the Mastership's own report, that the implementation of Comito has been problematic -- it's been an ongoing problem. And I think both parties would recognize that Comito is complicated.

It's not just -- there's not sort of a willful desire not to follow the law in Comito; it's that Comito is complicated.

And when many of your hearing officers or lay hearing officers -- really, very, very detailed and ongoing training is critical. Perhaps testing or something to gauge the commissioners' levels of understanding is needed.

But what's very clear -- based on the outcomes, based on the evidence that we put forth in our moving papers, and based on what we even hear from attorneys is that -- and see in revocation hearings -- it's that it's not working. Comito is not working. Confrontation rights are being trampled.

And I think that's why it's Plaintiff's position that this rises above other levels of violations within the Valdivia case.

**BARKLEY**
Court Reporters

DEPUTY SPECIAL MASTER MORRISON: On one point that you've raised. This would be an estimate, so it's really a general question. I know you haven't looked for this. I don't expect you've looked for this.

Among the DCs currently working in the field, about how many of them are lawyers?

I'm not looking for a number. Do you think it's a majority? A minority?

MS. CASSADY: I think it would be a small majority at this point.

DEPUTY SPECIAL MASTER MORRISON: Small majority?

MS. CASSADY: Right.

DEPUTY SPECIAL MASTER MORRISON: And we understand there's a new class in academy right now.

MS. CASSADY: Go ahead. I'm sorry.

DEPUTY SPECIAL MASTER MORRISON: Among the DCs who are in academy now, do you have a sense of how many are lawyers?

MS. CASSADY: I'm going to say zero.

MS. SULLIVAN: One

MS. CASSADY: I'm sorry. Excuse me, Steve. But those are -- is he permanent position?

SPECIAL MASTER RIVELAND: Let's stick to one person.

BARKLEY
Court Reporters

MS. CASSADY: None of those are permanent positions; but they are being trained, obviously, to be used when necessary.

DEPUTY SPECIAL MASTER MORRISON: Okay.

SPECIAL MASTER RIVELAND: The -- I lost my train of thought there.

MS. WHITNEY: Chase, can I just touch base with you on one of the issues? And that is, that what is the review right now? And presently if either CalPAP requests or the agent of record requests or the parolee makes a request to review a decision, the Board looks at that. If it is -- looks like that problem is a systemic problem, then all of the DCs are trained about it.

If it is not systemic, and it's limited to one DC, then that DC is trained on it. So there currently is that process in effect, in place.

SPECIAL MASTER RIVELAND: One of the things I was going to say is something that Loren said is absolutely correct. It is a complex problem. And that's the only decision we are going to make today is, yes, it's a complex problem.

But help me understand from a plaintiff's submissions. It is complex, and there's a whole variety of ways that one could review whatever, and

BARKLEY
Court Reporters

you have recommended one, that the CalPAP attorney -- CalPAP be funded so that its attorneys could do the habeas process.

That, however, does not seem to be stated in the remedial order whatsoever.

Can you help me understand a little more how you arrived at that? I mean, I can think of a whole variety of quality control processes that could be implemented to deal with the fact that it is complex, and that it may not be clearly universally applied. That's one solution.

MR. STEWART: Do you want to speak to this?

MR. GALVAN: Oh, okay. This -- what we would be asking for, what Plaintiffs would be asking for, would be a recommendation to the Court for a further remedial order.

In other words, based on the finding that the compliance with Paragraph 24 has been unsatisfactory, a further remedial order is necessary so that the funding of CalPAP for selected writs would be in the form of further -- a further remedy ordered by the Court beyond what's in the permanent injunction.

MR. STEWART: And the Court has done this before?

MR. GALVAN: The Court in Valdivia has not been asked to order additional remedies since 2004, if I

recall correctly. Certainly the Court in other similar class actions, such as Armstrong and Coleman, has periodically found that it's necessary to order additional actions from the defendants beyond what we are -- in the existing injunctions, some of those injunctions.

Coleman and Armstrong, those are not consent decrees. Those are -- it depends. Part of Armstrong's are in the form of the consent decrees for stipulated injunctions; parts are imposed injunctions after trial.

But in both types of contexts, stipulated and nonstipulated injunctions, courts, in actions similar to this one, have ordered additional relief when they find it's necessary because the existing relief has not succeeded in curing the constitutional violation.

SPECIAL MASTER RIVELAND: We did have a stipulated order on the remedial -- joint stipulated order on remedial sanctions since 2004.

MR. GALVAN: That's correct. And that demonstrates the imperfection of my recollection. That April 3rd, 2007, stipulated order does order additional further steps that were not specifically prescribed in the existing -- in the 2004 injunction. So, yes, Valdivia is also an example.

BARKLEY
Court Reporters

MR. STEWART: I might just add for context that in the emergence of this Comito dispute, as Plaintiff's counsel identified this as a problem and started to engage with Defendants about the perceived problems, it was a long arduous process. And we encountered intransigence. We felt that really is actually not -- it's not a personal intransigence, it was just simply what is a disagreement for the legal standard of admission of hearsay evidence and nonconfrontation and revocation hearings.

I don't think that it necessarily means that we couldn't devise some sorts of solutions, but I think that there needs to be -- the legal disagreements will certainly need to be clarified before Plaintiff's counsel would have confidence in a quality control mechanism that is internal to Defendants. Hence, the resort to the courts to funding writs.

MS. WHITNEY: Do I get to respond?

SPECIAL MASTER RIVELAND: You certainly do.

MS. WHITNEY: I'm trying to be polite.

I guess a couple of points. Number one, they are asking for folks to go back to the Court and basically say that there's been a finding that there's been no compliance in Paragraph 24, that it's been

unsatisfactory. And I find it curious about that. While there may have been some problems, there's not a lot of evidence to support that kind of a determination to warrant a further court order in this regard.

I think the fact that there may be some difficulties in understanding, you know, Comito and how it's going to be applied and what have you, doesn't rise to the level that we are not complying or that we are violating terms of injunction, and I just want to be very careful about that. That that shouldn't be the connotation here.

And I also don't think it warrants going back and asking for an order for CalPAP to be funded by the State to file writs, when there is no statistics submitted by the Plaintiffs, no evidence to show that this is such a problem that it requires such an extreme remedy.

And by that, I want to go back and touch on how we kind of got here, which was Morrissey and Gagnon. Morrissey alludes to the potential of maybe having counsel for some of the parolees. Gagnon goes a little further, and it says, yes, you should have to have attorneys, but it limits the circumstances in which an attorney has to be provided to a parolee.

BARKLEY
Court Reporters

What we have done in this case, in Valdivia, through the injunction, is we have gone way further than Morrissey and Gagnon ever required, and we have provided attorneys, the State has, to every parolee going through a revocation proceeding.

There's no other state in this country that does that. And so I want to be careful that we don't create an obligation and an extreme that is neither warranted or necessary, but is also really going to be extending the obligations in this state beyond what even the U.S. Supreme Court, and even the injunction in this case, warrant requires.

MR. GALVAN: If Plaintiffs might be heard on one point about the settlement. The provision of attorneys to all parolees in the Valdivia settlement was not done gratuitously by Defendants. The defendants were under an order to provide a full probable cause hearing within ten calendar days of the arrest with live witnesses, and confrontation at the probable cause hearing followed by a revocation hearing 30 days after the arrest, full confrontation witnesses.

And the matter of how many attorneys had to be appointed -- or in how many cases attorneys had to be appointed was set for trial, would have to be

BARKLEY
Court Reporters

tried. So they were under the jeopardy of full probable cause hearing, ten business days with live witnesses, and a trial in which they had the risk of being subjected to much broader or further attorney appointment by order of the court.

They settled the case partly by offering full attorney appointment. And in return, they got a significant modification of the Morrissey probable cause hearing requirement, which under this injunction does not ordinarily require live witnesses under this injunction.

So I'm always cautious when I hear an appeal back to, well, Morrissey and Gagnon don't require us to do all these things. There are many things that Morrissey and Gagnon would require them to do that they do not have to do because of this stipulated permanent injunction.

And so I think these appeals to Morrissey and Gagnon should be disregarded in this kind of situation. You know, "Oh, we are doing much more than we had to do under Morrissey." They are also doing much less than they had to do under Morrissey. There are benefits and burdens that they got in this settlement.

SPECIAL MASTER RIVELAND: Okay.

BARKLEY
Court Reporters

DEPUTY SPECIAL MASTER MORRISON: I think we are in the home stretch, you guys.

So earlier, Plaintiffs had talked about a practice of identifying another witness or other evidences needed during the hearing and postponing in order to get that. I didn't hear what Defendant's position is on that.

MS. WHITNEY: One moment. I had a case -- there are a couple of things, I guess. Let me harken back to what I was thinking long ago.

I guess I would point -- I think that the Mastership has touched on a lot of things having to do with what good cause could be for maybe pushing past the 35 days, if that happens. Aside from the fact that the example that's given is the only one we know of, and even then I'm not sure it's a pure, true example of everything.

But I would also point you to Ryan versus Montana, which is a 9th Circuit case. We do address some of that in our brief -- or address the case in the brief.

But in that case, importantly I think to this consideration, is the fact that there was sort of a head-butting of constitutional rights. One was the right to confrontation, and one was the right against

self-incrimination. But -- so the parolee didn't want to testify at his own revocation hearing because he didn't want to incriminate himself for a later criminal proceeding.

What the 9th Circuit said in Ryan is that, again, it harkens back to Gagnon in the precursor. And the statements there that the procedural rights afforded in probation revocation and -- are not intended to create this sort of rigid and overly formal proceeding, that the right to confront and cross-examine adverse witnesses is not absolute in such a proceeding, and may be curtailed, again, if the hearing officer finds good cause for not allowing the confrontation.

And what it said in the context of pitting the right against self-incrimination against the right to confrontation is that there are circumstances even -- well, basically that it was a decision, a strategic decision, on the part of the parolee.

And that there were circumstances even in criminal trials, where a defendant is required to make a difficult strategic choice that necessarily results in a relinquishing of a constitutional right that is both legitimate and noncompulsive.

And so in that situation it says, sorry, it

BARKLEY
Court Reporters

doesn't matter that you're going to be -- you're having to choose between those two constitutional rights. That's a strategic choice on your part. And it said that's a circumstance in which, again, looking at full circumstances, a hearing officer could find that confrontation doesn't have to be allowed, or it's not going to suffer as a result.

So I think there are choices that have to be made in those circumstances. And, again, this right to confrontation and revocation proceedings, as Gagnon really states, is not an absolute, and that there may be good cause. And I would say in the particular parolee's case, some of that -- and I think the record bears that out -- is that even the parolee's own witnesses weren't there.

And so I think you have to give some latitude to the fact that the good cause can determine that out at that phase. It could be the public safety concern, for example. All of those considerations can come into play. It doesn't necessarily result in the two rights -- I guess I don't know how to say it better, but I think just the fact that the two rights are there and exist, and the strategic choice that's made on what to do with it in a constitutional sense is not going to be something that's in error.

BARKLEY
Court Reporters

DEPUTY SPECIAL MASTER MORRISON: Okay. And so I know you want to get in here. I just want to distill a chunk of that.

So is it fair to say that Defendants believe that in some circumstances in the weighing that postponing for the evidence that people believe is necessary can be a good cause for postponement?

MS. WHITNEY: Absolutely.

DEPUTY SPECIAL MASTER MORRISON: And a lot of your description goes to a disagreement with Plaintiffs that putting a parolee to that choice is an improper one.

MS. WHITNEY: And it goes to the fact that they are saying that there's this one example that we are forcing a choice between constitutional rights, and the Ryan case goes to the fact that, yeah, that happens sometimes, but the right to confrontation in some setting isn't absolute. And it's a choice that can be made.

DEPUTY SPECIAL MASTER MORRISON: Understood.

Yes, Mr. Stewart?

MR. STEWART: I simply can't let that spin of Ryan go. And I know it's not -- I'll make it very brief because I know the Mastership isn't concerned with the facts of the case.

BARKLEY
Court Reporters

SPECIAL MASTER RIVELAND: That's not necessarily true, but proceed.

MR. STEWART: Ryan's case involved a choice that Ryan made to either testify and possibly incriminate himself on local charges for theft of a typewriter in the Billings bus station. Ryan was basically in a hearing, where he was facing revocation of his probation and deferred sentencing.

At the same time, that testimony could be used against him. He chose not to testify. That is what Ryan talks about. I challenge you to find any hearsay, to find confrontation issues in Ryan. It's not in the case.

The Ryan case is about a strategic choice between testifying and possibly incriminating oneself or not testifying and basically relinquishing that right to testify.

That is not a confrontation case. And to the extent that Defendants rely on it to the contrary, I would submit it's a misread of the case.

DEPUTY SPECIAL MASTER MORRISON: Okay. I appreciate both of your clarifications, and I would like to move on to another subject.

MR. STEWART: Sure.

DEPUTY SPECIAL MASTER MORRISON: I would like each

BARKLEY
Court Reporters

of you also to comment on a subject we haven't touched on yet.

As we are thinking about the effect of hearsay exceptions, should we be distinguishing documents from testimonial evidence from other types of out-of-court statements? And if so, how?

MS. WHITNEY: Go ahead.

MR. STEWART: That's a good question.

DEPUTY SPECIAL MASTER MORRISON: Thank you.

MR. STEWART: It's a tricky question. It's something that we have discussed at some length, and I think wasn't addressed much in the briefing, if that's your question.

Our position is that the distinction between a particular piece of hearsay evidence, whether it's testimonial or nontestimonial, sometimes called documentary, our position is that in the Comito balancing, that that distinction has no place. And I'll tell you why.

To the extent that the testimonial and nontestimonial distinction has gotten a whole lot of new traction under the Crawford v. Washington decision by the Supreme Court in 2004, that is a 6th Amendment case, what we are talking about here is the limited 5th Amendment due process confrontation. And to

BARKLEY
Court Reporters

clarify, Plaintiff's counsel do not believe that Crawford V. Washington or 6th Amendment confrontation applies in parole revocation.

So to the extent that the Crawford decision distinguishes in a big way against testimonial and nontestimonial evidence, the 5th Amendment jurisprudence hasn't taken that same course. The 5th Amendment due process right to confrontation is based on an entirely different body of law. It's something that, honestly, as the parties didn't brief this -- we thought about it a little bit, but we didn't brief it, and I don't think we are prepared to sort of make concessions or agreements on that right now.

But it is our position that the distinction shouldn't change the way that hearsay exceptions or reliability might fit into a Comito balancing.

MR. GALVAN: Could I add one thing to that? This is where the hearing officer needs maximum discretion and ability to decide cases individually, as Morrissey requires. Morrissey says you have to make a specific finding as to a piece of evidence.

The Comito balancing test is robust enough to ensure that the hearing officer can make decisions about the reliability of a particular piece of evidence, including in those decisions whether it's a

BARKLEY
Court Reporters

document. Whether it's, I think, testimonial would translate in the Comito context to unsworn verbal allegation, the least reliable type of out-of-court statement.

I don't think that in order to comply with the 14th Amendment and the Paragraph 24, the Valdivia permanent injunction, that Defendants need to import the new 6th Amendment Crawford distinctions between testimonial and nontestimonial into their guidelines and standards.

I think their guidelines and standards will work just based on the Comito doctrine, and maximizing the hearing officer's ability to decide each case individually. That, by the way, is where we depart fundamentally on the significance of a hearsay exception.

They say hearsay exception exists; you apply a per se rule, in every single case, no matter the circumstances; that that unconfronted out-of-court statement can come in and be considered. We say don't take away the hearing officer's discretion. Don't put blinders on the hearing officer to all the other circumstances.

And one of the circumstances would be: This is a document recording something that happened in the

BARKLEY
Court Reporters

ordinary course of business, not prepared for litigation, tends to be reliable, reduces the confrontation interest.

So, yes, the hearing officer should look. Is it documentary, is it testimonial? But I don't think the hearing officer has to look at it through the lens of the new 6th Amendment jurisprudence, which is based in very historical notions of why the 6th Amendment confrontation right in particular was developed, and what kind of statements it was meant to keep out and let in.

Because we are in a separate due process realm, I don't think you need -- you don't need it. It doesn't add any protection for either the State or the parolee, because Comito is enough, properly applied, provided Comito is not distorted with a per se hearsay exception rule.

SPECIAL MASTER RIVELAND: To follow Defendants on that, is a deputy commissioner prohibited from applying Comito --

MS. WHITNEY: No.

SPECIAL MASTER RIVELAND: -- if there's a hearsay exception?

MS. WHITNEY: No. And one of the things that we raise in our opposition in the very beginning, in the

BARKLEY
Court Reporters

introduction, is that we need -- to have a deputy commissioner, even if there is a hearsay exception, and they don't feel comfortable with it, should be able to then have the discretion and have the choice to say I'm just going to run through the Comito balancing.

It's like running home to mama, if you will. But the point being that the legal obligation itself that's created, which we believe is founded in cases, is that we have the option, if there is a longstanding exception, to permit admissibility if we choose -- if a DC chooses to do that.

If they choose to go through a Comito balancing nonetheless, that's what they have discretion to do. And we are not seeking to limit that ability for a DC to do that. What we want to be clear of is that in the context of a document, being the injunction, that imposes a legal obligation, that legal obligation doesn't go too far down the road.

And so that's why -- and the position in our opposition is taken the way that it is -- that we have a right and the ability under the law, and it permits us to use hearsay exceptions if we so choose to do that, or we can just run through Comito balancing, whichever is more comfortable.

BARKLEY
Court Reporters

But the legal obligation itself we feel is very fundamentally something that has to be based on the law and not beyond it. But, yes, absolutely, it's the case, they can do it if they want to do it.

DEPUTY SPECIAL MASTER MORRISON: So on the earlier question, what would your observations be?

MS. WHITNEY: On the distinction between testimonial and documentary? You know, I would have to join with Loren. That was not an issue that was addressed in the briefing. So giving some thought to it, there are some cases, including even In Re Miller, the California case that the Plaintiffs look at, that talks about -- and Comito, for example, the unsworn, out-of-court statement is testimonial in nature. Obviously that was a problem situation.

And in In Re Miller, they talk about how the documentary evidence has indicia of reliability that's built into it, sort of things like that. When you look at cases that cut -- the business records exception, obviously that's a documentary evidence, but I don't think -- I would agree that I don't think that there -- Comito itself doesn't make a distinction between the two at all.

And so tying the obligation to Comito, which it must be because of the injunction, there's nothing

BARKLEY
Court Reporters

in Comito itself that says there should be a distinction between the two.

DEPUTY SPECIAL MASTER MORRISON: Okay. Some specific language that I would like Plaintiffs to comment on, Vicky read it earlier, but I'll read it again so it's fresh in your minds.

So Hall's language concerning "the interest is outweighed by the government's good cause and the independent indicia of reliability" that support Hawkins's statements" what are your thoughts about that? It's right before the conclusion.

MR. STEWART: I think -- I mean, before the conclusion -- so this is the point where the Court is talking about the false imprisonment claim --

DEPUTY SPECIAL MASTER MORRISON: Which, by the way, I'm familiar with, so you don't have to catch me up.

MR. STEWART: Right. Right. I won't.

I think to the extent that the Court is at that point, summarizing what it's done in that same section -- and I would refer back to the preceding page. So the nature of the facts to be proven by the evidence heading underneath that heading is where the court looked at corroborative evidence. The Court runs through the various pieces.

BARKLEY
Court Reporters

The Court, at that point, says this is not the end of the inquiry. Simply because hearsay evidence bears some indicia of reliability does not render it admissible. Hall's otherwise strong interesting confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated.

I think that we are talking about the same charge here. This is the false imprisonment claim. And I think this is the Court's way of summarizing that at the end of the day, the Government's good cause did in this case outweigh Hall's interest in confronting the hearsay evidence, the reliability -- as the Court says, the reliability of the evidence decreased Hall's interest in confrontation, but didn't end the day. That's the way I would view that.

DEPUTY SPECIAL MASTER MORRISON: Okay. I want to -- I'm going to delay us for just a minute because I want to call it up, because I think that what I had in mind was a little different from what we have addressed so far. So I want to make sure that we have a chance to talk about it if we haven't yet.

Okay. I think my question remains about your take on why the Court is discussing the fact that the balance goes against Hall, why that discussion

BARKLEY
Court Reporters

separates out the independent indicia of reliability as though it were a separate factor.

MR. STEWART: In that same paragraph?

DEPUTY SPECIAL MASTER MORRISON: Right.

MR. STEWART: So just to be clear, you're reading the conjunctive. So this is where that interest is outweighed by the Government's good cause for not producing Hawkins as a witness and independent indicia of reliability? That portion?

DEPUTY SPECIAL MASTER MORRISON: Right. That portion.

MR. STEWART: So you're reading that in the conjunctive to say that both the good cause and separately or independently the indicia of reliability would outweigh?

DEPUTY SPECIAL MASTER MORRISON: I'm saying it can can read that way. So I'm wondering what your response to that is.

MR. STEWART: My read of that is simply that the Court is acknowledging that in this particular case indicia of reliability were important. They were important to decreasing Hall's interest in confrontation that the Court had characterized in the false imprisonment claim.

The Court had characterized that interest as

BARKLEY
Court Reporters

very high. This is the Court's way, through the indicia of reliability, of reducing that somewhat, which then, compared with the Government's good cause, results in this outcome. Now -- and I understand -- I want to be responsive to exactly what you're asking.

I see how you could read it as a completely independent and separate ground for denying the confrontation as indicia of reliability alone, but I think Hall explicitly says to the contrary, that indicia of reliability does not defeat that confrontation of interest.

Inartful language, perhaps. But probably a better explanation is simply that the Court here is going through a Comito balancing -- and it's not hidden; it's in the headings of each section -- and quite clearly concludes that conducting that Comito balancing, that the interest in confrontation is outweighed by the good cause for denying it.

I think -- I mean, I think that it's -- that sentence can be misleading. But I think that an interpretation that indicia of reliability independently would overcome the confrontation interest is squarely rejected in the preceding page, when the Court says no, that's not the case.

DEPUTY SPECIAL MASTER MORRISON: Your thought.

BARKLEY
Court Reporters

MS. WHITNEY: With all due respect, I think it is more consistent to read it as you are seeing it, which is that it is a second fact. It's not just a combination of the two; it's two separate components of the Government's good cause.

The reason that I say that is that this, when you point to the beginning of the inquiry, which talks about indicia of reliability is not enough, that then turns the Court to the good cause, but in the focus of the first element, which is the expense and availability of that witness, his unavailability. Because if you look at what Hall does in this regard, you know, they go at length. The first thing they cover off the bat on that analysis is the fact that Hawkins is homeless. Nobody can find her. They can't subpoena her. So it really focuses on the unavailability as a separate factor from the indicia of reliability.

And the reason that I think that it is consistent internally with Hall to say that indicia of reliability -- in our case we would say a longstanding hearsay exception means you don't have to go through the balancing -- is because, again, in the precurser before the full analysis of all the charges in Hall, the 9th Circuit says -- I mean, they can say it's

BARKLEY
Court Reporters

dicta, but it's there -- that in addition, several pieces of evidence supporting the domestic violation allegation are admissible under hearsay exceptions.

They don't say that we would have to balance or anything of that nature. They say it's admissible under hearsay exceptions. And then they go on to point to, again, the language about longstanding hearsay exceptions. They meet the more demanding requirements for criminal prosecutions also suffice in parole revocation proceeding.

So it's internally consistent in the Hall case to say that if I have something that's subject to a long-standing hearsay exception which both Congress in the federal rules of evidence -- Congress and the courts have determined establish indicia of reliability, that that factor alone establishes good cause -- that that alone establishes good cause for the Government on that side.

So you don't have to do the balancing because it's already been done for you because Congress and the courts have said it. They have done the balancing. Why would we need to redo it here in this context?

So I think it's internally consistent to take the approach that if you've got indicia of reliability

BARKLEY
Court Reporters

under hearsay exception, you really don't have to go through more. And I guess just as a follow-up, you know, the cases -- one of the cases that we talked about, which I think is really important in the context of how this is workable, is United States versus Aspinall, out of the 2nd Circuit, which is cited by our cases in the 9th Circuit.

And in Aspinall, they run through this thing, this whole procedure, and come to the point, again, of saying you don't need to do any balancing analysis when it comes with a longstanding hearsay exception. They even talk about Comito in Aspinall and what Comito did and what Comito's effect was, and the fact that even Comito is discussed in the advisory committee notes to the Federal Rules of Criminal Procedure 32.1, which is sort of the confrontation kind of aspect, that conducting the harmless error analysis is something that you do except where the out-of-court statements fall within a recognized hearsay exception.

So I think the Aspinall case has some very good language that really speaks to what we are talking about. And it talks about Comito, and it talks about the process to get there. But I think that's totally consistent and actually where Hall is

BARKLEY
Court Reporters

getting its language in that regard.

MR. STEWART: Could I make a couple points just in response? The Aspinall case may have good language; I don't think it's cited in your brief. And I'm at a loss to discuss it today because I don't see it cited in the papers.

MS. WHITNEY: It is.

MR. STEWART: But as to the Hall case, the language that Ms. Whitney cited is -- it's not discussed before any of the violations are discussed. In fact, it's -- and I'm referring to the language as to hearsay exceptions.

First of all, Hall does not say that the reliable hearsay pieces of evidence must satisfy. The Hall court says that the longstanding exceptions to the hearsay rule that they should satisfy the lesser standards. It's not as clear that necessarily the Court is saying what Defendants are making the Court out to say. I'm not going to go on further about Hall because you've seen it in my exhaustive brief.

I do want to add one thing, though, to this conversation. I'm just going to quote a little piece of the United States v. Martin. And the reason this is relevant is that United States v. Martin, to refresh, was the urinalysis case. And that's a case

BARKLEY
Court Reporters

where the Government precisely made the argument that balancing -- that considering each of the factors on each side -- and at this point it wasn't called Comito balancing; it was called the Simmons balancing or the Simmons right cause test -- it was effectively the same balance that we still talk about today.

At this point the Government was arguing in Martin, 9th, Circuit 1993, the Government was arguing that where urinalysis tests are so reliable, they should simply come in, no balancing. What the court said to that is no. The court says the Government urges -- and I'll give you a cite here. I'm on 313.

"The Government urges us to hold that urinalysis reports are so inherently reliable that they may be introduced in any revocation hearing. We decline to adopt such a doctrine in this circuit. Such a blanket rule would be tantamount to abandonment of the Simmons balancing test.

We would effectively hold the weight of the Defendant's right to confrontation is irrelevant in revocations involving urinalysis which is likely a significant class of cases."

And going onto 314, the Court says: "The balancing test is a workable means to assure" -- now quoting Morrissey -- "to assure that the finding of a

BARKLEY
Court Reporters

supervisory release violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the releasee's behavior."

The court then went on to its command that we cited in our reply brief that the Martin Court says "District courts should apply the balancing test to every alleged violation of the Morrissey right to confrontation."

In a later footnote: "Having held that district courts must apply the Simmons right balancing test." It's clear. This has been tried before; it's been rejected before. And I think going down the path of hearsay exceptions trumping a confrontation right is ill-advised.

DEPUTY SPECIAL MASTER MORRISON: That's all I have.

SPECIAL MASTER RIVELAND: I would like to add all of the briefs as exhibits to the transcript. Can you take them electronically?

Let me ask the first question. Do both parties have with them hard copies of that, that we could introduce as exhibits?

MS. WHITNEY: I would need a copy made of it. I have -- I have my originals, but, yes, I do have both

BARKLEY
Court Reporters

our opposition brief and our rebuttal brief with me.

MR. STEWART: We have our -- could easily produce -- mine is marked up a little bit but --

SPECIAL MASTER RIVELAND: That's my problem.

MR. STEWART: We have them all in this office as well, so I think we could produce them.

SPECIAL MASTER RIVELAND: Can we provide them to Linda?

MR. GALVAN: Yes.

MS. WHITNEY: Is it just the briefs that you want?

SPECIAL MASTER RIVELAND: Yes.

MS. WHITNEY: Because I know we have things under seal problems with some of the other things. That's why I asked.

MR. GALVAN: So, to clarify, not the declarations and exhibits? Just the actual memoranda of points and authorities? The briefs? The arguments?

SPECIAL MASTER RIVELAND: I think the exhibits are fine unless they are under seal.

MS. WHITNEY: There are many under seal.

MR. GALVAN: So we should leave those out.

SPECIAL MASTER RIVELAND: I believe so.

MR. GALVAN: And we'll provide Linda with everything not -- everything not marked "sealed

BARKLEY
Court Reporters

document" we'll provide to Linda.

SPECIAL MASTER RIVELAND: Could you simply mark them as exhibits chronologically by date? Each one is dated. Start with the first date and mark them through.

MS. WHITNEY: Maybe we can go off the record?

(Discussion was held off the record.)

(Exhibits 1 through 4 were marked for identification.)

(Time noted: 1:19 p.m.)

BARKLEY
Court Reporters

EXHIBIT B—EXHIBIT 1

BINGHAM, McCUTCHEN LLP
GEOFFREY HOLTZ – 191370
KRISTEN A. PALUMBO – 215857
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

PRISON LAW OFFICE
DONALD SPECTER – 83925
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
HOLLY M. BALDWIN – 191317
ERNEST GALVAN – 196065
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA:

OFFICE OF THE SPECIAL MASTER

| | |
|---|---|
| JERRY VALDIVIA, et al.,<br><br> Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br> Defendants. | No. Civ. S-94-0671 LKK/GGH<br><br>**NOTICE OF MOTION AND MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION**<br><br>HEARING<br><br>Date: November 1, 2007<br>Time: 10:00 am<br>Location: Rosen, Bien & Galvan, LLP<br>Officer: Chase Riveland, Special Master |

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

1006

**TABLE OF CONTENTS**

Page

NOTICE.................................................................................................. 1

INTRODUCTION ................................................................................... 2

FACTS..................................................................................................... 4

ARGUMENT ........................................................................................... 7

I. The Applicability of a Hearsay Exception to Proffered Hearsay Evidence Does Not Obviate the DC's Obligation to Conduct a Balancing Under *Comito*. ........................................................................ 8

 A. *Morrissey v. Brewer* and Other Pre-*Comito* Cases on Confrontation Emphasized the Importance of the Parolee's Right to "Confront and Cross-Examine Adverse Witnesses." ...................... 8

 B. Under *United States v. Comito*, the Hearing Officer Must Balance an Individual's Confrontation Rights Against the Government's Good Cause for Denying that Right. .................................. 10

 C. Subsequent Holdings of the Ninth Circuit Dutifully Follow *Comito*, Applying the Prescribed Balancing Approach............................. 11

 D. Other Administrative Cases, Statutes, and Regulations Reaffirm the Principle that Confrontation is Central, even Outside of Criminal Law............................................................................ 14

 E. Recent California Cases Support the Federal Case Law Position.......................................................................................................... 16

II. Hearsay Evidence Statements that Cannot be Admitted Under *Comito* Do Not Become Admissible When They are "Corroborated" by Other Inadmissible Hearsay Evidence. ....................................................................... 17

III. A Parolee Should Never be Put to Choosing Between a Timely Hearing and Confronting His Accuser: If a *Comito* Objection is Sustained and the 35-Day Deadline is Imminent, the Hearsay Evidence Must be Excluded. ......................................................................... 19

IV. The Systemic Violation of Confrontation Rights Requires A Comprehensive Remedy That Includes an Effective Means of Challenging Future Violations. .......................................................................... 20

CONCLUSION ........................................................................................ 21

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Gagnon v. Scarpelli,*
411 U.S. 778 (1973)............................................................................9

*Goldberg v. Kelly,*
397 U.S. 254 (1970)..........................................................................17

*Hernandez-Guadarrama v. Ashcroft,*
394 F.3d 674 (9th Cir. 2005) ......................................................14, 15

*Morrissey v. Brewer,*
408 U.S. 471 (1972)....................................................................passim

*Saidane v. INS,*
129 F.3d 1063 (9th Cir. 1997) ...........................................................15

*United States v. Comito,*
177 F.3d 1166 (9th Cir. 1999) ....................................................passim

*United States v. Egge,*
223 F.3d 1128 (9th Cir. 2000) ...........................................................18

*United States v. Hall,*
419 F.3d 980 (9th Cir. 2005) ...............................9, 11, 12, 13, 14, 18

*United States v. Huckins,*
53 F.3d 276 (9th Cir. 1995) ...............................................................18

*United States v. Littlesun,*
444 F.3d 1196 (9th Cir. 2006) ...........................................................11

*United States v. Martin,*
984 F.2d 308 (9th Cir. 1993) .........................................................9, 13

*United States v. Petty,*
982 F.2d 1365 (9th Cir. 1993) ...........................................................18

*United States v. Simmons,*
812 F.2d 561 (9th Cir. 1987) ...............................................................9

*United States v. Stanfield,*
360 F.3d 1346 (D.C. Cir. 2004)..........................................................11

*United States v. Walker,*
117 F.3d 417 (9th Cir. 1997) ...........................................2, 9, 10, 11

*Valdivia v. Davis,*
206 F. Supp. 2d 1068 (E.D. Cal. 2002)................................................2

*White v. White,*
 925 F.2d 287 (9th Cir. 1991) ........................................................................................2

*Zadvydas v. Davis,*
 533 U.S. 678 (2001)..................................................................................................... 14

**State Cases**

*In re Miller,*
 52 Cal. Rptr. 3d 256 (Cal. Ct. App. 2007) .............................................................passim

*People v. Arreola,*
 7 Cal.4th 1144 (1994) ................................................................................................. 16

*People v. Shepherd,*
 60 Cal. Rptr. 3d 616 (Cal. Ct. App. 2007) ....................................................... 16, 17, 21

**Statutes**

2 C.F.R. § 180.745(a)(1)..................................................................................................... 15

5 C.F.R. § 919.840(a)(1)..................................................................................................... 15

8 C.F.R. § 1240.10(a)(4)..................................................................................................... 15

22 C.F.R. § 51.85................................................................................................................. 16

22 U.S.C. § 2714................................................................................................................. 16

28 C.F.R. § 45.3(d)(3)......................................................................................................... 15

42 C.F.R. § 431.242(e)........................................................................................................ 15

45 C.F.R. § 205.10(a)(13)(vi) ............................................................................................ 15

Cal. Code Regs. tit. 15, § 2643 .......................................................................................... 15

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

**NOTICE**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 1, 2007 at 10:00 a.m. at Rosen, Bien & Galvan, LLP, located at 315 Montgomery Street, 10th Floor, San Francisco, a hearing by the Special Master with Report and Recommendation to the Court will take place regarding plaintiffs' motion for an Order Enforcing Paragraph 24 of the *Valdivia* Stipulated Order for Permanent Injunctive Relief ("*Valdivia* Permanent Injunction" or "Injunction").

Through this motion, plaintiffs seek a Report and Recommendation requesting an Order remedying defendants' denial of parolees' right to confront and cross-examine evidence against them, in violation of Paragraph 24 of the *Valdivia* Permanent Injunction and of parolee's due process rights set forth in *Morrissey v. Brewer*, 408 U.S. 471 (1972) and *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999). Defendants are unlawfully denying plaintiffs' confrontation rights by failing to properly limit the admission of hearsay statements in parole revocation proceedings as required by law. Plaintiffs request that the Special Master recommend that the Court issue an Order: (1) enforcing Paragraph 24 of the Injunction and clarifying its meaning; (2) compelling defendants to revise training materials, policies, and procedures to comport with *Comito* and the strictures of constitutional due process; and (3) requiring defendants to provide counsel to pursue writs of habeas corpus on behalf of parolees whose confrontation rights have been violated as a result of defendants' unlawful actions.

This motion is based on this Notice of Motion and Motion and Proposed Report and Recommendation filed and served herewith, the Declarations of Shirley Huey ("Huey Dec.")[1] and Loren G. Stewart ("Stewart Dec.") filed and served in support of this motion, the Court files in this action, and such other materials and argument as may be presented before or at the hearing.

---

[1] The Huey Declaration and the exhibits attached thereto contain "personal information" about prisoners and parolees which is protected by a July 11, 2000 Protective Order in this case. Should the Huey Declaration or its exhibits be filed with the Court, they must be filed under protective seal.

1
NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

**INTRODUCTION**

Before the state can return a parolee to prison, the state must provide due process, which "must include procedures which will prevent parole from being revoked because of 'erroneous information or because of an erroneous evaluation.'" *Valdivia v. Davis*, 206 F. Supp. 2d 1068, 1074 (E.D. Cal. 2002) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)). The state, as well as the parolee, has an interest in a process that provides a "reliable result" in determining the facts regarding the parolee's conduct. *See id.* at 1078. In our legal tradition, the strongest check on "erroneous information" is confrontation and cross-examination of the witness providing the information. *See White v. White*, 925 F.2d 287, 291 (9th Cir. 1991) (reversing parole revocation due to government's failure to produce witnesses, noting that "[w]here the facts are contested, the presence of adverse witnesses, absent good cause for their nonappearance, is necessary to enable the parole board to make accurate findings").

Because of their critical truth-finding functions, confrontation and cross-examination are central to the otherwise somewhat relaxed due process requirements for parole revocation. *See Morrissey*, 408 U.S. at 489. The settlement in *Valdivia* recognized the crucial role of confrontation and cross-examination by incorporating in the *Valdivia* Permanent Injunction the following requirement at Paragraph 24: "The use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999). The Policies and Procedures shall include guidelines and standards derived from such law." The rules of evidence, including the hearsay rule, do not apply to parole proceedings. Instead, the admission of evidence is regulated by the parolee's due process confrontation rights, which limit what facts may be proved without an opportunity to cross-examine the witness asserting the purported facts. *See United States v. Walker*, 117 F.3d 417, 419-420 (9th Cir. 1997). The Ninth Circuit stated in *Comito* that, "in determining whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally

-2-
NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

guaranteed right to confrontation against the Government's good cause for denying it." *Comito*, 177 F.3d at 1170.

In late 2006, defendants announced to plaintiffs' counsel that their hearing officers would be instructed to dispense with any consideration of the parolee's confrontation right whenever the state offered to prove a fact by an out-of-hearing assertion that fell within a recognized hearsay exception. *See* Huey Dec. ¶ 2. Defendants have imported one-half of the rules of the evidence—the hearsay exceptions—into parole proceedings, while ignoring the other half, the hearsay exclusions. Importing the hearsay exceptions allows the state to offer more unconfronted evidence against parolee, while conveniently ignoring the hearsay exclusions that might operate to limit such unconfronted evidence. By announcing and adhering to this novel rule, defendants have stopped complying with *Comito*, the *Valdivia* Permanent Injunction, and due process. As set forth in the factual recitation below, individual cases show that this approach has been implemented and is currently depriving parolees of their due process-based confrontation rights. After many requests by plaintiffs' counsel—starting in December 2006—to resolve this issue informally, the parties met and conferred with the Special Master on August 6, 2007. *See* Huey Dec. ¶ 6. It became clear that the parties had reached an impasse over at least the following three issues implicating *Comito* and confrontation rights.

**First**, under *United States v. Comito*, in a hearing to which the rules of evidence do not apply, may California return a parolee to prison based on out-of-court statements from persons the parolee never gets to confront or cross-examine merely because the statement might fall within a state or federal hearsay exception?

**Second**, under *United States v. Comito*, can the denial of confrontation be excused if the state lines up several unconfronted hearsay statements next to one another and allows each statement to corroborate its neighbors, even though all are from witnesses who are never confronted or cross-examined by the parolee?

**Third,** under due process and the *Valdivia* Permanent Injunction are defendants ever entitled to make a parolee choose between the right to a timely hearing and the right to confront adverse witnesses?

The correct answer to all three questions is "no" under the Permanent Injunction, as well as under the controlling federal case law, and persuasive California authorities.

The Reports of the Special Master in this case provide context to these three disputes, demonstrating that defendants' recognition of parolee's confrontation rights, and compliance with the corresponding section of the *Valdivia* Permanent Injunction, has been inconsistent at best. *See* Huey Dec. ¶ 7 & Ex. 3 at 33-34 (noting in First Report of the Special Master that "[d]efendants acknowledge the need for further training guidance" regarding *Comito*, that interviews with "parole agents and supervisors reveal[ed] that many uncertainties and misinformation regarding hearsay information and *Comito* requirements remain," and that "Deputy Commissioners' application of *Comito* varies depending upon their background and length of tenure"); *see also* Huey Dec. ¶ 8 & Ex. 4 at 30 (noting in Second Report of the Special Master that "[p]ossible obstacles to the rights to present evidence, to be heard, and to confront accusers must be examined").

Plaintiffs respectfully request that the Special Master recommend that the Court issue an order requiring that defendants revise their policies and procedures to conform with due process and Paragraph 24 of the Permanent Injunction, develop and implement new training for hearing officers, and revise the contract for state-appointed counsel to provide compensation for writs and appeals regarding denial of confrontation rights.

**FACTS**

Although this motion seeks relief on purely legal issues and not specific individuals' cases, plaintiffs' counsel first recount four recent examples of the impact that defendants' *Comito* policy had on *Valdivia* class members. In the brief summaries below, the parolees are identified by number. Identifying information is provided in the sealed Huey Declaration filed concurrently herewith.

(A) Parolee 1, *see* Huey Dec. ¶¶ 9-10 & Ex. 7-9: Parolee 1 was charged, among other things, with possession of marijuana. The marijuana was found during a parole search of Parolee 1's residence of record, where several other people lived. During the search, these other residents allegedly denied that the marijuana was theirs, and said it belonged to Parolee 1. At Parolee 1's revocation hearing, none of the other residents appeared, and the Agent of Record testified that all of the "people at the home that lived their denied it was theirs and said it was [Parolee 1]'s marijuana." *See* Huey Dec. ¶ 10 & Ex. 5 at 7:10-20. Parolee 1's attorney objected to the introduction of these hearsay statements. Instead of weighing the parolee's interest in confronting the accusations against the government's good cause for denying the confrontation before ruling on the objection, the Deputy Commissioner ("DC") summarily overruled the objection without conducting any *Comito* balancing. The following exchange then occurred between the DC and the Agent of Record: "[DC]: Were you in your official capacity as [a] peace officer when you took that statement? [Agent]: Yes. [DC]: Is that a normal operation – normal part of your duties? [Agent]: Yes. [DC]: Okay." *Id.* at 8:6-13. The DC conducted no further discussion of the hearsay statements and found good cause for the charge of possession of marijuana, assessing a twelve month revocation term, ineligible for half-time credit. *See id.* at 24:5-10. The DC thus relied on the least reliable form of unsworn verbal allegation—the self-serving statements of persons trying to avoid prosecution, and did so by short-circuiting the required *Comito* balancing test.

(B) Parolee 2, *see* Huey Dec. ¶¶ 11-17 & Ex. 7-9: Parolee 2 was charged with, among other things, failure to complete a drug treatment program at Center Point. Parolee 2 was discharged from Center Point because of an alleged dispute that he had with a Center Point employee. The employee was subpoenaed to testify regarding alleged verbally abusive statements made by Parolee 2 to the employee and his decision to "lay-in" in his bed during a period not designated for laying in (conduct that resulted in his expulsion from the program). The Center Point employee failed to appear. The DC found good cause for the violation of failure to complete a drug treatment program by relying on a document

containing hearsay statements by the Center Point employee. The DC stated that the document was "used in the normal course of business" making it "almost a business-record-type of document, giving it more credibility than just an average document." *See* Huey Dec. at ¶ 15 & Ex. 9 at 36:1, 36:9-11. The DC also allowed the parole agent to testify to a conversation he had with the Center Point employee in which the employee recounted the alleged verbally abusive statements. *See* Huey Dec. at ¶ 15 & Ex. 9 at 20:16-25, 21:1-10. The DC did not conduct a *Comito* balancing as to either hearsay statement, never considering whether good cause existed for denying confrontation and whether parolee's strong interest in confronting the witness's version of the facts that led to his program expulsion and parole violation might outweigh the government's good cause. The parolee was returned to custody for twelve months, eligible for half-time credit. *See* Huey Dec. at ¶16 & Ex. 9 at 58:15-17.

(C) Parolee 3, *see* Huey Dec. ¶¶ 19-24 & Ex. 10-14: Parolee 3 admitted to one charge of use of cocaine, and denied charges of possession of marijuana and battery (the battery charge was amended to assault). Several witnesses were subpoenaed for the revocation hearing that was held on the 27th day from the hold, but none of the witnesses to the possession of marijuana or battery charges appeared. The Agent of Record sought to introduce the witnesses' out-of-court statements through a police report and other hearsay. Parolee 3 made a *Comito* objection. The hearing officer sustained the *Comito* objection, and then said "I'm sustaining it to the extent that we're going to postpone [the hearing] and subpoena all the witnesses." *Id.* at ¶ 21 & Ex. 11 at 24:17-19. The hearing on the remaining two charges occurred on November 14, 2006, eleven days beyond the 35-day requirement set forth in paragraph 23 of the *Valdivia* Permanent Injunction. *See* Huey Dec. at ¶ 21 & Ex. 13-14.

At Parolee 3's late hearing on the remaining charges, only one of seven subpoenaed witnesses appeared. The DC allowed the witness to testify regarding statements made by three hearsay declarants based on the belief that the reliability of three corroborating

hearsay statements bolstered one other. The DC denied a *Comito* objection, stating on the BPH 1103 that:

> P's interest in confrontation weighed against the importance of witnesses' testimony to the final finding of fact is lesser than the reliability of the hearsay evidence and the corroboration of it. Three independent [hearsay] statements . . . each corroborate each other and the weight of the corroborated hearsay evidence outweighs P's interest in confrontation.

Based on these hearsay statements, good cause was found on a charge of battery, and the parolee was returned to custody for a period of nine months, eligible for half-time credit. *See* Huey Dec. at ¶ 24 & Ex. 12 at 4.

(D) Parolee 4, *see* Huey Dec. ¶ 25-26 & Ex. 15-17: Although Parolee 4's attorney objected to the admission of hearsay statements regarding Parolee 4's alleged intoxication in a car accident, the DC admitted the hearsay without conducting a *Comito* balancing test. The DC heard testimony from a police officer regarding out-of-court statements made by the parolee's brother in which the brother recounted the parolee's statements at the accident scene about the parolee's alleged ingestion of methamphetamines and alcohol. The parolee's brother was not present at the revocation hearing and had never been subpoenaed. When asked about his decision to allow the hearsay statements of the brother, the DC stated that the more important the evidence is to the state's case, the more likely he is to admit it. This is the precise opposite of the proper test under *Comito*. The DC ultimately found good cause on all charges. *See* Huey Dec. at ¶ 26 & Ex. 16 at 2.

## ARGUMENT

First, under Comito, its precursors, and its progeny, a balancing test must be used to weigh the releasee's interest in confrontation against the government's good cause for denying it before hearsay evidence is admitted. The applicability of a state or federal hearsay exception does not obviate the need to conduct the Comito balancing. Other federal, administrative, and California cases and statutes lead to the same conclusion.

Second, one hearsay statement is not rendered admissible because it is corroborated by other inadmissible hearsay statements.

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

Third, when a revocation hearing is held at or near the 35-day deadline set in Paragraph 23 of the Valdivia Permanent Injunction and percipient witnesses fail to appear, DCs must exclude hearsay evidence pursuant to Comito and, if necessary, dismiss charges accordingly; even if the case involves serious charges, the witness's failure to appear is not good cause for postponing the hearing.

**I. The Applicability of a Hearsay Exception to Proffered Hearsay Evidence Does Not Obviate the DC's Obligation to Conduct a Balancing Under *Comito.***

In the cases of Parolees 1 and 2 above, hearing officers declined to conduct a *Comito* balancing and instead admitted the evidence as "reliable" because they believed it fell within a hearsay exception.[2] Defendants have confirmed in writing that these are not isolated errors, but rather official policy. *See* Huey Dec. ¶ 5, Ex. 2. As set forth below, this approach is contrary to *Comito, Morrissey*, and due process.

**A. *Morrissey v. Brewer* and Other Pre-*Comito* Cases on Confrontation Emphasized the Importance of the Parolee's Right to "Confront and Cross-Examine Adverse Witnesses."**

In *Morrissey v. Brewer*, the U.S. Supreme Court recognized the importance of "assur[ing] that the finding of a parole violation will be based on verified facts." *Morrissey*, 408 U.S. at 484. To that end, the Court held that the "minimum requirements of due process" include the parolee's "right to confront and cross-examine adverse witnesses." *Id.* at 489. The *Morrissey* Court authorized a single exception to that rule: the right to confront and cross-examine yields if "the hearing officer specifically finds good cause for not allowing confrontation." *Id.* The *Morrissey* Court provided one example of good cause: "if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed." *Id.* at 488. The Court did not suggest that evidence deemed

---

[2] In the case of Parolee 1, it must also be noted that the hearing officer did not comprehend the standards for admission of hearsay evidence under either the business or public records exceptions to the hearsay rule. Those exceptions only apply to the introduction of a *writing* containing hearsay statements, not oral statements perceived while performing official duties. *See* Fed. R. Evid. § 803(6), (8) (pertaining to admission of a "memorandum, report, record, or data compilation"); Cal. Evid. Code §§ 1271, 1280 (permitting admission of "[e]vidence of a writing"). Such errors are perhaps unsurprising, granted the scant training that DCs have had on the issue. *See generally* Stewart Dec. ¶¶ 2-6, 8-9.

trustworthy, testimony of fearful witnesses, or any other hearsay statements should be exempt from the confrontation requirement in parole revocation hearings.

The Ninth Circuit has applied the *Morrissey* conditional confrontation right using a balancing test. In *United States v. Simmons*, 812 F.2d 561 (9th Cir. 1987), the Ninth Circuit noted that the Supreme Court's decisions in *Morrissey* and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), "delineate a process of balancing the probationer's right to confrontation against the Government's good cause for denying it." *Simmons*, 812 F.2d at 564. The balancing approach set forth in *Simmons* formed the foundation for subsequent confrontation disputes in the revocation context.

In *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993), the Ninth Circuit again emphasized the *Morrissey* confrontation rights, noting that a supervised releasee[3] must "receive a fair and meaningful opportunity to refute or impeach the evidence against him." *Martin*, 984 F.2d at 310. In *Martin*, the supervised releasee contended that the court's refusal to allow him to retest urine samples deprived him of the right to confrontation. Citing *Simmons*, the Ninth Circuit applied a balancing approach and agreed with the releasee. *Martin*, 984 F.2d at 314. As in *Simmons*, the proper approach to the violation of a parolee's confrontation right was a balancing test; the court recognized no exception based on "trustworthy" evidence. Indeed, the *Martin* court noted that, although a urinalysis may be fairly trustworthy, a trustworthiness rule "would be tantamount to abandonment of the *Simmons* balancing test." *Martin*, 984 F.2d at 313. It would "effectively hold that the weight of the defendant's right to confrontation is irrelevant in revocations" that involve trustworthy evidence. *Id.* The Ninth Circuit also adhered to the balancing approach four years later in *United States v. Walker*. See 117 F.3d 417, 420-21 (9th Cir. 1997) (balancing releasee's right to confrontation against government's good cause for denying it and noting that "[u]pon conducting the balancing test enunciated in *Martin*, reliable hearsay evidence may be admitted").

---

[3] "Parole, probation, and supervised release revocation hearings are constitutionally indistinguishable and are analyzed in the same manner." *United States v. Hall*, 419 F.3d 980, 985 n.4 (citing *Comito*, 177 F.3d at 1170).

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

**B. Under *United States v. Comito*, the Hearing Officer Must Balance an Individual's Confrontation Rights Against the Government's Good Cause for Denying that Right.**

The seminal case in the Ninth Circuit on confrontation in revocation hearings is *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999). In that case, Robert Comito's supervised release was revoked on four charges: three grade C violations and one more serious grade B violation. *See Comito*, 177 F.3d at 1167-68. The grade B violation, unlawful use of his ex-girlfriend's bank cards, credit cards, and checks without her permission, was sustained purely on the basis of hearsay evidence. *See id.* at 1168. Comito's probation officer, Officer Perdue, testified that Comito's ex-girlfriend had told Perdue that Comito had used the cards and checks without her permission. *See id.* Corroborative evidence that, alone, was insufficient to sustain the alleged violation was also presented. *See id.* at 1168-69, 1172.

The *Comito* court stated that, "in determining whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court *must* weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Id.* at 1170 (citing *Walker*, 117 F.3d at 420) (emphasis added). The parolee's interest in confrontation is based on two primary factors. First, the more important a piece of evidence is to a particular finding, the more important it is that the parolee be given an opportunity to demonstrate that the proffered evidence does not reflect verified fact. *Id.* at 1171. Second, the less reliable the particular hearsay evidence is, the greater the parolee's interest in confronting that evidence. *Id.* ("Unsworn verbal allegations are, in general, the least reliable type of hearsay . . . .").

Then, the government's good cause for denying confrontation is assessed. In the *Comito* case, "no cause [was] shown for denying Comito his confrontation rights—there is nothing at all to put on the Government's side of the scale." *Id.* at 1172. As in *Morrissey*, *Simmons*, *Martin*, and *Walker*, the message is clear: when a releasee or parolee objects to the admission of hearsay in a revocation hearing, the court *must* balance the individual's confrontation rights against the government's good cause.

-10-
**NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION**

Nowhere did the *Comito* court suggest that "trustworthy" hearsay evidence is an exception to the rule. In fact, the government made that argument, and the *Comito* court rejected it.

> The Government also argues that, even absent a showing of difficulty in obtaining [the girlfriend's] testimony, the hearsay evidence bears sufficient indicia of reliability, by virtue of the other testimony and evidence presented at the hearing, to make it admissible. Given the substantial nature of Comito's interest in confrontation and the absence of good cause for the Government's failure to produce the adverse witness, the supporting or corroborative evidence noted by the Government cannot suffice to deprive Comito of his constitutional right to confrontation.

*Id.* at 1172 & n.9.

### C. Subsequent Holdings of the Ninth Circuit Dutifully Follow *Comito*, Applying the Prescribed Balancing Approach.

The federal cases over the eight years that have elapsed since *Comito* reaffirm its approach. *See generally United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) (noting that *Morrissey v. Brewer* "expressly held that a parolee is entitled to cross-examine witnesses at a revocation proceeding, subject to balancing certain factors" (internal footnote omitted)); *United States v. Stanfield*, 360 F.3d 1346, 1359 (D.C. Cir. 2004) (noting that, where an objection is raised to hearsay evidence, courts are "obliged to conduct a balancing test, weighing [the releasee's] right to confront the declarant against the government's asserted grounds for foregoing confrontation"). The Federal Rules of Criminal Procedure that apply to revocation of federal supervised release—a procedure that is "constitutionally indistinguishable" from parole revocation, *see Hall*, 419 F.3d at 985 n.4—codify the same approach and cite *Morrissey*, *Walker*, and *Comito*. *See* Fed. R. Crim. P. 32.1(b)(2)(C) & Advisory Committee Note to 2002 Amendment ("[T]he court should apply a balancing test at the hearing itself when considering the releasee's asserted right to cross-examine adverse witnesses. The court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it.").

The Ninth Circuit's most detailed examination of a *Comito*-type issue was in *United States v. Hall*, 419 F.3d 980 (9th Cir. 2005). Although the *Hall* court discussed hearsay exceptions with respect to the reliability of the evidence, two very important points should be emphasized. First, the *Hall* court dutifully followed the balancing framework set forth in *Comito*, and heavily cited and reaffirmed the teachings of both *Comito* and *Morrissey*. Second, the *Hall* court discussed federal hearsay exceptions to the extent that they bolstered the reliability of the evidence, thereby reducing the releasee's confrontation interest *within* the *Comito*-balancing test, but *not* substituting for or excusing the balancing test.

The appellant in *Hall* appealed the revocation of his supervised release because he claimed, among other things, that he was denied his due process confrontation rights by the admission of hearsay statements regarding two charges against him: domestic violence and false imprisonment. *See Hall*, 419 F.3d at 986-89. The *Hall* court examined each charge under the *Comito* framework in turn. On the domestic violence charge, the court held that "[t]he nonhearsay evidence at the hearing was substantial and sufficient to conclusively prove the domestic violence charge." *Id.* at 986. Because the domestic violence charges were supported by competent nonhearsay evidence, the hearsay statements were of low importance to the ultimate finding, reducing Hall's interest in confronting them.

On the false imprisonment charge, the court found that Hall's interest in confrontation was higher than it was for the domestic violence charge because the hearsay statements (unsworn verbal allegations) were the primary evidence on the charge. *Id.* at 987. The court noted, however, that the victim statements were partially corroborated by competent evidence (discovery of a golf club allegedly used in the offense where the victim had stated it would be, confronted testimony from an eyewitness to the encounter between Hall and the victim, photographs of bruises that the victim sustained that were consistent with her statements, and confronted testimony from a doctor regarding the bruises sustained by the victim), and therefore could be considered more reliable than uncorroborated unsworn verbal allegations. *Id.* at 987-88.

But the court did not stop there. It expressly stated that reliability alone does not end the inquiry, and proceeded to examine the government's good cause for not producing the witness. *Id.* at 988 ("Simply because hearsay evidence bears some indicia of reliability does not render it admissible. *See Martin*, 984 F.2d at 313-314 (even urinalysis testing conducted by a laboratory is not sufficiently reliable to create a blanket rule that releasee has no interest in contesting the results). Hall's otherwise strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated."). After examining the government's extensive attempts to find the victim and bring her to the hearing, the court held that Hall's "interest in confronting [the witness]" was "outweighed by the government's good cause for not producing [the witness]." *Id.* at 989. It is clear that the *Hall* court engaged in *Comito* balancing for both charges.

The outcome was different than that in *Comito* and other cases because the government presented copious evidence at the hearing to establish good cause for the hearsay declarant's absence. The hearsay declarant, Susan Hawkins, was a homeless woman who left the shelter where she had been staying without providing forwarding information. *See id.* at 988. The government even tried running Hawkins's social security number and birth date to attempt to ascertain her location. *See id.* As the *Hall* court stated, "[t]his effort stands in stark contrast to cases where we have found that the government did not have good cause for failing to produce a witness. *See, e.g., Comito*, 177 F.3d at 1172." *See id.*

The *Hall* court's discussion of hearsay exceptions was only relevant to its *Comito* balancing, and did not constitute the announcement of a new rule to elevate hearsay exceptions above the confrontation right. *See Hall*, 419 F.3d at 987. Indeed, hearsay exceptions are often relevant to a *Comito* analysis of the parolee's confrontation interest. If the out-of-court statement bears indicia of reliability, the parolee's interest in confronting the evidence decreases. One example of reliability may be whether an out-of-court statement falls within a recognized reliability-based hearsay exception. *See Comito*, 177 F.3d at 1171 ("[T]he more subject to question the accuracy and reliability of the proffered

evidence, the greater the releasee's interest in testing it by exercising his right to confrontation."). But the *Comito* balancing must still occur.

Though hearsay exceptions may be relevant to a *Comito* balancing, they do not render hearsay *per se* admissible. The *Hall* court considered the relevant indicia of reliability, and then incorporated that into its *Comito* balancing. *See id.* (examining "whether the government had good cause in failing to produce [the hearsay declarant], and whether that good cause outweighs Hall's right to confrontation"). Indicia of reliability, including hearsay exceptions, diminish a parolee's confrontation interest, but do not erase it. *See id.* ("Simply because hearsay evidence bears some indicia of reliability does not render it admissible. Hall's otherwise strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated.").

The *holdings* in *Hall* are unmistakable. First, as to the domestic violence violation, "Hall's interest in excluding hearsay evidence was thus weak, especially when weighed against the government's good cause for not producing Hawkins." *Id.* at 987. Second, as to the false imprisonment violation, "[a]lthough Hall had a strong interest in confronting Hawkins . . . , that interest is outweighed by the government's good cause for not producing Hawkins as a witness." *Id.* at 989. As to both charges, the court conducted a *Comito* balancing.

**D. Other Administrative Cases, Statutes, and Regulations Reaffirm the Principle that Confrontation is Central, even Outside of Criminal Law.**

Cases arising from several other types of administrative proceedings support the conclusion that confrontation rights are distinct from hearsay exceptions. One particularly illustrative example because of its similarities to parole revocation is confrontation in civil immigration cases. As in parole revocation cases, the rules of evidence do not apply in immigration hearings, *see Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 681 (9th Cir. 2005), and an immigrant's confrontation rights are based on the Fifth Amendment's Due Process Clause, *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Governing regulations in both the immigration and parole context permit the examination of adverse witnesses. *See* 8

-14-
NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

C.F.R. 1240.10(a)(4) (granting immigrant "reasonable opportunity . . . to cross-examine witnesses presented by the government"); Cal. Code Regs. tit. 15, § 2643 (permitting parolee "to question all witnesses").

The Ninth Circuit has made clear in the immigration context that the government does not have an "unfettered" choice of whether to present a witness or a hearsay statement to prove a particular fact. *See Saidane v. INS*, 129 F.3d 1063, 1065 (9th Cir. 1997). Instead, "the INS may not use an affidavit from an absent witness unless the INS first establishes that, despite reasonable efforts, it was unable to secure the presence of the witness at the hearing." *Hernandez-Guadarrama*, 394 F.3d at 681 (internal quotation omitted). Furthermore, the mere sending of a subpoena to the adverse witness "cannot suffice to satisfy the government's obligation to make reasonable efforts to produce its witnesses." *Saidane*, 129 F.3d at 1065. That type of effort is "fundamentally unfair" and "shift[s] the burden of producing [government] witnesses onto the alien." *Id.* (internal citations and quotations omitted).

The same principles of confrontation and cross-examination exist throughout myriad areas of administrative law. *See, e.g.*, 45 C.F.R. § 205.10(a)(13)(vi) (granting welfare claimants the right "[t]o question or refute any testimony or evidence, including opportunity to confront and cross-examine adverse witnesses"); 42 C.F.R. § 431.242(e) (permitting Medicaid recipient to "[q]uestion or refute any testimony or evidence, including opportunity to confront and cross-examine adverse witnesses" before Medicaid benefits are taken away); 2 C.F.R. § 180.745(a)(1) (allowing Social Security recipient to "present witnesses and other evidence, and confront any witness presented" before being subject to nonprocurement debarment or suspension); 8 C.F.R. § 1240.10(a)(4) (permitting immigrants "to present evidence in his or her own behalf and to cross-examine witnesses presented by the government" in removal hearings); *see also* 5 C.F.R. § 919.840(a)(1) (guaranteeing confrontation in Civil Service suspension hearings); 28 C.F.R. § 45.3(d)(3) (guaranteeing confrontation in Department of Justice disciplinary proceedings); 22 C.F.R. §

51.85 (guaranteeing confrontation in hearings regarding the cancellation, denial, or revocation of a United States passport pursuant to 22 U.S.C. § 2714).

### E. Recent California Cases Support the Federal Case Law Position.

The *Valdivia* Permanent Injunction plainly states that the admission of hearsay evidence in parole revocation proceedings is governed by *Comito*. *See Valdivia* Permanent Injunction ¶ 24. However, even the persuasive California authority supports the *Comito* balancing approach.[4] At least two recent state court cases involving hearsay in revocation proceedings make clear that "[t]here is . . . no justification for failing to undertake [a balancing] analysis." *In re Miller*, 52 Cal. Rptr. 3d 256, 266 (Cal. Ct. App. 2007); *People v. Shepherd*, 60 Cal. Rptr. 3d 616 (Cal. Ct. App. 2007).

*In re Miller* arose from a parole revocation hearing under *Valdivia* procedures in which the Board of Parole Hearings ("BPH") "relied on unsworn hearsay statements without determining either the unavailability of the declarant or the reliability of the hearsay evidence." *In re Miller*, 52 Cal. Rptr. 3d at 258. The *Miller* court cited *Morrissey* and *Comito*, as well as the California Supreme Court's decision in *People v. Arreola*, 7 Cal.4th 1144 (1994), for the proposition that courts must "balanc[e] the defendant's need for confrontation against the prosecution's showing of good cause for dispensing with confrontation." *Arreola*, 7 Cal.4th at 1160. The *Miller* court noted that "[t]here is also no justification for failing to undertake [a balancing] analysis," and that "the hearing officer's failure to weigh the State's need for hearsay versus petitioner's right of confrontation cannot be considered harmless error." *In re Miller*, 52 Cal. Rptr. 3d at 266-67.

The probationer's circumstances in *People v. Shepherd* were remarkably similar to those of Parolee 2 above. In *Shepherd*, a program administrator of a substance abuse program for probationers made out-of-court statements to Scott Shepherd's probation officer that Shepherd had smelled of alcohol and had been asked to leave the treatment

---

[4] Although these California cases support plaintiffs' position, they are only persuasive. It cannot be disputed that *United States v. Comito* governs this issue under the federal constitution, and as stipulated by the parties in paragraph 24 of the *Valdivia* Permanent Injunction.

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

program. *See Shepherd*, 60 Cal. Rptr. 3d at 618-19. The program administrator did not testify, and the probation officer introduced her statements through hearsay evidence without making a showing of good cause for her absence. *See id.* at 622-23. The Court of Appeal "ha[d] no difficulty concluding that, as in *Arreola* and *Winson*, no showing of good cause has been made for relying on [the probation officer's] hearsay or double hearsay testimony in lieu of live testimony." *Id.* at 623.

These California cases are in line with the federal constitutional principle that confrontation is one of the fundamental pillars of our justice system. As the United States Supreme Court stated in one administrative case,

> In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. . . . [I]t is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

*Goldberg v. Kelly*, 397 U.S. 254, 269-70 (1970). Defendants' attempt to dispense with a parolee's limited confrontation rights would place in jeopardy the confrontation right that the "[Supreme] Court has been zealous to protect." *Id.*

**II. Hearsay Evidence Statements that Cannot be Admitted Under *Comito* Do Not Become Admissible When They are "Corroborated" by Other Inadmissible Hearsay Evidence.**

As demonstrated in the second revocation hearing of Parolee 3 above, hearing officers sometimes admit hearsay because it is corroborated by other hearsay, reasoning that such corroboration renders hearsay more reliable. That logic is flawed. Indeed, using hearsay evidence to support other hearsay does not increase reliability: "[r]ather than providing a strong indication of the hearsay testimony, adopting such a criterion would eviscerate the need to provide indicia of reliability before hearsay evidence is received." *In re Miller*, 52 Cal. Rptr. 3d at 264.

As set forth above, the governing cases on this point are clear: any time a hearsay statement is proffered as evidence in a revocation hearing, "the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the

Government's good cause for denying it." *Comito*, 177 F.3d at 1170. The hearing officer must conduct the *Comito* balancing for each hearsay statement, considering the importance of each hearsay statement to the ultimate finding and the nature of the facts to be proven by each piece of hearsay evidence. *Id.* at 1171. If a statement is admitted after a *Comito* balancing, it—like non-hearsay evidence—may then be used to corroborate other statements. *See, e.g., Hall*, 419 F.3d at 987-88 (supporting victim Hawkins's hearsay statement with corroborative evidence including testimony at the revocation hearing from a live eyewitness to the events in question, nonhearsay physical evidence (a golf club), nonhearsay pictures of physical bruising authenticated by a live witness, and the defendant's own statement to police). *Hall* illustrates the correct approach to corroboration of hearsay evidence: to become reliable, a hearsay statement must be corroborated by *extrinsic* evidence, rather than by other hearsay statements in the same report or sponsored by the same witness.

The reliance on extrinsic non-hearsay evidence to corroborate hearsay evidence finds support in other areas of law. In *United States v. Huckins*, 53 F.3d 276 (9th Cir. 1995), a case involving the reliance on hearsay statements at criminal sentencing, the court held that, to avoid reliance on materially incorrect information, "we require that some minimal indicia of reliability accompany a hearsay statement." *Id.* at 279 (citing *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993)). With respect to making a hearsay statement more reliable, the government must offer "extrinsic evidence." *Id.; see also United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (same). Extrinsic evidence must be separate evidence that, standing alone, is trustworthy enough to bolster the credibility of the hearsay evidence. Reliance on separate *hearsay* statements to corroborate a hearsay statement provides no outside verification, and indeed compounds the nature of the confrontation violation. *See In re Miller*, 52 Cal. Rptr. 3d at 264.

Either a hearsay statement is admitted over a defendant's or parolee's right to confront, or it is not. In that regard, admitted evidence is given value as evidence and excluded evidence is not. The excluded evidence cannot—no matter how many statements

-18-

are proffered—be aggregated to reach the threshold for admission if it has failed the test of admissibility. This would be akin to saying that $0 + 0 + 0 + 0 = 1$.

The admission of hearsay statements in Parolee 3's second revocation hearing served only to exacerbate the gravity of the violation of his confrontation rights: instead of merely admitting one hearsay statement in violation of the *Comito* rule, the hearing officer considered three additional hearsay statements to conclude that the first piece of hearsay evidence was reliable. Both *Comito* and common sense dictate that this approach is legally unsound.

**III. A Parolee Should Never be Put to Choosing Between a Timely Hearing and Confronting His Accuser: If a *Comito* Objection is Sustained and the 35-Day Deadline is Imminent, the Hearsay Evidence Must be Excluded.**

In Parolee 3's first revocation hearing, he raised a *Comito* objection to the admission of hearsay statements in violation of his confrontation rights. The hearing officer sustained the objection. Instead of excluding the proffered hearsay statements and holding the timely hearing, however, the hearing officer postponed the hearing beyond the 35-day deadline set forth in Paragraph 23 of the *Valdivia* Permanent Injunction. In so doing, the DC put the parolee to the choice of *either* having a timely hearing *or* being permitted to confront his accusers.[5] There is no legal basis for this approach that violates *Comito* and constitutes an end-run around the timeframes in the *Valdivia* Permanent Injunction.

The 35-day timeframe set forth in paragraph 23 of the *Valdivia* Permanent Injunction represents the Court-ordered maximum period of time during which a parolee may remain in custody pending revocation without offending the parolee's due process rights. Thus, if a parolee is faced with choosing between a violation of the *Valdivia* timeframe and the ability to confront his accuser, the choice pits one violation of due process against another. Whatever choice a parolee makes, constitutional injury accrues.

---

[5] Although this practice appears to occur in all classes of cases, it is particularly rampant in cases that defendants deem "priority cases" involving more serious charges. In "priority cases," defendants have more regularly and brazenly violated the 35-day rule in Paragraph 23, seldom if ever dismissing charges for the timeframe violation. Whether discussing priority cases or otherwise, there is no legal basis for this unprincipled rule.

-19-

NOTICE OF MOTION AND MOTION TO ENFORCE ¶ 24 OF THE *VALDIVIA* PERMANENT INJUNCTION

The approach taken in Parolee 3's case renders *Comito*'s admissibility rule meaningless. That is, if a witness fails to appear for a parolee's revocation hearing, the hearing officer could decline to exclude the hearsay evidence indefinitely, postponing the hearing over and over until the percipient witness appeared. A simple failure to appear without more reason must not justify the postponement of a hearing. Instead, the government must be put to its burden to show "good cause" for failing to produce the witness, as required by *Comito*. Absent a showing of good cause, the government can try to introduce the out-of-court statements through hearsay testimony, but if the hearsay does not satisfy the *Comito* balancing test, the evidence is excluded and—in some cases—revocation charges will be dismissed.

This outcome is just. It is the parole agent's responsibility to communicate with adverse witnesses whose testimony will be advanced to meet the agent's burden to sustain a violation. An adverse witness's failure to attend must not be at the expense of the parolee's due process rights.

**IV. The Systemic Violation of Confrontation Rights Requires A Comprehensive Remedy That Includes an Effective Means of Challenging Future Violations.**

This motion was made necessary by defendants' defiance of due process and the Permanent Injunction. As the Special Master's reports note, however, defendants have performed inconsistently in ensuring that hearing officers' respect parolee's confrontation rights. Plaintiffs' observations and correspondence have documented numerous instances where hearing officers require parolees to waive time in order to be able to confront witnesses against them. Although the state courts are in some cases willing to provide relief on a writ of habeas corpus, appointed counsel provided under the *Valdivia* Permanent Injunction are not compensated for writs or appeals. It is a rare parolee who can find counsel who will enforce the parolee's confrontation rights beyond the revocation hearing without compensation. *See In re Miller*, 52 Cal. Rptr. 3d 256. Given the defendants' inconsistent track record on these issues, an effective remedy must include a means for individual enforcement of rights by aggrieved class members. Plaintiffs' counsel cannot

efficiently provide such individual enforcement directly through this case. If appointed parole defense counsel were adequately compensated for the task, they would be able to use state habeas procedures to efficiently enforce individual confrontation rights. Defendants have recognized the efficacy of this practice in resolution of a previous dispute regarding so-called "confidential" information. *See* Huey Dec. ¶ 27 & Ex. 18. Defendants should be ordered to modify their attorney panel contract to allow for reasonable compensation of writs and appeals involving confrontation issues.

The funding of writs will serve multiple goals. First, it will permit parolees to challenge problematic *Comito* outcomes and vindicate confrontation rights that have been erroneously deprived. Second, it will produce decisions that will serve as guideposts to DCs for future cases involving difficult fact patterns. With more decisions like *In re Miller*, 52 Cal. Rptr. 3d 256, and *People v. Shepherd*, 60 Cal. Rptr. 3d 616, guidance from State Court judges will help take the guesswork out of defendants' *Comito* policy. Third, with the eventuality of more decisions on confrontation issues resultant from writs, defendants will be less reliant on plaintiffs' counsel to update and correct *Comito* policy. It will facilitate defendants' self-regulation of *Comito* policy.

### CONCLUSION

The *Comito* balancing test remains the controlling law as it was when the Injunction was entered in this case. A revocation panel *must* weigh the releasee's interest in his constitutionally guaranteed confrontation right against the government's good cause for a witness's absence. Defendant's position that *Comito* balancing is unnecessary if the proffered evidence falls within a hearsay exception runs contrary to over thirty years of case law from the Ninth Circuit and the U.S. Supreme Court. Furthermore, prohibited hearsay statements must not be admitted merely because they are corroborated by other prohibited hearsay statements. Finally, parolees must not be put to choosing between a timely hearing and confronting their accuser; the proper remedy for a sustained *Comito* motion is the exclusion of the proffered hearsay evidence, regardless of the charges.

Based on the foregoing, plaintiffs respectfully request that the Special Master recommend that the Court: (1) order defendants to draft new policies and procedures, with the cooperation of plaintiffs' counsel, as required by Paragraph 24 of the *Valdivia* Permanent Injunction within 60 days of the Court's order, with full implementation 120 days after the Court's order, and that such policies and procedures be changed so that the required *Comito* balancing test be applied even if the proffered out-of-court statements fall within a hearsay exception; (2) order defendants to provide appropriate training to all DC's concerning the revised policies and procedures within 90 days of the Court's order, including sending all DCs to trainings for administrative law judges; and (3) order defendants to modify their contract with the parole defense panel to provide for reasonable compensation for representation of parolees in writs and/or appeals concerning denial of confrontation rights.

RESPECTFULLY SUBMITTED,

Dated: October 3, 2007 ROSEN, BIEN & GALVAN, LLP

 */s/ Loren G. Stewart*

 By: Loren G. Stewart
 Attorneys for Plaintiffs

EXHIBIT B—EXHIBIT 2

EDMUND G. BROWN JR.
Attorney General of the State of California
JAMES M. HUMES
Chief Assistant Attorney General.
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
VICKIE P. WHITNEY, State Bar No. 145316
Supervising Deputy Attorney General
JESSICA R. DEVENCENZI, State Bar No. 232427
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 445-4979
 Fax: (916) 324-5205
 Email: Jessica.Devencenzi@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| JERRY VALDIVIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | 2:94-cv-0671 LKK GGH P<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION**<br><br>Hearing: November 9, 2007<br>Time: 9:30 a.m.<br>Location: Office of Atty General<br>Officer: Special Master<br>Chase Riveland |

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 2

 I. HEARSAY SUBJECT TO A LONG-STANDING HEARSAY
 EXCEPTION IS ADMISSIBLE IN REVOCATION HEARINGS
 WITHOUT HAVING TO ENGAGE IN *COMITO* BALANCING ...... 2

 A. *Comito's* Balancing Test ................................................ 3

 B. Providing More Process And Restrictions To The Admissibility
 Of Evidence In Parole Revocation Hearings Than Applies To
 Criminal Prosecution Would Contravene Supreme Court And
 Ninth Circuit Precedent ...................................................... 4

 C. Practices In Administrative Proceedings Are Irrelevant To The
 Issues Presented In This Motion ......................................... 9

 II. THE INDICIA OF RELIABILITY OF HEARSAY MAY BE
 DETERMINED FROM OTHER HEARSAY EVIDENCE .................. 9

 III. DEFENDANTS HAVE NOT FORCED A CHOICE BETWEEN
 THE *VALVIDIA* TIMELINE AND THE RIGHT TO
 CONFRONTATION ........................................................... 12

 IV. THE FOUR INDIVIDUAL CASES SELECTED BY PLAINTIFFS
 DO NOT SUPPORT THEIR CONTENTION THAT DEFENDANTS
 ARE VIOLATING PAROLEE'S DUE PROCESS RIGHTS OR THAT
 DEFENDANTS ARE RUNNING AFOUL OF *COMITO* ............... 13

 A. Parolee #1 ........................................................................ 14

 B. Parolee #2 ........................................................................ 15

 C. Parolee #3 ........................................................................ 16

 D. Parolee #4 ........................................................................ 16

 V. THERE IS NO BASIS TO REQUIRE DEFENDANTS TO FUND
 LEGAL REPRESENTATION FOR PAROLEES ON WRITS OR
 APPEALS INVOLVING *COMITO* ...................................... 17

CONCLUSION ............................................................................ 17

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Baxter v. Palmigiano*
425 U.S. 308 (1976)
5

*Idaho v. Wright*
497 U.S. 805, 817 (1990)
6

*Mempa v. Rhay*
389 U.S. 128 (1967)
5

*Morrissey v. Brewer*
408 U.S. 471, 489 (1972)
3-7, 11, 17

*Prellwitz v. Berg*
578 F.2d 190 (7th Cir. 1978)
7, 9

*Ryan v. Montana*
580 F2d 988, 992 (9th Cir. 1978)
5, 12

*Gagnon v. Scarpelli*
411 U.S. 778, 786 (1973)
4, 7, 8, 9, 11, 17

*United States v. Comito*
177 F.3d 1166 (9th Cir. 1999)
Passim

*United States v. Hall*
419 F.3d 980, 987 (2005)
6, 10, 11, 15, 17

*United States v. Martin*
984 F.2d 308, 311 (9th Cir. 1993)
3, 8

*United States v. Miller*
514 F.2d 41 (9th Cir. 1975)
6, 8, 9, 12

*United States v. Segal*
549 F.2d 1293 (9th Cir. 1977)
5

*United States v. Simmons*
812 F.2d 561 (9th Cir. 1987)
7, 8, 9

*United States v. Walker*
117 F.3d 417, 421 (9th Cir. 1997)
6, 8, 9

*White v. Illinois*
502 U.S. 346, 356 (1992)
6

*Wolff v. McDonnell*
418 U.S. 539 (1974)
5

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj.

2:94-cv-0671 LKK GGH P

ii

## INTRODUCTION

Paragraph IV, 24 of the Stipulated Order For Permanent Injunctive Relief, states that "[t]he use of hearsay evidence shall be limited by the parolees' confrontation rights in the manner set forth under controlling law as currently stated in United States v. Comito, 177 F.3d 1166 (9th Cir. 1999)." During the past few months, the parties, in conjunction with Special Master Riveland and Deputy Special Master Morrison, have engaged in efforts to resolve various aspects of how *Comito* is to be applied during the course of parole revocation hearings and, despite having come to agreement on various aspects of its application, the parties have been unable to reach full agreement. Thus, the parties agreed to submit their legal positions to the Special Master in accordance with procedures outlined at paragraph IV of the Stipulation and order Re: Special Master Order of Reference.

Plaintiffs have filed their motion for enforcement of paragraph 24 of the Permanent Injunction, characterizing the dispute as Defendants having violated the Permanent Injunction and violating parolees' due process rights. Defendants have done neither and have in fact complied with what the case law permits concerning *Comito* balancing and the role of hearsay exceptions in that process. While there may be isolated incidents where the balancing may not have been entirely correct, such incidents have been few in number, have not resulted in anything other than harmless error, and do not translate into a broad-sweeping conclusion that the Defendants have violated the Permanent Injunction or the due process rights of parolees.

Moreover, Plaintiffs' use of four purported examples as representative that Defendants are globally depriving parolees of due process is misleading and inaccurate. The hearing transcripts submitted by Plaintiffs contain many inaudible portions that the transcriber did not transcribe, and further demonstrate that the Deputy Commissioners did not fail in their task. Plaintiffs' selective use of four hearings out of the entire panoply of revocation hearings as purporting to support the serious allegation that Defendants are denying due process to all, is faulty under any standard.

///

///

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

1

The major point of disagreement between Plaintiffs and Defendants has been the role of hearsay exceptions in the context of *Comito* balancing. Plaintiffs contend that hearsay exceptions cannot be used for the admission of evidence in parole revocation proceedings (Pltf. Mot. at 2) and that even for hearsay that falls within a long-standing exception, *Comito* balancing is still required for it to be admissible. In contrast, Defendants' position is that where a long-standing exception to the hearsay rule would compel the admissibility of a piece of hearsay in a criminal prosecution, that same evidence is equally admissible in a revocation hearing without having to engage in full *Comito* balancing. Simply put, CDCR, and specifically the Deputy Commissioners presiding over the revocation hearings, can avail themselves of long-standing hearsay exceptions, if they so choose, for the admissibility of hearsay, without having to run through a full *Comito* balancing, because the exception automatically establishes good cause to deny the right to confront due to the inherent indicia of reliability.

## ARGUMENT

Plaintiffs' motion sets forth three issues they seek to have resolved: (1) whether hearsay exceptions obviate the requirement to do *Comito* balancing; (2) whether in determining admissibility of a piece of hearsay evidence, other hearsay evidence may be considered; and (3) whether the continuation of a revocation hearing beyond the 35-day time under the *Valdivia* injunction in order to permit witnesses to be subpoenaed is permissible. Defendants' position is that the answer to the first two questions above is "yes." As to question three, the only evidence submitted by Plaintiffs on this issue does not involve a confrontation between two constitutional principles and no other evidence is submitted to support Plaintiffs' contention that Defendants are forcing parolees to choose between rights. Thus, no resolution of that issue is required.

**I. Hearsay Subject to a Long-Standing Hearsay Exception Is Admissible in Revocation Hearings Without Having to Engage in *Comito* Balancing.**

In 2003, Defendants agreed under the Stipulated Order For Permanent Injunctive Relief (Permanent Injunction), to limit the use of hearsay in revocation hearings in the manner set forth under controlling law as then stated in *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999) --

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

2

they did not agree to a complete bar to the use of long-standing hearsay exceptions for admissibility purposes nor to have imposed on them a standard significantly beyond what the law requires.

### A. . *Comito's* Balancing Test

Defendants do not dispute that *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972), guarantees the right to confront and cross-examine adverse witnesses at a parole revocation hearing, unless the government shows good cause for not producing the witnesses. *Comito*, at 1170. To determine "whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Id.* The significance of the releasee's interest in the right to confrontation is assessed first. *Id.* at 1171. And while every releasee has the right to confrontation, "that right is not static, but is of greater or lesser significance depending on the circumstances. (citation)." *Id.* *Comito* points to two factors that are important but not exhaustive when weighing an individual's right to confrontation: "the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *Id.* The Ninth Circuit in *United States v. Martin*, 984 F.2d 308, 311 (9th Cir. 1993), sets up a sliding scale: the more significant the evidence is to the finding, and the more questionable as to reliability, the greater the interest in testing it through confrontation. *Id.* If a parolee can show that the hearsay at issue was significant towards proving the violation and that it is not reliable, then the government is called upon to show good cause for not producing the witness. *Comito*, at 1172.

The reasons that may constitute good cause for denying a releasee his right to confrontation in a revocation hearing are considered on the specific circumstances of each case. *Id.* The difficulty and expense of procuring witnesses (mere inconvenience or expense may be enough) and the traditional indicia of reliability borne by the evidence are factors in determining the government's good cause. *Id.*

///
///

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

3

As between Defendants and Plaintiffs here, there appears to be no dispute as to the elements of *Comito's* balancing. However, while *Comito* discussed and applied the aspects of its balancing approach in the context of the circumstances before it, *Comito* should not be read as an abstract answer to questions not presented in the case, but rather as a resolution of the issue the court said it was examining: "[o]nly Officer Perdue's testimony regarding what Connell purportedly told him is at issue in this appeal." *Comito*, at 1169. While *Comito* sets up a balancing test for pure hearsay, it does not in any way discuss what happens when a hearsay exception becomes part of the equation. Plaintiffs contend that nowhere in *Comito* did the court suggest that trustworthy hearsay evidence is an exception to the rule. (Pltf. Mot. at 11.) Simply put, the court was not confronted with nor did it decide whether hearsay that is admissible under a long-standing exception negates the balancing the court deemed appropriate for pure hearsay.

**B. Providing More Process and Restrictions to the Admissibility of Evidence in Parole Revocation Hearings Than Applies to Criminal Prosecutions Would Contravene Supreme Court and Ninth Circuit Precedent.**

There are some fundamental underpinnings to Defendants' position with regard to the use of hearsay exceptions in revocation proceedings. First, Defendants have never disputed that parolees and probationers have a limited right to confront and cross-examine adverse witnesses at revocation hearings. *Morrissey*, at 489 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973). In *Morrissey*, the Supreme Court discussed the "minimum requirements of due process" applicable in a parole revocation hearing. *Morrissey*, at 487-89. The Court held that one of those due process requirements is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489; see also *Gagnon*, at 781-87 (holding that the same due process requirements apply in probation revocation proceedings as in parole revocation proceedings).

However, the Supreme Court has been equally clear that a revocation proceeding is not to be equated to a criminal prosecution in any sense. *Morrissey*, at 489. In other words, the constitutional standard applicable in this type of post-conviction revocation hearing will sometimes permit the admission of evidence that would otherwise be inadmissible in a criminal prosecution. *Id.* Specifically, the Supreme Court in *Morrissey* stated that revocation "is a narrow

inquiry," and that "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.*

In addition, the Supreme Court has also emphasized that while in some cases there is simply no adequate alternative to live testimony, the court in *Morrissey* did not "intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions and documentary evidence." *Gagnon*, 411 U.S. at 782, n.5.

The Ninth Circuit in *United States v. Segal*, 549 F.2d 1293 (9th Cir. 1977), cert. denied, 431 U.S. 919 (1977), has noted that the Supreme Court has provided guidance in a number of decisions concerning what process is due in proceedings along a continuum starting with criminal prosecutions and ending with the correctional process. The Ninth Circuit divided that continuum into four types of proceedings where the Court has required differing levels of due process. In descending order of the amount of process which is due, from greater to lesser, are: "(1) criminal prosecutions, e.g., *Boykin v. Alabama, supra*; (2) probation revocation hearings with imposition of a sentence theretofore suspended, e.g., *Mempa v. Rhay*, 389 U.S. 128 (1967); (3) probation revocation hearings with the sentence already established and parole revocation hearings, e.g., *Morrissey v. Brewer*, 408 U.S. 471 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); and (4) prison disciplinary proceedings, e.g., *Wolff v. McDonnell*, 418 U.S. 539 (1974) and *Baxter v. Palmigiano*, 425 U.S. 308 (1976)." *Segal*, 549 F.2d at 1296.

And the Ninth Circuit has held that in a combined probation revocation and deferred sentencing hearing that falls somewhere between a criminal trial on one hand, and a hearing where sentence has been imposed and the sole issue is revocation of probation or parole on the other, while certain procedural rights must be afforded in a probation revocation and deferred sentencing hearing, they are not intended to create a rigid and overly formal proceeding. *Ryan v. Montana*, 580 F2d 988, 992 (9th Cir. 1978). The right to confront and cross-examine adverse witnesses is not absolute in such a proceeding and may be curtailed if the hearing officer finds good cause for not allowing confrontation. *Gagnon*, at 786; *Morrissey*, at 489. The Ninth Circuit noted in *Ryan* that in the combined proceeding which carries more procedural due process than a parole revocation proceeding, the hearing officer may consider hearsay evidence, such as that

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

5

included in the report of a probation officer, *United States v. Miller*, 514 F.2d 41 (9th Cir. 1975) (per curiam). *Ryan*, at 992.

The Supreme Court has stated that in the higher level of criminal prosecutions,"where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *White v. Illinois*, 502 U.S. 346, 356 (1992). Equally important, the Supreme Court has stated that the admission of hearsay under a firmly rooted exception, "satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements. (citations)." *Idaho v. Wright*, 497 U.S. 805, 817 (1990). Thus, while rules of evidence do not strictly apply to revocation hearings, *United States v. Walker*, 117 F.3d 417, 421 (9th Cir. 1997), "long-standing exceptions to the hearsay rule that meet the more demanding requirements for criminal prosecutions should satisfy the lesser standard of due process accorded the respondent in a revocation proceeding." *United States v. Hall*, 419 F.3d 980, 987 (2005), (citing *Morrissey*, at 489.)

Plaintiffs contend that *Hall* does not support the position that hearsay exceptions can supplant balancing because the *Hall* court followed the balancing framework of *Comito*, and because its discussion of federal hearsay exceptions was in the context of the reliability prong of the *Comito* balancing. (Pltf. Mot. at 12.) Plaintiffs' view of *Hall* is selectively skewed. *Hall* does not stand for the proposition that where there is a hearsay exception, full *Comito* balancing is still required. Quite simply, the reason the Ninth Circuit in *Hall* dutifully applied *Comito* was because the court was only addressing potential error from the admission of pure hearsay that was itself not subject to any exception. *Hall*, at 987. Thus, balancing was appropriate. Accordingly, the court's discussion of the evidence admissible under hearsay exceptions as a component of the reliability prong was again appropriate because that evidence was utilized to buttress the admission of the pure piece of hearsay. Plaintiffs' suggestion that what the court did in *Hall* is a death knell to Defendants' position that hearsay subject to a long-standing exception is admissible without more, is not supported by *Hall* itself. The balancing the court did was of true hearsay that was not subject to an exception. Moreover, there is nothing that undermines

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

6

*Hall's* pronouncement that hearsay subject to a long-standing exception leads to its admissibility – a conclusion wholly consistent with Supreme Court precedent.

*United States v. Simmons*, 812 F.2d 561 (9th Cir. 1987), fully comports with Defendants' position that hearsay subject to a long-standing exception, is admissible in a parole revocation hearing without balancing. In *Simmons*, the district court admitted copies of hospital records prepared by Simmons's attending physician and a Release of Information Clerk which the custodian of records for the hospital certified as true copies of records prepared and maintained in conjunction with the treatment of Simmons (classic business records). *Id.* at 564. The court noted that cases delineate a process of balancing the probationer's right to confrontation against the Government's good cause for denying it. *Id.* at 564. In particular, that good cause may arise from the "difficulty and expense of procuring witnesses." *Id.* (citing *Gagnon*, 411 U.S. at 783 n.5.) However, as a separate category, the Ninth Circuit then states, "[o]ur cases also suggest that the reliability of evidence may provide a basis for its admission." *Id.* at 564. The court then held that, "in light of the traditional indicia of reliability that these records bear, (citations omitted), and the diminished procedural protections which attach to a probation revocation proceeding, we cannot say that the admission of these records and the denial of Simmons's opportunity to confront and cross-examine the hospital personnel was plain error." *Id.* at 564-65. *Simmons* also cites to *Prellwitz v. Berg*, 578 F.2d 190 (7th Cir. 1978), as one of "other circuits that agree that hearsay evidence may be admissible in probation revocation hearings." *Simmons*, at 564. In *Prellwitz*, the petitioner argued that his due process rights to confront and cross-examine adverse witnesses at the revocation hearing were violated by the introduction of hearsay in the form of Department records which documented unsuccessful attempts of petitioner's original probation officer to locate petitioner when he failed to report. *Prellwitz* at 191-92. The court stated:

> Forcing the state to show good cause for not producing the hearsay declarant would unwisely extend the limited due process rights of a probationer at the revocation hearing. While we agree that the Gagnon-Morrissey right to confront and cross-examine witnesses imposes some limitations on the type of evidence that can be introduced at hearings to revoke probation, the Supreme Court has repeatedly emphasized the informal nature of those proceedings. *Gagnon v. Scarpelli, supra* at 789; *Morrissey v. Brewer, supra* 408 U.S. at 484. Thus, in parole and probation revocation hearings, the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial. *Id.* at 489.

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

7

*Id*. at 192.

The court then went on to conclude that "the report was one of the 'conventional substitutes for live testimony' which the Court has recognized to be permissible in probation revocation proceedings." *Id*. (citing *Gagnon v. Scarpelli*, at 783 n.5.) Moreover, the court in *Prellwitz* determined that the report was a record kept in the ordinary course of business by the Department, and thus, bore "recognized indicia of reliability." *Id*.

Similarly, in *United States v. Miller*, 514 F.2d 41, 42-43 (9th Cir. 1975), the Ninth Circuit held that an official could testify at a probation revocation hearing when his knowledge of the facts was obtained solely from state probation reports and state court criminal records.

Moreover, the Ninth Circuit has held that a district court's failure to conduct a balancing test was harmless where a probation officer testified from records maintained by another probation officer, because the records were likely admissible under the "public records" exception to the hearsay rule (something the parolee conceded in his reply brief), and thus sufficiently reliable to withstand a right to confrontation claim. *United States v. Walker*, 117 F.3d 417, 420-21 (1997). The court ultimately found that because of the reliability of the hearsay evidence, and the failure of Walker to show prejudice, any error in failing to apply the balancing test was harmless. *Id*.

Plaintiffs heavily rely on *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993), to contend that hearsay exceptions do not nullify *Comito* balancing. *Martin* did not again address whether hearsay subject to a well-recognized exception is admissible without balancing. Specifically, the issue in *Martin* centered around a urinalysis report where the witness who testified, could only testify about taking the urine samples and not about how they were handled or tested at the laboratory. It was this chain of custody problem that took the urinalysis report out of the realm of the business-records exception to the hearsay rule, and the court even alludes to that by declining the government's invitation to hold that all such reports are inherently reliable, stating that there was no demonstration that "custody problems and testing errors happen with such rarity at testing laboratories that their reports are always inherently reliable." *Id*. at 313. *Martin's* reference to the *Simmons* balancing only confirms Defendants' position because of what the Ninth Circuit held in *Simmons*.

What *Simmons*, *Prellwitz*, *Miller* and *Walker* all confirm is that hearsay that falls within a recognized exception is one of the "conventional substitutes for live testimony" that *Gagnon* expressly states can be used at revocation hearings. As a result, such evidence does not have to endure *Comito* balancing for its admission in a revocation hearing.

Plaintiffs' motion suggests that for purposes of revocation hearings, hearsay exceptions may not be used to have evidence that may fall within an exception, admitted for consideration by the Deputy Commissioner. What Plaintiffs contend is that while in a criminal prosecution, hearsay evidence that falls within a recognized exception is admissible, it would not be in a revocation proceeding. Plaintiffs' position, if adopted, would give parolees more rights in a revocation proceeding than a defendant possesses in a criminal prosecution – it would dictate a higher standard for admissibility of evidence in a revocation proceeding than in a criminal prosecution. Plaintiffs' position would create an unintended and extreme rule that is neither legally sound nor practically suitable for parole revocation hearings.

### C. Practices in Administrative Proceedings Are Irrelevant to the Issues Presented in this Motion.

Plaintiffs' brief seeks to buttress their claim that hearsay exceptions do not obviate *Comito* balancing, by discussing procedures in various administrative matters that include immigration hearings, welfare claims, Medicaid, Social Security, Civil Service suspensions, and Department of Justice disciplinary proceedings. (Pltf. Mot. at 14-15.) None of what occurs in such administrative proceedings is relevant to the issue of whether Defendants are properly following the law concerning the treatment of hearsay evidence in revocation proceedings. And, given the actual cases in this area as discussed above, resort to unrelated and unknown administrative proceedings is unwarranted.

### II. The Indicia of Reliability of Hearsay May Be Determined from Other Hearsay Evidence.

Plaintiffs contend that a Deputy Commissioner in a revocation hearing cannot consider several hearsay statements together to see if they corroborate any given piece of hearsay and provide indicia of reliability. Plaintiffs are incorrect.

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

9

To be clear, Defendants have not taken the position that for pure hearsay, *Comito* balancing is not necessary. However, Defendants submit that both *Comito* and *Hall* support the position that numerous pieces of hearsay evidence can be considered together in determining the indicia of reliability of a given piece of hearsay.

In *Comito*, the court in its balancing with regard to the officer's testimony as to what Connell told him about the alleged fraud, also addressed four other pieces of evidence the government offered. *Comito*, at 1168. The evidence consisted of stipulated testimony of a Las Vegas Police Detective as to reports made by Connell; a memorandum written by Connell that listed the dates and amounts of the transactions at issue; several of Comito's unemployment compensation documents and his bank statement; and the officer's testimony concerning discussions he had with a credit card fraud investigator and the investigator's conversations with Comito and Connell. *Id.* at 1168-1169. The court found that to varying degrees, the other evidence (which obviously included hearsay) did provide corroboration of certain aspects of the charge, but that it fell short of the proof required to establish the charged violation. *Id.* at 1168. Thus, the court in *Comito* did not rule out consideration of other hearsay evidence to corroborate the particular hearsay at issue – in fact, it did consider such evidence – it just concluded that they were not enough.

This point is again emphasized by the court in its discussion of the Government's side of the balance, specifically the indicia of reliability, where the Government argued that the hearsay at issue bore sufficient indicia of reliability as a result of the other evidence. *Id.* at 1172. The court did consider the other evidence that it expressly noted included hearsay, finding it "not particularly persuasive," that while some inferences could be drawn, there were still some missing pieces (that the withdrawals by Comito were without Connell's consent), and that when considered against other evidence showing another individual using Connell's ATM card, made the hearsay less reliable. *Id.* at 1172, n.9. Nothing in *Comito* states that other evidence, including hearsay, cannot be considered when assessing the indicia of reliability of a particular piece of hearsay. To the contrary, the Ninth Circuit in *Comito* did in fact consider other hearsay evidence to see whether it would corroborate the hearsay at issue, and thus, whether there was an

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

10

indicia of reliability to it.

Similarly, in *Hall*, the court analyzed hearsay (unsworn allegations of the victim, Hawkins, to the testifying police officer) under the *Comito* balancing. On the confrontation side of the balance, the Ninth Circuit found that unlike in *Comito*, Hawkins' statements to the officer bore indicia of reliability based upon the corroboration afforded by other evidence that included hearsay. *Hall*, at p. 987-88. The other corroborating evidence included: (1) discovery of the golf club where Hawkins told the officer it would be; (2) consistency with which Hawkins reported the events of the evening to multiple people (which testimony was based on hearsay); (3) Red's testimony; (4) the medical conclusions of the treating physician (which were based in part on hearsay from Hawkins); (5) documented physical bruising; and (6) Hall's own statements to a police officer. *Id.* And, the court in *Hall* found that the reliability of the domestic violence aspect of Hawkins' hearsay statements to the police gave credence to the rest of her account of the evening – again, all hearsay. *Id.* at 988.

After considering indicia of reliability on the confrontation side of the balance, the *Hall* court then moves to the government's side of the balance to look at good cause for not producing Hawkins and traditional indicia of reliability. *Id.* The court again determined indicia of reliability for the hearsay testimony based on its corroboration by the other evidence that included hearsay. *Id.* Ultimately, the court concluded that Hall's confrontation right was outweighed by both the good cause for not producing Hawkins and the independent indicia of reliability "because the hearsay evidence was substantially corroborated." *Id.* at 989.

Thus, both *Comito* and *Hall* show that other evidence, including other hearsay, can properly be considered together and can be used to corroborate hearsay to establish the indicia of reliability of a given piece of hearsay evidence. And, in *Hall*, hearsay was used to corroborate the false imprisonment hearsay testimony that established its reliability and eventually tipped the balance away from the parolees' confrontation right. Such treatment is also consistent with the Supreme Court's emphasis in *Morrissey* and *Gagnon* that the revocation process should be flexible such that evidence that would not normally be admissible in a criminal trial can be considered, and the Ninth Circuit's statements that "the hearing officer may consider hearsay

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

11

evidence." *Ryan*, at p. 992-93, citing *United States v. Miller*, 514 F.2d 41 (9th Cir. 1975).

**III. Defendants Have Not Forced a Choice Between the *Valdivia* Timeline and the Right to Confrontation.**

Plaintiffs' motion asks that the Mastership address a third issue purportedly implicating *Comito* and confrontation rights, characterized as whether under due process and the *Valdivia* Permanent Injunction, Defendants can make a parolee choose between the right to a timely hearing and the right to confront adverse witnesses. (Pltf. Mot. at 4.) To make their point, Plaintiffs' only evidence is a hearing transcript where the parolee's revocation hearing was continued past thirty-five days, to allow for both the state and the parolee to subpoena witnesses. Aside from the fact that there is no evidence in the transcript that this parolee was forced to make a choice, first and foremost, this is not a *Comito* issue as presented, and is not appropriately included within the scope of this proceeding. Plaintiffs' issue on this one alleged parolee, concerns a contention that the *Valdivia* timeline (thirty-five days) was not met. In fact, the Declaration of Shirley Huey submitted by Plaintiffs alleges that Defendants violated Paragraph 23 of the Permanent Injunction for failing to provide a timely hearing. Plaintiffs' attempt to tie the timeline issue into the *Comito* balancing issue is misleading, especially as to Parolee #3's case. Intermingling these two separate and distinct aspects of due process is overreaching in the context of this proceeding and it should not be a point of decision by the Mastership.

Additionally, Plaintiffs' allegation that the hearing occurring beyond day thirty-five violated Parolee #3's due process is also disputed by the evidence. Specifically, at the first hearing, Parolee #3 admitted to charge #2, use of cocaine. (Exh. 12, p. 3 of 5.) Based on that admission, Parolee #3's parole was revoked and he was returned to custody for four months. (Exh. 12, p. 3 of 5 and 4 of 5.) According to Plaintiffs' brief, the thirty-five-day timeframe in paragraph 23 of the Permanent Injunction represents the maximum time a parolee may remain in custody pending revocation without offending parolees' due process rights. (Pltf. Mot. at p. 19.) In Parolee #3's case, he was not in custody pending revocation at the time of the second hearing on the battery charge that is the subject of Plaintiffs' allegations, because his parole had already been revoked. Thus, the hearing on the battery occurring after day thirty-five was not a violation of his due

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

process rights and Plaintiffs' reliance on Parolee #3's case to improperly raise issues in this proceeding is wholly undermined.

Moreover, upon a reading of the record for this parolee, it is evident that Deputy Commissioner Rosenberg did do *Comito* balancing, to wit: the parolee's attorney acknowledges corroboration of the deputy's hearsay from the existence of verifiable injuries to the victim (Ex. 14, p. 25:4-5); the parolee admitted to Commissioner Rosenberg at the PCH that he punched the victim (Ex. 13, p. 3 of 5; Ex. 14, p. 25:10-20); there were three separate hearsay statements that supported each other and that caused each of the statements to have an increase in reliability (Exh. 14, p. 26:2-7); the witnesses were sent subpoenas that were not returned as being undeliverable (Exh. 14, p. 26:12-13); and that the testifying officer's report was very detailed and all statements were consistent, including that of the parolee's mother who was a percipient witness (Exh. 14, p. 26:17-20). Plaintiffs' Exhibit 13 at page 5 of 5, also reveals proper balancing was done by Commissioner Rosenberg:

> Interest in confrontation considered. Victim and several witnesses not present. Subpenas were sent to victim and witnesses and were not returned, and reasons for non-appearance is unknown. P has right, though limited, to confront and cross-examine victim and witnesses, but P's interest in confrontation weighted against the importance of witnesses' testimony to the final finding of fact is lesser than the reliability of the hearsay evidence and the corroboration of it. Three independent and separate statements to deputy Shriver, who did not attend last hearing which was postponed based on Comito objection. Each corroborate each other and the weight of the corroborated hearsay evidence outweighs P's interest in confrontation.

Finally, as to Parolee #3, Plaintiffs utilize his case as an illustration of considering multiple pieces of hearsay to corroborate the hearsay at issue. As set forth above at II, that is permissible.

In the end, the sole evidence of Plaintiffs' purported claim that Defendants are forcing parolees to choose between a thirty-five day hearing or right to confrontation, is completely dispelled. Plaintiffs have submitted no other evidence to support their charge and accordingly, the issue should go no further.

**IV. The Four Individual Cases Selected by Plaintiffs Do Not Support Their Contention that Defendants Are Violating Parolees' Due Process Rights or that Defendants Are Running Afoul of *Comito*.**

Plaintiffs' motion recounts four individual cases they picked to represent negative due process consequences of Defendants purportedly not following *Comito*. From these four cases,

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

13

Plaintiffs ask that the Mastership take the leap to conclude that widespread violation is occurring. Aside from the dearth of evidence to even support such a leap, as shown below, even the four cases Plaintiffs put forth do not establish that Defendants are violating parolees' due process.

### A. Parolee #1

Parolee #1 is cited by Plaintiffs as an example of a Deputy Commissioner failing to do *Comito* balancing and relying on the least reliable form of unsworn verbal allegations to find good cause on one of three charges against the parolee - marijuana possession. (Pltf. Mot. at 5.) Aside from the fact that it is nearly impossible to fully determine what the Deputy Commissioner did because there are numerous notations on the transcription of "[inaudible]," and "[Apparent gap in the audiotape]," (Ex. 5, p. 7-8), Plaintiffs have conveniently ignored the fact that the finding of good cause on the marijuana possession charge was not based on the third party hearsay statements. Instead, as noted on the Form 1103, the good cause was based upon the parole agent's testimony of what he found during the search of the parolee's room - marijuana in the parolee's closet along with the parolee's belongings. (Ex. 6, page 3 of 5.)[1] That evidence was not hearsay.

As set forth in *Comito*, the weight to be given to a parolee's right to confrontation in a particular case is based on two primary factors, the first of which is "the importance of the hearsay evidence to the court's ultimate finding." *Comito*, at 1171. It is only when the hearsay plays a significant factor in the ultimate finding that the parolee's right to confront the declarant is even triggered. *Id.* Unlike in *Comito* where the hearsay testimony of the girlfriend was critical to the finding of the violation (that Comito had used her credit cards and checks without permission), with Parolee #1, the hearsay statements from others in the house, including his girlfriend, that the marijuana was not theirs but the parolee's, played no part in the ultimate finding of good cause. Instead, the good cause for the marijuana possession violation was based upon the parole agent's non-hearsay testimony of his own observations and findings while

---

1. Plaintiffs' Exhibit 6 at page 3 of 5, has a block obstructing the reason for decision. Accordingly, Defendants have filed, under seal, the complete document that is unobstructed. (Decl. of Patricia Cassady and Exhibit A [filed under seal] thereto.)

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

14

conducting the search of parolee's room. Thus, the right to confront was not even triggered under *Comito*.

**B. Parolee #2**

Plaintiffs contend that in the case of Parolee #2, the Deputy Commissioner did not do *Comito* balancing with regard to the Center Point staff's statements to the parolee's agent of record as to why he was terminated from the program which was therefore, a violation. Parolee #2 is not a valid example of any failing on the part of Defendants. Parolee #2 was subject to a special condition of parole - that he participate in a drug treatment program and, in fact, after a couple of starts and stops, was enrolled at Center Point. (Ex. 8 at 3 of 5.) The violation of that condition was based solely on nonhearsay testimony that Parolee #2 was terminated from the program (something Parolee #2 admits at the hearing as well). (Ex. 9 at p. 44:10-14.)[2] Thus, the staff person's hearsay as to his conduct that formed the reason for the termination (which was the hearsay) was not significant to the allegation that he was terminated just as in *Hall*, where the court addressed the domestic violence violation, because the nonhearsay evidence alone was sufficient to sustain the allegation, the hearsay evidence could not have significantly affected the ultimate finding and thus, any confrontation interest was virtually eliminated. *Hall*, at 986. And, also as *Hall* stated, even if the hearsay should not have been admitted, the fact that nonhearsay proved the violation results in harmless error. *Id*. at 987, n.5.

Also, the hearsay testimony as to Parolee #2 being verbally abusive to the Center Point staff was corroborated by Parolee #2 himself. At the hearing, Parolee #2 offered a written statement which was read into the record by the Deputy Commissioner, which states, "I did allow my mouth to get me into trouble." (Ex. 9 at p. 40:24.) This admission provides indicia of reliability to the staff hearsay testimony.

Moreover, Parolee #2's attorney states on the record that the objection was not a *Comito* issue. (Ex. 9 at p. 37:4-6.) The problem was that the Center Point staff person ignored the

---

2. Plaintiffs did not include this portion of the transcript in Exhibit 9 as it jumps from page 42 to page 47. It is, however, included within the full hearing transcript lodged under seal per the Notice of Lodging Revocation Hearing Transcripts.

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

15

subpoena that the State had issued for their attendance. (*Id.*) Aside from establishing good cause for not producing the witness (since a subpoena issued but was not obeyed), there were numerous nonhearsay statements and Parolee's own admissions that corroborated the hearsay such that admission of the evidence was proper. And, ultimately, if not proper, it was harmless error.

**C. Parolee #3**

As the sole evidence on Plaintiffs' purported issue of forcing a choice between *Valdivia* timelines and confrontation, this parolee's case is discussed and dispensed with above at III.

**D. Parolee #4**

Plaintiffs submit parolee #4 as an example of a failure to do *Comito* balancing. This case is not evidence of non-compliance. First and foremost, it is nearly impossible to ascertain what fully transpired at the revocation hearing for Parolee #4 because, as the transcript itself states, "Proceedings Not Adequately Recorded For Transcription." Thus, there are notations of "inaudible" at nearly every other word, including the critical portions where the Deputy Commissioner was engaging in his *Comito* decision. For Plaintiffs to utilize Parolee #4's case as evidence for their serious contention that Defendants are not following the law, is incredulous.

Second, Plaintiffs' Exhibit 17, the Summary of Revocation Hearing and Decision, makes clear that even if the Deputy Commissioner did not properly conduct the *Comito* balancing, there was no harm to Parolee #4. In particular, the disposition was "in the interests of justice and parolee's rehabilitative opportunities justify him transitioning from hospital to achieve rehabilitation and reintegration to society - incarceration under these circumstances counterproductive though his history warrants 12 mos RTC." (Ex. 17, p. 3 of 5.) As *Comito* itself points out, the failure to perform the balancing test may be erroneous, but not fatal. *Comito*, at 1170. The question is whether, if confrontation rights were violated, that violation was harmless beyond a reasonable doubt. *Id.* In Parolee #4's case, there is no question that even if the Deputy Commissioner either failed to or did not properly conduct the balancing, such error was entirely harmless given that Parolee #4's liberty interest was not impacted because he was not returned to custody.

///

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

16

**V. There Is No Basis to Require Defendants to Fund Legal Representation for Parolees on Writs or Appeals Involving *Comito*.**

Plaintiffs contend, without sufficient, and in most cases without any, evidence that there has been a systemic violation of confrontation rights by Defendants. They ask that Defendants be forced to amend the contract with the attorney panel to provide compensation to the attorneys to file writs and appeals on *Comito* issues. The request is without basis. As demonstrated with the four cases advanced by Plaintiffs in their motion, Defendants did not violate the four parolees' confrontation rights. Moreover, there is no evidence at all to support the serious charge that Defendants have systemically violated parolees' rights. Plaintiffs provide no legal or factual basis to support their request that Defendants be forced to fund attorney fees for unnecessary legal proceedings.

## CONCLUSION

Based on the foregoing, Defendants request a determination that where a proffered out-of-court statement is admissible under an established exception to the hearsay rule that would cause it to be admissible in a criminal proceeding, Defendants may avail themselves of that exception to admit the out-of-court statement in a parole revocation proceeding without having to engage in *Comito* balancing. To do otherwise would be to provide more rights to parolees than those provided to defendants in criminal prosecutions -- something both *Morrissey* and *Gagnon* denounced.

Additionally, Defendants request a determination that like both *Comito* and *Hall*, other hearsay statements can be considered in assessing the indicia of reliability of a piece of hearsay evidence, as part of the balancing process.

Because Plaintiffs submit no evidence on their claim that Defendants are forcing parolees to choose between a thirty-five day hearing and the right to confrontation, no determination should be made.

/ / /

/ / /

/ / /

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

17

Lastly, with no evidence of systemic violations of parolees' confrontation rights and no legal basis, Plaintiffs' request that Defendants be ordered to fund attorney fees for writs and appeals on *Comito* issues should be denied.

Dated: October 26, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

ROCHELLE C. EAST
Supervising Deputy Attorney General

VICKIE P. WHITNEY
Supervising Deputy Attorney General
Attorneys for Defendants

Defs.' Opposition to Motion to Enforce Par. 24 of Perm. Inj.

18

2:94-cv-0671 LKK GGH P

EXHIBIT B—EXHIBIT 3

BINGHAM, McCUTCHEN LLP
GEOFFREY THOMAS HOLTZ – 191370
KRISTEN A. PALUMBO – 215857
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

PRISON LAW OFFICE
DONALD SPECTER – 83925
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LOREN G. STEWART – 243645
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

OFFICE OF THE SPECIAL MASTER

| | |
|---|---|
| JERRY VALDIVIA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION**<br><br><u>HEARING</u><br><br>Date: December 14, 2007<br>Time: 10:00 am<br>Location: Rosen, Bien & Galvan, LLP<br>Officer: Chase Riveland, Special Master |

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

I. The Basic Rule of Confrontation in Revocation Hearings ........................................ 2

II. Hearing Officers Must Conduct a *Comito* Balancing Whenever the State Seeks to Deny the Right to Confront and Cross-Examine Adverse Witnesses ............................................................................................................... 4

 A. Contrary to Defendants' Opposition, There is No Basis to Fear that Parolees Will Receive More Process than Criminal Defendants ...................................................................................................... 4

 1. Criminal Defendants Are Protected by the Rules of Evidence Excluding All Hearsay Not Within Exceptions, as Well as Sixth Amendment Confrontation-Based Limitations, While Parolees Are Protected Only by a Conditional Due Process Confrontation Right ..................................... 4

 2. Hearsay Exceptions Do Not Satisfy Sixth Amendment Confrontation Rights Under *Crawford v. Washington*, 541 U.S. 36 (2004) ...................................................................................... 5

 B. The Due Process Conditional Confrontation Right Requires a Balancing Test for the Admission of All Hearsay, Including that Which May Fall Within a Hearsay Exception. ............................................ 6

 1. Reliability—Derived From Hearsay Exceptions—Is Only One of Several Factors that Affect the Weight of the Parolee's Confrontation Right. ............................................................ 6

 2. Defendants' Reading of the Cases Would Turn Confrontation into the Exception Rather than the Rule. ..................... 7

 3. Defendants' Readings of *Hall* and *Martin* Are Distorted by Defendants' Insertion of the Notion of "Pure Hearsay." ................... 8

 C. Defendants' Attempts to Support Their Desired Outcome by Relying on General Flexibility and on Cases with Little or No Nexus to the Instant Dispute Are Unconvincing ......................................... 11

i

1. *Morrissey* Sets Forth a Standard That Requires Flexibility and Confrontation, Not Just Flexibility............................................ 11

2. Defendants' "Flexibility" Cases Do Not Negate the Basic Rules of Confrontation....................................................................... 12

D. Plaintiffs' Reliance on Confrontation in Other Administrative Proceedings Is Both Relevant and Persuasive. ........................................... 15

III. Confrontation Rights Are Not Satisfied by Adding More Hearsay Evidence On Top of Other Hearsay Evidence Because Such So-Called "Corroboration" Merely Adds to the Number of Unconfronted Accusers, Aggravating the Constitutional Violation. ................................................. 15

IV. The Problem of Postponing a Hearing Instead of Granting a *Comito* Objection Is Plainly within the Scope of this Motion, and Parolee 3's Case Clearly Illustrates that Issue. ......................................................... 19

V. Funding Legal Representation for Parolees Aggrieved by Defendants' Unlawful *Comito* Policies Is Essential to Provide Meaningful Relief and Advance Defendants' Compliance with Valdivia.................................... 20

VI. The Defendants' Attacks on the Four Exemplar Cases Are Incorrect and Inconsequential to the Outcome of this Motion. ...................................... 21

CONCLUSION ............................................................................................................ 22

ii

## TABLE OF AUTHORITIES

**Page**

**Cases**

Crawford v. Washington,
 541 U.S. 36 (2004) ........................................................................................... 4, 5

Gagnon v. Scarpelli,
 411 U.S. 778 (1973) ..................................................................................... 3, 11, 13

Goldberg v. Kelly,
 397 U.S. 254 (1970) ............................................................................................. 15

Idaho v. Wright,
 497 U.S. 805 (1990) ............................................................................................... 5

In re Miller,
 145 Cal. App. 4th 1228 (Cal. Ct. App. 2007) ...................................... 18, 19, 20, 21

Morrissey v. Brewer,
 408 U.S. 471 (1972) ...................................................................................... passim

Prellwitz v. Berg,
 578 F.2d 190 (7th Cir. 1978) .......................................................................... 13, 14

Ryan v. Montana,
 580 F.2d 988 (9th Cir. 1978) ................................................................................ 13

Santa Fe Ind. School Dist. v. Doe,
 530 U.S. 290 (2000) ............................................................................................. 20

United States v. Comito,
 177 F.3d 1166 (9th Cir. 1999) ....................................................................... passim

United States v. Hall,
 419 F.3d 980 (9th Cir. 2005) ......................................................................... passim

United States v. Martin,
 984 F.2d 308 (9th Cir. 1993) ......................................................................... passim

United States v. Miller,
 514 F.2d 41 (9th Cir. 1975) ........................................................................... 12, 13

United States v. Segal,
 549 F.2d 1293 (9th Cir. 1977) .............................................................................. 12

*United States v. Simmons,*
 812 F.2d 561 (9th Cir. 1987) ........................................................................ 3, 8, 11

*United States v. Walker,*
 117 F.3d 417 (9th Cir. 1997) ........................................................................ 3, 8

*Valdivia v. Davis,*
 206 F. Supp. 2d 1068 (E.D. Cal. 2003) ........................................................ passim

*White v. Illinois,*
 502 U.S. 346 (1992) .................................................................................... 5

**Other Authorities**

Robert S. Hunter, Federal Trial Handbook:
 Criminal § 65.1 (Thomson West 4th ed. 2007) ............................................ 7

**Rules**

Fed. R. Evid. 801(c) ......................................................................................... 17

Fed. R. Evid. 802 ............................................................................................. 4

# INTRODUCTION

The practical issue here is whether live witnesses will be the rule or the exception in revocation hearings. Defendants' new procedure would make live witnesses the exception by reversing the burdens of proof required under existing law. Under existing law, as stated in *Morrissey v. Brewer,* 408 U.S. 471 (1972), and *United States v. Comito,* 177 F.3d 1166 (9th Cir. 1999), the default rule is that those providing information against the parolee must do so live at a hearing. The government must show good cause to make an exception. Defendants' new procedure would reverse the default rule; parolees would have to show that statements against them do not meet a hearsay exception in order to invoke the right to face a live accuser. The proper default rule has already been resolved by constitutional law and the *Valdivia* Permanent Injunction. Defendants offer no basis to change the rules now.

Defendants' proposal to elevate hearsay rules above due process would cause unjust results because hearing officers would be forced to ignore the other factors that count on the parolee's side of the confrontation balancing. Under controlling law, the hearing officer must consider the importance of the challenged statement to the ultimate decision. *Comito,* 177 F.3d at 1171. Under Defendants' standard, statements within a hearsay exception would come in, regardless of whether the statement was the only evidence to send a person back to prison. Under controlling law, the hearing officer must consider the consequences of the findings. *Id.* at 1171 n. 7. Under Defendants' standard, statements within a hearsay exception come in whether the result is a one-month term or a life term. Such results are fundamentally unfair and contrary to due process.

The only reason offered for elevating hearsay exceptions above due process is a fear that parolees might get more rights than criminal defendants. This perception is incorrect. Criminal defendants get the full benefit of the rules of evidence, under which all hearsay is excluded unless it fits within an exception, and get the benefit of the Sixth Amendment Confrontation Clause. Parolees get no benefit from the rules of evidence. The parolee's only protection against untested evidence arises from the due process conditional right to confrontation. Moreover, Defendants' assertion that criminal defendants are denied Sixth Amendment confrontation based

1

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

on hearsay exceptions is wrong as matter of constitutional law.

Defendants do not seriously contest the other two issues present in the motion. Defendants offer no basis for the proposition that two or more items of hearsay are somehow less of a confrontation problem than one. Defendants offer no justification for requiring parolees to choose between timely hearings and fair hearings.

As set forth in our proposed Report and Recommendation, Plaintiffs' respectfully request that the Special Master issue a Report and Recommendation to the Court, answering all three questions presented at pages 3-4 of the Motion in the negative:

1. No, California may not return a parolee to prison based on out-of-hearing statements from persons the parolee never gets to confront or cross examine merely because the statement might fall within a state or federal hearsay exception.

2. No, denial of confrontation is not excused if the state lines up several unconfronted hearsay statements next to one another and allows each statement to corroborate its neighbors, even though all are from witnesses are who never confronted or cross-examined by the parolee.

3. No, California may not make a parolee choose between the right to a timely hearing and the right to confront adverse witnesses.

Plaintiffs request that the Special Master adopt the Proposed Report and Recommendation submitted with the Motion, and recommend orders requiring Defendants: (1) to revise their policies, procedures, standards, guidelines, and training materials to conform to the law on this issue; (2) to train all hearing officers on this matter; and (3) to provide funding for select writs to remedy the constitutional violations that have occurred. For the reasons stated in the accompanying Response to Defendants' Objections, Plaintiffs also request that Defendants' evidentiary objections be overruled.

## ARGUMENT

### I. The Basic Rule of Confrontation in Revocation Hearings

In *Morrissey*, the U.S. Supreme Court held that "the minimum requirements of due process" in revocation hearings include "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey*, 408 U.S. at 488-89; *see also Gagnon v. Scarpelli*, 411 U.S. 778,

2

782, 786-787 (1973) (reaffirming *Morrissey* confrontation rule).

The Ninth Circuit has consistently articulated the *Morrissey* rule in deciding parole revocation cases involving confrontation. *See United States v. Hall*, 419 F.3d 980, 986 (9th Cir. 2005) (citing *Morrissey*'s recognition of parolee's "'right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witnesses'"); *Comito*, 177 F.3d at 1170 (same); *United States v. Martin*, 984 F.2d 308, 310 (9th Cir. 1993) (same); *United States v. Simmons*, 812 F.2d 561, 564 (9th Cir. 1987) (same).

To implement the *Morrissey* right, the hearing officer must follow "a process of balancing the [parolee's] right to confrontation against the Government's good cause for denying it." *Simmons*, 812 F.2d at 564; *see also Hall*, 419 F.3d at 986 (weighing "'the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it'"); *Comito*, 177 F.3d at 1170 (same); *United States v. Walker*, 117 F.3d 417, 420 (9th Cir. 1997) (same); *Martin*, 984 F.2d at 310 (same).

To assess the releasee's interest in confrontation, the decision-maker should consider "the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *Comito*, 177 F.3d at 1171. "'[T]he more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect "verified fact."' *Id.* (quoting *Martin*, 984 F.2d at 310-11). The *Comito* court continued, "So, too, the more subject to question the accuracy and reliability of the proffered evidence, the greater the releasee's interest in testing it by exercising his right to confrontation." *Id.* Finally, the Ninth Circuit has recognized that a parolee's interest in confrontation increases as "the consequences of the court's finding" increases. *Martin*, 984 F.2d at 311; *see also Comito*, 177 F.3d at 1171 n.7.

On the government's side of the balance, the reasons for denying confrontation vary "depending on the specific circumstances." *Comito*, 177 F.3d at 1172. In some cases "mere inconvenience or expense may be enough; in others, much more will be required." *Id.* The general principle is that the government must make a "showing of difficulty in obtaining" the adverse witness's presence for cross examination. *Id.* The courts have also relied on "the

---

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

traditional indicia of reliability borne by the evidence" to assess the government's good cause for denying confrontation. *Hall*, 419 F.3d at 988 (internal quotation marks omitted).

The parolee's confrontation right prevails "unless the hearing officer *specifically finds* good cause for not allowing confrontation." *Morrissey*, 408 U.S. at 489 (emphasis added).

**II. Hearing Officers Must Conduct a *Comito* Balancing Whenever the State Seeks to Deny the Right to Confront and Cross-Examine Adverse Witnesses.**

Defendants argue that the applicability of a hearsay exception "automatically establishes good cause to deny the right to confront due to the inherent indicia of reliability." Defendants' Opposition to Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction ("Opp.") at 2. Due process does not allow confrontation to be excused so lightly. Defendants defend their new standard by: (1) wrongfully arguing that any other rule would guarantee parolees greater confrontation rights than criminal defendants; (2) inventing a fictional dichotomy between "pure hearsay" and other hearsay—a dichotomy that has no place in this dispute and is, in fact, squarely rejected by the leading cases and the Federal Rules of Evidence; and (3) misstating the holdings of the leading cases.

**A. Contrary to Defendants' Opposition, There is No Basis to Fear that Parolees Will Receive More Process than Criminal Defendants.**

**1. Criminal Defendants Are Protected by the Rules of Evidence Excluding All Hearsay Not Within Exceptions, as Well as Sixth Amendment Confrontation-Based Limitations, While Parolees Are Protected Only by a Conditional Due Process Confrontation Right.**

Accused criminal defendants—unlike accused parolees—have the right to formal trials, including trial by jury, proof beyond a reasonable doubt, and most pertinent here, trial under federal or state rules of evidence, including the prohibition on admission of hearsay evidence that does not meet an exception. *See, e.g.*, Fed. R. Evid. 802. In addition, criminal defendants have the right to confront their accusers under the Sixth Amendment, which bars all testimonial hearsay, whether or not the hearsay falls within an exception. *Crawford v. Washington*, 541 U.S. 36 (2004). In contrast, parolees have only a conditional due process confrontation right and no hearsay rule. Defendants' position would import only half of the hearsay regime—the exceptions that benefit the government—without also including the hearsay rule that would

4

protect the accused. *See also* Notice of Motion and Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction ("Motion") at 3. Defendants would use this one-sided half-importation of the hearsay rule only for the purpose of negating the conditional confrontation right, the only screen accused parolees have against untested out-of-hearing statements.

2. **Hearsay Exceptions Do Not Satisfy Sixth Amendment Confrontation Rights Under *Crawford v. Washington*, 541 U.S. 36 (2004).**

Defendants mistakenly state that "the admission of hearsay under a firmly rooted exception, 'satisfies the constitutional requirement of reliability.'" Opp. at 6 (quoting *Idaho v. Wright*, 497 U.S. 805, 817 (1990), also citing *White v. Illinois*, 502 U.S. 346, 356 (1992)). While Defendants' do not inaccurately quote *Wright* and *White*, the legal proposition relied upon is no longer good law.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the U.S. Supreme Court rejected any reliance on the *Wright* and *White* line of cases, to the extent such cases were read to mean that confrontation rights are satisfied by the presence of hearsay exceptions or any other indicia of reliability. Whatever the rule might have been before 2004, after *Crawford* it can no longer be said that criminal prosecutors can get out-of-court testimonial statements admitted in criminal trials based on a judicial finding of 'reliability' based on hearsay exceptions. *Crawford* could not be clearer on this point:

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Crawford*, 541 U.S. at 61. The Crawford Court squarely rejected the prior framework under which a statement that "falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness'" may be admitted against a criminal defendant without confrontation and cross-examination. *Id.* at 60. For testimonial statements, such as witness statements to police investigators and parole agents, the current rule of confrontation in criminal trials is exactly the opposite of what Defendants contend it is here. For testimonial statements,

5

judicial findings of "reliability" based on hearsay exceptions (or anything else) are completely irrelevant to whether or not the accused gets to confront and cross-examine the hearsay declarant.

Defendants' error on this point is plain and profound. There is no danger that parolees will receive more process than criminal defendants if *Comito* and the *Valdivia* Injunction are respected.

**B. The Due Process Conditional Confrontation Right Requires a Balancing Test for the Admission of All Hearsay, Including that Which May Fall Within a Hearsay Exception.**

**1. Reliability—Derived From Hearsay Exceptions—Is Only One of Several Factors that Affect the Weight of the Parolee's Confrontation Right.**

Defendants' Opposition does not say what becomes of the non-reliability factors that must be considered in deciding whether to excuse confrontation of a particular statement. *Comito* states that the confrontation right "is not static, but is of greater or lesser significance depending on the circumstances." *Comito*, 177 F.3d at 1171 (citing *Martin*, 984 F.2d at 310-11). *Comito* states even that the factors to consider will vary with the circumstances, *id.* at 1171 n.7, but identifies three factors—two primary, and one illustrative of the non-exhaustive nature of the two primary factors: (1) "the importance of the hearsay evidence to the court's ultimate finding;" (2) "the nature of the facts to be proven by the hearsay evidence;" and (3) "the consequences of the court's findings." *Id.* at 1171 & n.7.

Defendants and Plaintiffs agree that reliability falls under factor number 2, above, "nature of the facts to be proven," and that reliability tends to increase when statements fall within some long-established hearsay exceptions. Under Defendants' plan, however, whenever reliability is bolstered by a hearsay exception, the other two factors (not to mention other factors that may arise, since this list is non-exhaustive) are simply written out of the test. The "importance of the hearsay" to the finding and the "consequences" of an adverse finding would not be considered at all. Thus, under Defendants' plan if any hearsay exception applies, the statement comes in with no balancing of good cause, even if is the only evidence linking the parolee to the crime. Likewise, if a hearsay exception applies, the statement comes in even if it is the only evidence supporting a finding that would send the parolee back to prison for life, as is the case in certain

6

*Valdivia* hearings for life-term parolees. The fundamental unfairness of such a rule is clear.

This one-size-fits-all approach is all the more unacceptable when one considers that not all hearsay exceptions are created equal. Hearsay exceptions are constantly changing based on policy decisions and reliability assessments. *See* Robert S. Hunter, Federal Trial Handbook: Criminal § 65.1 (Thomson West 4th ed. 2007). Under Defendants' plan, however, all hearsay exceptions would have equal weight in negating a parolee's confrontation rights.

### 2. Defendants' Reading of the Cases Would Turn Confrontation into the Exception Rather than the Rule.

Defendants assert that, under *Comito*, "If a parolee can show that the hearsay at issue was significant towards proving the violation and that it is not reliable, then the government is called upon to show good cause for not producing the witness. *Comito,* at 1172." Opp. at 3. This completely misstates the burdens and balancing test set forth in *Comito*.[1]

As Defendants would have it, the parolee would only have a confrontation right if the parolee could first meet a burden of proof to show two elements: (1) that the evidence is significant, and (2) that it is unreliable. Under Defendants' proposed scheme, *if* the parolee could show that the evidence was significant *and* unreliable, *only then* would the government have any burden at all to show good cause for not producing the witness. In practice, this would mean that the State's preparation for a *Morrissey* hearing could include no efforts to secure witness attendance, but only efforts to fit the witness's statements into certain hearsay exceptions. With the burdens thus reversed, the State could return the parolee to prison on hearsay alone without having to say even one word to the hearing officer about the reasons for not presenting the live witness for cross-examination. Due process does not permit returning a person to prison on hearsay when there is "nothing at all to put on the Government's side of the scale" regarding good cause for failure to produce the witness. *Comito,* 177 F.3d at 1172.

---

[1] Defendants also erroneously state that the *Comito* court considered "traditional indicia of reliability borne by the evidence" in the "government's good cause." Opp. at 3. The court did not consider indicia of reliability as to good cause. The *Comito* court first examined the government's cause for denying confrontation, remarking that "no cause has been shown for denying Comito his confrontation rights—there is nothing at all to put on the Government's side of the scale," *Comito,* 177 F.3d at 1172, and then dispatched the government's alternative argument that the hearsay evidence should nonetheless be admitted because of its reliability, *id.*

Contrary to Defendants' approach, due process requires the opposite allocation of burdens. Confrontation is the rule, and non-confrontation is the exception to be enjoyed by the government only if it can meet its burden to show good cause. "[E]very releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation hearing, unless the government shows good cause for not producing the witness." *Id.* at 1170. "[I]n determining whether the admission of hearsay evidence violates the releasee's right to confrontation in a particular case, the court must weigh the releasee's interest in . . . confrontation . . . against the Government's good cause for denying it." *Id.*

*Comito* sets forth the agreed-upon standard for admission of any "hearsay evidence," not just hearsay evidence that does not fall within a hearsay exception. *Id.* at 1170. Indeed, all of the lead cases set forth this same standard. *See Hall*, 419 F.3d at 986 ("[W]hether the admission of *hearsay evidence* violates the releasee's right to confrontation . . . .") (emphasis added); *Walker*, 117 F.3d at 420 ("[I]n determining whether the admission of *hearsay evidence* violates the releasee's right to confrontation . . . .") (emphasis added); *Martin*, 984 F.2d at 310 ("In cases involving the *Morrissey* right to confrontation, we employ 'a process of balancing the [releasee's] right to confrontation against the Government's good cause for denying it.'"); *Simmons*, 812 F.2d at 564 ("The cases [on confrontation] thus delineate a process of balancing the probationer's right to confrontation against the Government's good cause for denying it.").

### 3. Defendants' Readings of *Hall* and *Martin* Are Distorted by Defendants' Insertion of the Notion of "Pure Hearsay."

Defendants contend that the *Hall* court conducted a *Comito* balancing "because the court was only addressing potential error from the admission of pure hearsay that was itself not subject to any exception." Opp. at 6.

There are two problems with Defendants' interpretation of *Hall*. First, their interpretation relies on the false distinction between "pure" or "true" hearsay and other hearsay—a distinction that the *Hall* court does not make. Second, the *Hall* court conducted a *Comito* balancing and rejected the government's arguments that mere fit within a hearsay exception renders evidence admissible.

8

At issue in *Hall* were two supervised release revocation charges: domestic violence and false imprisonment. *See Hall*, 419 F.3d at 986-89; *see also* Motion at 12-14. The hearsay evidence at issue in the case were statements made by Susan Hawkins—Hall's alleged victim—presented second-hand through the testimony of Hall's probation officer (Officer Bergland), and testimony of the responding officer to the incident (Officer Gross). *Id.* at 983-84. The court rejected Hall's confrontation challenge to the first charge, the domestic violence charge, because "the nonhearsay evidence . . . alone was sufficient to sustain the domestic violence allegation." *Id.* at 986. Specifically, the direct evidence supporting the charge included: (1) testimony from Hall's friend "Red" that he had seen Hall slap Hawkins, *id.* at 984, 986; (2) Hall's own admission to his agent that he slapped her, *id.*; and (3) properly authenticated photographs taken shortly after the incident showing Hawkins' bruising, *id.* at 983, 986-87. "[T]he hearsay evidence could not have significantly affected the court's ultimate finding." *Id.* at 986.

The false imprisonment claim, however, raised a serious confrontation question. "Officer Gross' account of Hawkins' statements regarding [the] false imprisonment [charge] were undoubtedly significant to the court's ultimate finding. . . . The evidence of false imprisonment in this case primarily comes from Hawkins' account of the evening as testified to by Officer Gross." *Id.* at 987.

Under the heading, "Nature of facts to be proven by hearsay evidence," the *Hall* court examined Hall's side of the *Comito* balance, noting that the statements were unsworn verbal allegations that are, "in general, the least reliable type of hearsay." *Id.* The proffered hearsay statements were "significant to the court's ultimate finding," but bore "indicia of reliability." *Id.* The court recounted six pieces of evidence (four of which were presented in live non-hearsay testimony at the hearing) that in some manner corroborated Hawkins' hearsay statements: (1) Officer Gross' live testimony regarding his discovery of a golf club allegedly used to threaten Hawkins in Hall's home, exactly where Hawkins had said it would be; (2) the consistency with which Hawkins reported her events of the evening to multiple people shortly after the incident; (3) Red's live testimony that Hawkins had been in Hall's apartment, and that Red saw Hall hit

Hawkins; (4) Dr. Grover's[2] live testimony to his medical conclusions that Hawkins' injuries were consistent with her description of an assault; (5) live testimony of another officer presenting photographs of Hawkins' bruising shortly after the incident; and (6) Hall's own admission to Officer Bergland that he had slapped Hawkins. *Id.* at 983-84, 987-88. Because Hawkins' hearsay statement was corroborated, bolstering its reliability, Hall's interest in confronting it was not as high. The court continued, "[t]his is not the end of the inquiry, however. Simply because hearsay evidence bears some indicia of reliability does not render it admissible. . . . Hall's otherwise strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated." *Id.* at 988.

The *Hall* court then weighed the "government's good cause" for denying confrontation. *Id.* at 988. The court noted that Hawkins was homeless and had left the shelter where she was living without providing a forwarding address. *Id.* The government sought her out at the shelter, and even "ran checks on Hawkins' social security number and birth date" in its attempts to locate her. *Id.* The court concluded that, "[a]lthough Hall had a strong interest in confronting Hawkins with regard to the false imprisonment charge, on balance, that interest is outweighed by the government's good cause for not producing Hawkins as a witness." *Id.* at 989. The *Hall* court carefully balanced the government's good cause for not presenting the witness against the releasee's interest in confronting the evidence, even though the evidence bore indicia of reliability. *Hall* therefore simply cannot stand for the proposition that indicia of reliability excuse any inquiry into good cause.

Finally, Defendants somehow arrive at the conclusion that, in *United States v. Martin*, "[i]t was this chain of custody problem that took the urinalysis report out of the realm of the business-records exception to the hearsay rule, and the court even alludes to that by declining the government's invitation to hold that all such reports are inherently reliable." Opp. at 8. This is wrong. First of all, the *Martin* court nowhere discusses hearsay exceptions. In conducting the proper balancing analysis, the *Martin* court examined the degree of "reliability" accorded to a

---

[2] The *Hall* court alternately refers to the doctor as Dr. Grover and Dr. Glover. For sake of clarity, Plaintiffs refer to him as Dr. Grover throughout.

urinalysis test as part of the confrontation balance. The court recognized that urinalysis reports "are the regular reports of a company whose business it is to conduct such tests, and which expects its clients to act on the basis of its reports." *Martin,* 984 F.2d at 314. But, the court continued, in this case the government presented little information about the company conducting the test, and the court therefore accorded the test little weight. *Id.* Contrary to Defendants' representations, the court did *not* discuss a business records exception—or any other hearsay exception—at all.

Instead, *Martin* actually went one step further: the court unequivocally stated that "District courts should apply the balancing test to every alleged violation of the *Morrissey* right to confrontation." 984 F.2d at 314. The *Martin* court reiterated that holding in a footnote later in the opinion, stating, "[H]aving held that district courts must apply the *Simmons* right-cause balancing test to every denial of confrontation, we think it obvious that a simple finding of reliability, without attention to the [releasee's] side of the balance, would be insufficient." *Id.* at n.12.

**C. Defendants' Attempts to Support Their Desired Outcome by Relying on General Flexibility and on Cases with Little or No Nexus to the Instant Dispute Are Unconvincing.**

**1. *Morrissey* Sets Forth a Standard That Requires Flexibility and Confrontation, Not Just Flexibility.**

Defendants' Opposition relies heavily on the undisputed flexibility of due process standards, quoting at page 5 the statements in *Morrissey* and *Gagnon* that "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial," and that *Morrissey* did not "intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." *Morrissey,* 408 U.S. at 489; *Gagnon,* 411 U.S. at 782.

Plaintiffs do not dispute these principles. The principle of flexibility is stated in *Morrissey* in the very same paragraph that states that among the "minimum requirements of due process" is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey,* 408 U.S. at 489. The

11

clear import of these two statements in the same paragraph within the *Morrissey* opinion is that flexible use of "letters, affidavits, and other material" is allowed, provided that the "minimum requirements of due process," including confrontation, are also met.

The simplest application of the flexibility language is to evidence submitted not against the parolee, but *by* the parolee to defend against the charges or to oppose return to prison as a sanction. Such evidence raises no confrontation problems, and allows maximum flexibility to accept letters of support, declarations, and other material "that would not be admissible in [a]... criminal trial." *Id.*

For material offered *against* the parolee, the "minimum requirements of due process" must be met, and the due process right to confrontation respected unless the hearing officer "specifically finds good cause to deny confrontation." *Id.*

It must be noted here that Defendants' plan to impose an across-the-board, one-size-fits-all rule of non-confrontation of some hearsay would prevent hearing officers from "specifically" finding good cause to deny confrontation, and would thus violate due process as defined in *Morrissey*. This is why *Comito* and the other cases following *Morrissey* require balancing in all cases where unconfronted hearsay is offered, so that the hearing officer can make the required *specific* finding.

### 2. Defendants' "Flexibility" Cases Do Not Negate the Basic Rules of Confrontation.

Defendants assert a so-called "continuum" of process set forth in dicta in a thirty-year-old Ninth Circuit case, *United States v. Segal*, 549 F.2d 1293 (9th Cir. 1977). Opp. at 5. *Segal* has nothing to do with constitutional confrontation rights, but rather concerns the procedure for making guilty pleas in probation revocation cases. The petitioner in *Segal* did not even seek a revocation hearing, but rather admitted and pled guilty to the charges. *Id.* at 1295.

A second new case cited by Defendants for the proposition that "the hearing officer may consider hearsay evidence" is *United States v. Miller*, 514 F.2d 41 (9th Cir. 1975). Opp. at 5-6. This short opinion rejects the appellant's objection to the admission of unauthenticated copies of state court criminal records. *Id.* at 42-43. The court's cursory analysis, citing only two cases—

12

*Morrissey* and *Gagnon*—that predates the bulk of the leading cases on this disputed topic, is unpersuasive. Additionally, the hearsay evidence admitted in *Miller* was *not* admitted pursuant to a hearsay exception. *Id.*

Defendants' reliance on *Ryan v. Montana*, 580 F.2d 988 (9th Cir. 1978), is equally unconvincing. Opp. at 5. Ryan had a combined probation revocation and deferred sentencing hearing, at which he sought immunity from use of his testimony for a simultaneously pending criminal indictment for the same act that constituted the alleged probation violation. *Ryan*, 580 F.2d at 990-91. After the court denied his request for immunity and revoked his probation, Ryan petitioned for a writ of habeas corpus, arguing that it was improper for a court to deny him immunity from his own testimony that might have been self-incriminating. *Id.* This case has little or nothing to do with the instant dispute. Apart from vague background statements citing the limited confrontation right in *Morrissey* and *Gagnon*, this case is entirely irrelevant. *Id.* at 992-93.

Finally, Defendants rely on *Prellwitz v. Berg*, 578 F.2d 190 (7th Cir. 1978), a Seventh Circuit case that should be considered only as persuasive authority, and that contradicts *Comito* and other binding Ninth Circuit and Supreme Court precedent. After Prellwitz had reported to his probation officer for the first year of a three-year probation sentence, he absconded supervision for five years before being arrested on another charge. *Prellwitz*, 578 F.2d at 191. At his probation revocation hearing, Prellwitz's new probation officer relied on the departmental record of supervision—generated by Prellwitz's former probation officer—to show that Prellwitz had been failing to report, and that the probation officer had made attempts to contact Prellwitz. *Id.*

The Seventh Circuit addressed Prellwitz's argument that the court erred by failing to require the state to show good cause for failing to produce his original probation officer. *Id.* at 192-93. The court noted that Prellwitz was permitted to review and attach the record of supervision itself, and denied his request to produce the probation officer who created the record of supervision. *Id.* "Forcing the state to show good cause for not producing the hearsay declarant would unwisely extend the limited due process rights of a probationer at the revocation

13

hearing." *Id.* at 192. The *Prellwitz* court's holding in that regard is contrary not only to *Comito*, 177 F.3d at 1170 ("every releasee is guaranteed the right to confront and cross-examine adverse witnesses at a revocation, unless the government shows good cause for not producing the witnesses"), but also to *Morrissey v. Brewer*, 408 U.S. at 489 ("the minimum requirements of due process" include "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"). To the extent that this out-of-circuit case contradicts the clear mandates of *Morrissey*, the Mastership should deem it non-persuasive.

Two other factors decrease the persuasiveness of *Prellwitz*. First, the facts on which *Prellwitz* was decided make it a poor choice on which to build a statewide confrontation policy. *Prellwitz* concerned the simple issue of whether the probationer had reported to his officer during the five years he was accused of absconding. In contrast to that narrow issue, the practical outcome of this motion will be a statewide policy and procedure governing all sorts of factual disputes, in which cross-examination of an accuser will be central to determining whether certain acts occurred, whether the parolee committed the acts, and whether the parolee's conduct was justified or unlawful. Such a policy should not be built on a case about a simple fact of absconding which was not likely to be disputed. Second, *Prellwitz* was decided in 1978, two decades before *Comito*, the controlling Ninth Circuit case, and only six years after *Morrissey*. By 1999, the year of *Comito*, the federal courts had the benefit of decades of experience with *Morrissey* procedures, and were in a far better position to make reasonable judgments about the level of confrontation right needed to ensure reliable results.[3]

/ / /

/ / /

---

[3] Earlier in this case, the *Valdivia* Court had to sort through inconsistencies among out-of-circuit cases, and even within dicta in Ninth Circuit cases, regarding the requirements of due process in parole revocation cases. *See Valdivia v. Davis*, 206 F. Supp. 2d 1068, 1076-1078 and 1077 n.19 (E.D. Cal. 2003) (considering and rejecting as non-persuasive the holding of *Ellis v. District of Columbia*, 84 F.3d 1413 (D.C.Cir. 1996), and dicta in *Pierre v. Wash. St. Bd. Of Prison Terms & Paroles*, 699 F.2d 417 (9th Cir. 1983), regarding the preliminary hearing requirements). The Court correctly chose to apply controlling authority, and to reject non-controlling authority when it is not helpful or not consistent with due process requirements.

14

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

### D. Plaintiffs' Reliance on Confrontation in Other Administrative Proceedings Is Both Relevant and Persuasive.

Defendants maintain that "[n]one of what occurs in . . . administrative proceedings is relevant to the issue of whether Defendants are properly following the law concerning the treatment of hearsay evidence in revocation proceedings." Opp. at 9. This statement belies Defendants' repeated insistence that revocation proceedings are distinct from criminal proceedings, requiring less due process. Opp. at 9. To the extent any "continuum" of due process proceedings should be examined, the continuum should be examined for confrontation standards, which Plaintiffs have done here.

Revocation proceedings are a type of administrative proceeding in which substantial rights are at stake. The U.S. Supreme Court instructed in an administrative proceeding involving the discontinuation of welfare payments that, "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). *Morrissey* cites *Goldberg* as one of its sources for the due process standards. *Morrissey*, 408 U.S. at 481, 485, 486, 487. Plaintiffs' reliance on across-the-board guarantees of confrontation in other areas of administrative law is relevant and persuasive evidence that Defendants' attempt to short-circuit confrontation is ill-advised.

### III. Confrontation Rights Are Not Satisfied by Adding More Hearsay Evidence On Top of Other Hearsay Evidence Because Such So-Called "Corroboration" Merely Adds to the Number of Unconfronted Accusers, Aggravating the Constitutional Violation.

Defendants do not address the cases presented by Plaintiffs' Motion at page 18 to show that, in hearings where hearsay is allowed if reliable, reliability must be shown by "extrinsic" evidence, not by the hearsay itself. Instead, Defendants rely on *Comito* itself, which does not support the proposition they assert.

Defendants state that the *Comito* court considered other hearsay evidence to corroborate the hearsay at issue: Dierdre Connell's statements to Officer Perdue. Opp. at 10. Defendants describe four pieces of corroborative evidence: (1) the stipulated testimony of a Las Vegas Police Detective as to reports made by Connell; (2) a memorandum written by Connell that listed the

15

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA
PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

dates and amounts of the transactions at issue; (3) several of Comito's unemployment compensation documents and his bank statement; and (4) Officer Perdue's testimony as to discussions he had with a credit card fraud investigator. *Id.; see also Comito*, 177 F.3d at 1168-69. Defendants conclude that the court thus considered this evidence—"which obviously included hearsay"—as corroborative, just not corroborative enough to meet the Government's burden.

This mischaracterizes the *Comito* opinion. Immediately after describing the above evidence, the court stated, "While the additional evidence may also be subject in whole or in part to *valid* objections based on hearsay and Comito's right to confrontation, those challenges are not raised before us. Only Officer Perdue's testimony regarding what Connell purportedly told him is at issue in this appeal." *Comito*, 177 F.3d at 1169 (emphasis added). Thus, the court is explicitly saying that the additional evidence *itself* is objectionable; it is simply not the subject of the appeal.

The court does not leave it at that. It adds in one footnote regarding the stipulated testimony of the Las Vegas Police Detective that "Defense counsel stipulated to this testimony with the caveat that Comito's hearsay objections were not waived." *Id.* at n.3. In another footnote, the court again expresses its doubts about the propriety of the supposedly corroborative evidence, noting that Connell's memorandum "was hearsay," that the stipulated testimony was "more hearsay," and that Officer Perdue's account of a conversation with the fraud investigator "suffers from the same defect, doubled." *Id.* at 1172 n.9. Far from condoning the practice of corroborating hearsay with hearsay, the court seems pained that the question of corroboration of hearsay with hearsay was "not raised before us." *Id.* at 1169. This confirms the common-sense conclusion that piling more out-of-hearing statements on top of each other does not cure the confrontation problem; piling on makes it worse.

Defendants subject *Hall* to similar distorting treatment. *Hall* is not a case involving the piling up of hearsay statements to corroborate each other. To the contrary, in *Hall* "the government put on the five witnesses who had been in contact" with the alleged victim, Susan Hawkins, whose hearsay statements to Officer Gross were the statements that Mr. Hall did not

16

get to confront. 419 F.3d at 983. Nearly all of the corroboration at issue in *Hall* came from these live witnesses and was subject to confrontation and cross-examination. Defendants' Opposition, however, enumerates the evidence in *Hall* as if the corroborating statements were coming in as unconfronted hearsay, which Defendants propose to do here as a matter of policy under *Valdivia*. *See* Opp. at 11. This confusion between corroborating testimony from live witnesses and so-called "corroborating" hearsay distorts *Hall* beyond recognition.

Defendants describe Dr. Grover's testimony as "medical conclusions of the treating physician (which were based in part on hearsay from Hawkins)." Opp. at 11. This is a misunderstanding of the hearsay rule. A piece of evidence is either hearsay, or it is not. Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." *See* Fed. R. Evid. 801(c). The corroborating evidence from Dr. Grover was not what he heard Ms. Hawkins say, but rather the things Dr. Grover himself saw when "he personally examined" Hawkins, the contusions on her chest, back and elbow. 419 F.3d at 983. This first-hand testimony of Dr. Grover, who testified live at the revocation hearing, and was subject to confrontation and cross-examination, is not the type of unconfronted hearsay that Defendants here would pile up to "corroborate" other unconfronted hearsay.

Similarly, Officer's Gross's live testimony at the hearing as to his discovery of a golf club where Hawkins said it would be is not hearsay; it is Officer Gross's live testimony as to his own observations. *Id.* at 983-84.

The live, confronted testimony of "Red," Mr. Hall's and Ms. Hawkin's drinking companion, that he witnessed Hall slap Hawkins, is not hearsay testimony. *Id.* at 984.

Hawkins' documented physical bruising in photographs authenticated by the police officer who took them, Officer Tagaban, another live witness at the hearing, is not hearsay evidence. *Id.* at 983.

Mr. Hall's own statement to his probation officer, admitting that he hit Ms. Hawkins, is, under the rules of evidence, a party admission, not hearsay. *Id.* at 986.

The only statements used as corroboration in *Hall* were Ms. Hawkin's own statements to various persons (the five persons who testified live at the hearing), the consistency of which over

17

time were cited in *Hall* as an indication of reliability for purposes of the *Comito* balancing test. *Id.* at 987.

In light of the wealth of non-hearsay corroborating statements from live witnesses at the hearing who were subject to confrontation and cross-examination, Defendants' suggestion that the reliability of corroborative evidence in *Hall* was "all hearsay," is inaccurate and misleading. Opp. at 11.

Defendants decline to even address *In re Miller*, 145 Cal. App. 4th 1228 (Cal. Ct. App. 2007), in which the Fourth District Court of Appeal granted a writ of habeas corpus because of a *Comito* error by one of Defendants' own Deputy Commissioners. The *In re Miller* case provides an excellent example of a court condemning the use of hearsay evidence to corroborate proffered hearsay.

In that case, Miller's parole was revoked on charges of sexual battery and forced oral copulation allegedly occurring in a hotel. *In re Miller*, 145 Cal. App. 4th at 1231. The revocation was based in part on testimony from Officer Norton, an investigating officer. *Id.* at 1232-33. Officer Norton testified that a hotel front desk employee told Officer Norton that the victim told the employee that Miller had tied her up and pushed her around. *Id.* at 1238. Officer Norton also testified that the hotel's housekeeping staff told him that they had found towels tied together, consistent with a statement allegedly made by the victim. *Id.*

The Attorney General argued that Officer Norton's testimony as to what the hotel staff said corroborated hearsay statements made by the non-testifying victim.

> In other words, the parole agent proffers as corroborating evidence third-parties' unsworn verbal statements, precisely the type of evidence *Comito* characterizes as "the least reliable type of hearsay." In addition, the Attorney General invites us to use one portion of Officer Norton's testimony, based entirely on this unreliable hearsay, to corroborate a second portion [of] his testimony, also based on hearsay. Rather than providing a strong indication of the reliability of the hearsay testimony, adopting such a criterion would eviscerate the need to provide indicia of reliability before hearsay evidence is received. Were this standard adopted, unreliable hearsay evidence could become reliable simply by attributing the evidence to several sources.

18

*Id.* at 1238. It is plain from this passage that a court actually presented with the question of whether hearsay evidence may be corroborated by other hearsay evidence unequivocally answered in the negative. That is precisely what happened in Parolee 3's second revocation hearing. Motion at 6-7; Huey Decl. ¶ 22 & Ex. 13.

Defendants' position—that inadmissible hearsay evidence that has not been admitted under *Comito* may somehow be admitted to bolster other hearsay evidence—lacks legal support and defies common sense. The *Comito* court implicitly rejected such an approach, and the *In re Miller* court issued a writ in part because of it.

**IV. The Problem of Postponing a Hearing Instead of Granting a *Comito* Objection Is Plainly within the Scope of this Motion, and Parolee 3's Case Clearly Illustrates that Issue.**

Defendants first contend that situations in which a hearing officer puts a parolee to the choice between a timely hearing and the right to confrontation are somehow outside of the scope of this dispute. Opp. at 12. But, this practice implicates the core of what *Comito* was designed to protect: confrontation. If a parolee is put to the choice of confronting his accuser at a later date beyond the *Valdivia* time frames, or having a timely hearing in which he is returned to prison without the right of confrontation, his constitutional rights are violated. As set forth in the moving papers, if a hearing officer could repeatedly postpone a revocation hearing if a percipient adverse witness was absent instead of holding the hearing, Defendants have eviscerated the core of the confrontation right. Timely hearings and confrontation *are* linked. They are both rights guaranteed by the Constitution and the *Valdivia* Permanent Injunction. Defendants' practice of trying to condition one right on the other has further "intermingled" the two. Opp. at 12.

Second, Defendants contend that Parolee 3 was not put to a choice of having a timely hearing or having his *Comito* objection ruled upon. Opp. at 12. Yet, on the very next page of their opposition, Defendants cite the hearing officer's notice of decision at the postponed hearing stating that "the last hearing . . . was postponed based on Comito objection." Opp. at 13. Indeed, at the first hearing, the hearing officer stated on the record, "I will note your [*Comito*] objection, counsel; however, I'm going to – part of my decision – I'm not overruling them; I'm sustaining it

19

to the extent that we're going to postpone it and subpoena all the witnesses...." Huey Decl. ¶ 21 & Ex. 11 at 24:15-20. The DC's record of decision shows that he granted the *Comito* objection, and postponed the relevant charges. *Id.* ¶ 21 & Ex. 12 at 3, 5. Defendants may insist without evidentiary support that they do not put parolees to the choice of a timely hearing and confronting witnesses, but they utterly fail to rebut Plaintiffs' evidence demonstrating exactly that scenario.

Finally, Defendants point to the *Comito* analysis in Parolee 3's second hearing as a "proper balancing." Opp. at 13. The second hearing, however, was a clear example of multiple confrontation violations, as the hearing officer piled one unconfronted out-of-hearing statement on top of another, and allowed them all to come in against the parolee without confrontation and cross-examination because they somehow "corroborated" each other. Defendants emphasize that the DC here stated, "Three independent and separate statements to deputy Shriver, who did not attend the last hearing which was postponed based on Comito objection. Each corroborate[s] each other and the weight of the corroborated hearsay evidence outweighs P's interest in confrontation." Opp. at 13. Such grouping of unreliable evidence is precisely the approach rejected by the *In re Miller* court when it considered two "independent" hearsay statements to a police officer. *See In re Miller*, 145 Cal. App. 4th at 1238 (rejecting Attorney General's invitation "to use one portion of Officer Norton's testimony [statement of hotel employee], based entirely on this unreliable hearsay, to corroborate a second portion [of] his testimony [statement of housekeeping staff], also based on hearsay").

**V. Funding Legal Representation for Parolees Aggrieved by Defendants' Unlawful *Comito* Policies Is Essential to Provide Meaningful Relief and Advance Defendants' Compliance with *Valdivia*.**

Constitutional injury need not be present at a magnitude of tens, hundreds, or thousands to be severe. *See, e.g., Santa Fe Ind. School Dist. v. Doe*, 530 U.S. 290, 313-14 (2000) (discussing "serious constitutional injury" that results from forcing a student to participate in an act of religious worship in violation of the Establishment Clause). Even violation of the confrontation rights of one parolee gives rise to a great enough harm to mandate court intervention.

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

As set forth in our moving papers, Defendants have a longstanding problem with *Comito*. *See* Motion at 4, 20 (citing First and Second Reports of the Special Master). Very few parolees can afford to hire experienced counsel to vigorously and quickly appeal the violation of their *Comito* rights in revocation hearings. The few that do are very fortunate, and sometimes bring the profundity of Defendants' misunderstanding of this dispute to a neutral tribunal. *See, e.g., In re Miller*, 145 Cal. App. 4th 1228.

The funding of select writs is in Defendants' interest. The writs would provide guideposts for future cases, helping DCs, Plaintiffs and Defendants understand the courts' interpretation of *Comito*. Indeed, with more decisions on which to base their *Comito* policy, and some accountability for DCs to get it right (as there is currently virtually no appeal process that informs a DC when they get it wrong), the funding of writs might ultimately help Defendants self-regulate their own *Comito* policy.

Far from being the drastic remedy that Defendants make it out to be, all parties would be well-served by the funding of a limited number of CalPAP writs to remedy *Comito* violations against *Valdivia* class members. For the reasons set forth above and in our motion, Plaintiffs respectfully request that the Special Master issue a Report and Recommendation to the Court requiring Defendants to fund a limited number of CalPAP writs for parolees who allege that their *Comito* rights were violated in revocation hearings.

## VI. The Defendants' Attacks on the Four Exemplar Cases Are Incorrect and Inconsequential to the Outcome of this Motion.

Only one fact need be found to justify a Recommendation that Plaintiffs' motion be granted: Defendants have stated their intention to distribute policies and guidelines that are inconsistent with parolees' confrontation rights, contrary to their duty under Paragraph 24 of the *Valdivia* Permanent Injunction to develop and implement policies and guidelines that are consistent with due process and controlling law.

The exemplar cases of Parolees 1-4 were provided for context, to demonstrate that the outcome of this dispute has consequences in the real world. This is not an appeal of the revocation outcomes for Parolees 1-4, and the Mastership and the Court need not base its

21

decision on their cases. The proper focus, instead, is whether Defendants' *Comito* policies are in compliance with Paragraph 24 of the *Valdivia* Permanent Injunction.

Nonetheless, Defendants' attacks on these examples are in error. For ease of reference, each exemplar parolee's case is addressed in the Appendix to this Reply.

### CONCLUSION

As set forth in our proposed Report and Recommendation, Plaintiffs respectfully request that the Special Master issue a Report and Recommendation to the Court answering all three questions presented at page 3-4 of the motion in the negative, *i.e.,* (1) that California may not return a parolee to prison based on out-of-hearing statements from persons the parolee never gets to confront or cross examine merely because the statement might fall within a state or federal hearsay exception; (2) that denial of confrontation is not excused if the state lines up several unconfronted hearsay statements next to one another and allows each statement to corroborate its neighbors, even though all are from witnesses are who never confronted or cross-examined by the parolee; and (3) that California may not make a parolee choose between the right to a timely hearing and the right to confront adverse witnesses.

Plaintiffs respectfully request that the Special Master recommend entry of an Order (1) requiring Defendants to revise their policies, procedures, standards, guidelines, and training materials to conform to the law on this issue, (2) to train all hearing officers on this matter; and (3) to provide funding for select writs to remedy the constitutional violations that have occurred.

Dated: November 27, 2007

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

By: /s/ Loren G. Stewart
Loren G. Stewart
Attorneys for Plaintiffs

PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION - Case No. Civ. S-94-0671 LKK/GGH

### EXHIBIT B—EXHIBIT 4

EDMUND G. BROWN JR.
Attorney General of the State of California
JAMES M. HUMES
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
VICKIE P. WHITNEY, State Bar No. 145316
Supervising Deputy Attorney General
JESSICA R. DEVENCENZI, State Bar No. 232427
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 445-4979
 Fax: (916) 324-5205
 Email: Jessica.Devencenzi@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JERRY VALDIVIA, et al.,** | 2:94-cv-0671 LKK GGH P |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION** |
| v. | |
| **ARNOLD SCHWARZENEGGER, et al.,** | |
| Defendants. | Hearing: December 14, 2007 |
| | Time: 10:00 a.m. |
| | Location: Rosen, Bien & Galvan, LLP |
| | Officer: Special Master |
| | Chase Riveland |

Under the agreement reached between all counsel and the Special Master, Defendants submit the following response to Plaintiffs' reply to Defendants' opposition to Plaintiffs' Motion to Enforce Paragraph 24 of the *Valdivia* Permanent Injunction.

## INTRODUCTION

Defendants' position — that hearsay subject to a long-standing exception is admissible, without balancing, as a substitute for live testimony because it bears the indicia of reliability that

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

1

establishes good cause to overcome confrontation -- will not make live witnesses the exception in revocation proceedings nor will it result in a shift of burdens of proof. Clearly, hearsay exceptions have not done that in criminal prosecutions, or anywhere else, and there is no reason to believe or basis in fact to which Plaintiffs can cite to demonstrate that will occur in revocation hearings. Plaintiffs' contention that parolees will have to show that statements do not fall within a long-standing hearsay exception in order to face a live witness is absurd. Fundamentally, the use of hearsay exceptions in courts has not resulted in the dire consequences Plaintiffs forecast and there is no reason to surmise that parole revocation proceedings will be any different.

To be clear, Defendants are not seeking to change the rules – they are seeking affirmation of the rules as set forth in applicable case law. It is indisputable that neither *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999) nor *United States v. Hall*, 419 F.3d 980 (2005), directly confronted the issue of whether hearsay that is subject to a long-standing exception, requires the government to engage in a full balancing approach in order for it to be admissible in a parole revocation proceeding. What is known from *Comito* and *Hall*, consistent with *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), is that a parolee's right to confrontation is not absolute and that substitutes for live testimony may be used where there is an indicia of reliability to that substitute. Moreover, such substitutes that bear indicia of reliability to establish good cause for not producing a live witness include evidence that falls within long-standing exceptions to the hearsay rule. Thus, where the government can establish that evidence (such as a parole officer's records) come within a long-standing hearsay exception (e.g., the business records exception), they are admissible without having to engage in any balancing, and the parolee's confrontation right is satisfied since the indicia of reliability as a result of the exception, establishes the good cause for not producing the parole officer. This position is shared by the Ninth Circuit as set forth in *Hall*.

Defendants will not belabor the arguments set forth in detail in their opposition but simply address the faulty law and logic Plaintiffs rely on in their reply to both mischaracterize the effects of Defendants' position and to effectively ask that the Special Master ignore or overturn relevant precedential decisions.

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

2

## ARGUMENT

**I. Defendants Have Not Mischaracterized *Comito* or *Hall*.**

Plaintiffs generally accuse Defendants of mischaracterizing or distorting *Comito* and *Hall*. The accusation is false. While in their opening brief, Plaintiffs state that nowhere in *Comito* did the Ninth Circuit suggest that trustworthy hearsay is an exception to the rule, when Defendants' opposition properly points out that the court was never confronted with the role of hearsay exceptions because of the limited nature of *Comito*, Plaintiffs' reply incongruously tries to undermine the Defendants' arguments by relying on the very language cited by Defendants as limiting the scope of *Comito* – that only Officer Perdue's testimony is at issue (and not additional evidence that may or may not be subject to objections). (Plft. Reply at 16.) Defendants correctly observed (as admitted by Plaintiffs' reply) that *Comito* cannot be read to apply to issues it did not expressly address.

Plaintiffs also incorrectly assert that the court in *Comito* was "explicitly saying that the additional evidence itself is objectionable." (Plft. Reply at 16, lines 11-13.) As stated by the court, "the additional evidence **may** also be subject in whole or in part to valid objections based on hearsay and Comito's right to confrontation." *Comito*, at 1169 (emphasis added). However, since none of that was before the court, as Defendants rightly pointed out, issues surrounding the additional evidence -- including that which may have been subject to a hearsay exception -- were not within the ambit of the *Comito* decision. The only thing considered by the court in *Comito* was hearsay evidence that was not subject to any exception and, thus, *Comito* did not address whether hearsay subject to a long-standing exception is admissible without engaging in full balancing.

Also, in footnote 1 of Plaintiffs' reply, they contend that Defendants erroneously state that in *Comito*, the court considered the traditional indicia of reliability as part of the government's good cause. (Pltf. Reply at 7.) Not only is that exactly what the court did in *Comito*, but the Ninth Circuit reiterated the point in *Hall*: "in determining the government's good cause in not producing a witness, we look to 'both the difficulty and expense of procuring witnesses and the traditional indicia of reliability borne by the evidence.'" *Hall*, at 988.

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

3

II. **Plaintiffs' Advocation of *Crawford v. Washington* to Argue That Hearsay Exceptions in the Context of Parole Revocation Hearings Do Not Satisfy Sixth Amendment Confrontation Is Wholly Erroneous.**

Plaintiffs' reply devotes a great deal of argument in attempting to undermine Defendants' position that hearsay exceptions negate *Comito* balancing, by improperly asserting that *Crawford v. Washington*, 541 U.S. 36 (2004), has some application to revocation hearings. Simply put, Plaintiffs' argument runs wholly contrary to the law governing parole revocation hearings.

*Crawford* addressed the Sixth Amendment rights of the accused in a criminal prosecution; it did not address the due process rights attendant to post-conviction proceedings for violations of conditions of release -- and the distinction is important. Specifically, in *U.S. v. Hall*, 419 F.3d 980 (2005), decided the year after *Crawford*, the defendant argued that the use of Hawkins' hearsay statements at his revocation hearing violated his Sixth Amendment right to confrontation as articulated in *Crawford*. *Id*. at 984-85. The Ninth Circuit could not have been more clear: "[w]e reject Halls' assertion that *Crawford* extends the Sixth Amendment right to confrontation to revocation of supervised release proceedings." *Id*. at 985. The Ninth Circuit went on to state, "We, like the two circuits that have also addressed this question, see no basis in <u>Crawford</u> or elsewhere to extend the Sixth Amendment right of confrontation to supervised release proceedings. See *United States v. Aspinall*, 389 F.3d 332, 342 (2d Cir. 2004) (holding that *Crawford* does not apply to probation revocation because *Crawford* and the Sixth Amendment apply only to "criminal prosecutions" and "it has long been established that probation revocation, like parole revocation, is not a stage of a criminal prosecution") (internal quotations omitted); *United States v. Martin*, 382 F.3d 840, 844 n.4 (8th Cir. 2004) (holding that confrontation right in criminal prosecutions does not apply to supervised release revocation proceedings because they are not part of a criminal prosecution)." *Id*. at 985-986.

Unlike the criminal proceeding in *Crawford* where the standard for admissibility of hearsay evidence is based on the Sixth Amendment, a due process standard is used to determine admissibility in a parole revocation proceeding. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). "Because 'revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole

restrictions' the full protection provided to criminal defendants, including the Sixth Amendment right to confrontation does not apply to them." *Hall*, at 985, citing *Morrissey*, at 482.

Accordingly, it is clear that neither the Sixth Amendment nor *Crawford*'s holding have any application to post-conviction release revocation proceedings. It is irrelevant in the context of this motion what the court did in *Crawford* because it has no bearing on parole revocation proceedings. Plaintiffs' suggestion that *Crawford* has some application here is contrary to *Hall* and to *Morrissey*. Moreover, accepting their proposition that hearsay statements in revocation proceedings are subject to the Sixth Amendment right to confrontation and the principles articulated in *Crawford*, would require that the Special Master overturn *Hall*.

Importantly, after holding that *Crawford* is not applicable, the Ninth Circuit in *Hall* goes on to expressly indicate its view with regard to hearsay exceptions in revocation proceedings: "long-standing exceptions to the hearsay rule that meet the more demanding requirements for criminal prosecutions should satisfy the lesser standard of due process accorded the respondent in a revocation proceeding." *Hall*, at 987. *Hall's* statement here is further bolstered by the Second Circuit's decision in *Aspinall*, cited by *Hall* as to *Crawford's* inapplicability, where it held that due process does not oblige that a balancing analysis be performed with respect to a "proffered out-of-court statement [that] is admissible under an established exception to the hearsay rule." *Aspinall*, at 344 (2d Cir. 2004), see also *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006). Defendants' position is thus consistent with the federal cases that have directly opined on the issue.

**III. The Ninth Circuit Has Established that *Morrissey's* Flexibility of Process and Substitutes for Live Testimony Not Only Apply to Both Sides but that Such Substitutes Satisfy Confrontation.**

Plaintiffs' reply argues that the language in *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972), that "the process [revocation] should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial," means that flexibility in terms of substitutes for testimony only applies to evidence submitted by the parolee, not evidence against the parolee. (Pltf. Reply at pp. 11-12.) Plaintiffs' interpretation is not supported by any law and, in fact, is contradicted by it.

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

5

The Ninth Circuit in *United States v. Simmons*, 812 F.2d 561 (9th Cir. 1987),[1] in affirming the admission of hospital records that bore traditional indicia of reliability, coupled with the "diminished procedural protections which attach to a probation revocation proceeding," stated, "[o]ur cases also suggest that the reliability of evidence may provide a basis for its admission." *Id.* at 564-65. In reaching its decision that hearsay evidence may be admissible in revocation hearings, the Ninth Circuit in *Simmons* cites to *Prellwitz v. Berg*, 578 F.2d 190 (7th Cir. 1978). *Simmons*, at 564. In *Prellwitz*, the admissibility of Department records documenting unsuccessful attempts of petitioner's original probation officer to locate petitioner when he failed to report were upheld because "the report was one of the 'conventional substitutes for live testimony' which the Court has recognized to be permissible in probation revocation proceedings." *Prellwitz*, at 192 (citing *Gagnon v. Scarpelli*, at 783 n.5). The substitutes for live testimony that *Gagnon* endorses as part of the flexibility *Morrissey* speaks to, is not just for the benefit of the parolee but, as *Simmons* and *Prellwitz* demonstrate, is also for the benefit of the government to use against a parolee. Plaintiffs' hypothesis that only the parolee may benefit from such substitutes is wholly erroneous.

Moreover, *Simmons* itself demonstrates that confrontation can be satisfied simply by the reliability of the evidence (such as business records which is an exception to the hearsay rule). The flexibility of *Morrissey* embraces the substitutes for live testimony that *Gagnon* identifies as meeting the parolee's confrontation rights. In other words, as *Simmons* determined, traditional indicia of reliability

**IV. Plaintiffs' Attempts to Detract from Cases Cited by Defendants Is Unavailing.**

Plaintiffs' reply endeavors to divert attention from various cases cited by Defendants in their opposition, with criticisms that suggest legal precedent, that has never been reversed, should simply be discarded. Plaintiffs disparage the cases as "a thirty-year-old Ninth Circuit case," a "cursory analysis, citing only two cases - *Morrissey* and *Gagnon*," as having "vague background statements citing the limited confrontation right in *Morrissey* and *Gagnon*," and, in a case heavily

---

1. Plaintiffs' motion heavily relies on *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993) which refers to the balancing from *Simmons*. (See Pltf. Reply at 11.)

relied upon by the Ninth Circuit in constructing the *Simmons* balancing test for confrontation (the precursor to *Comito*), stating it has only limited persuasiveness and is "a poor choice on which to build a statewide confrontation policy." (Pltf. Reply at 12-13.) None of Plaintiffs' criticisms withstand scrutiny.

Defendants' opposition brief raised *United States v. Segal*, 549 F.2d 1293 (9th Cir. 1977), cert. denied, 431 U.S. 919 (1977) – the "thirty-year-old Ninth Circuit case," because, based on Supreme Court guidance, the court identifies four types of proceedings and the amount of process which is due for each, from greater to lesser. *Segal* demonstrates that parole revocation proceedings rank as third out of the four, meaning there is less process due than for criminal prosecutions and probation revocation hearings with imposition of a sentence theretofore suspended, which rank as numbers one and two, respectively. Point being, that in no event should a parole revocation hearing afford greater process or rights than is accorded defendants in criminal prosecutions. This is wholly consistent with *Morrissey. Morrissey*, at 489. That the case may be thirty-years-old, does nothing to undermine its relevance, especially since it has never been overturned.

Plaintiffs' criticism of *United States v. Miller*, 514 F.2d 41 (9th Cir. 1975) is also curious - that it is a cursory analysis and only cites *Morrissey* and *Gagnon*. (Pltf. Reply at 12-13.) In *Miller*, the only witness who testified at the revocation hearing was Miller's probation officer, and his testimony was from records maintained by another probation officer, objected to as hearsay. *Id.* at 42. Based on the evidence, it was determined that Miller had been convicted of three criminal offenses while on probation, resulting in the revocation of his probation. *Id.* at 41. The Ninth Circuit found such evidence reliable and thus, admissible, relying on the language of *Morrissey* and *Gagnon*, that revocation hearings are not to be equated to criminal prosecutions and, that the process should be flexible to consider evidence that may not otherwise be admissible in a criminal prosecution. *Id.* at 42-43. The conciseness of the *Miller* opinion, a case that has never been reversed, has no effect on its validity or applicability.

Similarly, Plaintiffs' attack on *Ryan v. Montana*, 580 F.2d 988 (9th Cir. 1978), is meritless. Plaintiffs simply cast aside as "vague background statements," the Ninth Circuit's reiteration of

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

7

the due process principles governing revocation proceedings which includes *Morrissey* and *Gagnon* – two cases that are clearly instrumental in the injunction in this case. After restating the scale of due process protections identified in *Segal*, the Ninth Circuit in *Ryan* reaffirms that the right to confront and cross-examine adverse witnesses afforded in revocation hearings is not absolute and, based on this Circuit's cases, includes not only that illegally seized evidence can be used, but that the hearing officer may consider hearsay evidence such as that included in a probation officer's report. *Id.* at 992-93. *Ryan* not only cites to *Miller* (discussed above), but importantly, has never been overturned, not even by *Comito*.

Finally, Plaintiffs have not undermined *Prellwitz v. Berg*, 578 F.2d 190 (7th Cir. 1978). First, *Prellwitz* is not contrary to either *Comito* or *Morrissey* but is instead, consistent with both. *Prellwitz* discusses and heavily relies on *Morrissey* (and *Gagnon*) to formulate the conclusion that "a record kept in the ordinary course of business" -- the business records exception to the hearsay rule -- is admissible in a revocation hearing because it is one of the "conventional substitutes for live testimony" that the Supreme Court has determined satisfies confrontation since it bears "recognized indicia of reliability." *Id.* at 192. Plaintiffs suggest that a reason not to follow *Prellwitz* is because it was decided six years after *Morrissey* but that is nonsensical and finds no basis in the law.

Importantly, as *Comito* even states, the right to confront and cross-examine derived from *Morrissey* exists **unless** the government shows good cause for not producing the witness. *Comito*, at 1170. It is undisputed that the government has the right to use substitutes for live testimony where they bear indicia of reliability. *Gagnon*, at 783 n.5. Substitutes for live testimony that bear the indicia of reliability and thus, satisfy good cause, may be found in evidence admissible under long-standing hearsay exceptions. *Prellwitz*, at 192; *Hall*, at 987.

Plaintiffs are also incorrect in asserting that *Prellwitz* is not persuasive here. As set forth above, the Ninth Circuit in *Simmons* cites to *Prellwitz* as one of the "other circuits that agree that hearsay evidence may be admissible in probation revocation hearings." *Simmons*, at 564. Plaintiffs' trivializing *Prellwitz* as a "simple fact of absconding" case that should not be relied upon to clarify whether hearsay exceptions satisfy confrontation, is itself simplistic because they

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

8

ignore that *Prellwitz* speaks to the overarching issue of what constitutes good cause to overcome the parolee's conditional right to confrontation in revocation hearings. And its relevance, that hearsay exceptions require admissibility without more, is borne out by the same principle being reiterated by the Ninth Circuit after *Comito*, in its decision in *Hall*. *Hall*, at 987.

**V. What Occurs in Other Administrative Proceedings Is Irrelevant.**

Plaintiffs ask that the Special Master not find persuasive, on-point federal authority – be it Ninth Circuit cases that Plaintiffs think are too old, or cases from other federal circuits who have directly dealt with the subject of this motion simply because they are from other circuits – while at the same time asking that unrelated administrative proceedings (such as welfare payments) be considered relevant and persuasive. Such a position defies logic. Simply put, where there are existing, on-point federal cases, resort to matters that are off-the-mark, is not warranted. Even the Ninth Circuit, in the paramount cases involved here (*Comito* and *Hall* as well as others), expressly rely upon cases from other circuits who have directly decided issues that the Ninth Circuit has not.

Further, Plaintiffs' reliance on *Goldberg v. Kelly*, 397 U.S. 254 (1970), because *Morrissey* looked to the case, is misguided. *Morrissey* considered *Goldberg* on the following: (1) as part of determining whether procedural protections are due; (2) the nature of a "preliminary hearing" to determine probable cause; (3) whether someone not directly involved in the case should find reasonable ground exists for revocation of parole; and (4) whether the decision maker should state reasons for his determination as well as the evidence relied upon. However, *Morrissey* in no way looked to *Goldberg* to define the confrontation rights afforded to a parolee in revocation matters. *Goldberg*, therefore, is not relevant to the issue presented by Plaintiffs' motion here.

**VI. Hearsay Can Be Considered to Establish the Reliability of Other Hearsay.**

Plaintiffs are wrong when asserting that the court in *Hall* did not look to hearsay evidence to corroborate Hawkins' out-of-court hearsay statements. Plaintiffs suggest that, for example, because five witnesses did testify at the hearing about what Hawkins told them, confrontation of Hawkins who was not present, was satisfied. Not so. Each of the witnesses testifying at the hearing were offering statements made by Hawkins to them -- hearsay. No matter that the

Defs.' Response to Reply to Opp. to Motion to Enforce Par. 24 of Perm. Inj. 2:94-cv-0671 LKK GGH P

9

witness testifying about what Hawkins told them was present -- Hawkins, the hearsay declarant, was not. There was no confrontation of Hawkins. Instead, as Defendants rightly pointed out, the court considered both hearsay and non-hearsay to corroborate Hawkins' out-of-court statements, ultimately determining they were reliable.

Plaintiffs take issue with the fact that Defendants did not discuss *In re Miller*, 145 Cal.App.4th 1228 (2006) in their opposition. Apart from the fact that *Miller* is a non-binding state appellate court case, all that it really demonstrates is that there should not be any hard and fast rule like Plaintiffs propose since considerations of reliability of a particular piece of evidence are wholly dependent on the circumstances of each particular case. This only affirms the flexibility that should be present in revocation proceedings to which *Morrissey* speaks.

CONCLUSION

In sum, Defendants' position is legally supported and does not result in a parolee's right to confrontation being "short-circuited." Plaintiffs repeatedly trumpet the right to confrontation but wholly ignore that *Morrissey* expressly provides that the right is not absolute -- that is, a parolee possesses the right **unless** the hearing officer finds good cause for not allowing confrontation. *Morrissey*, at 489. Where evidence falls within a long-standing hearsay exception, it is admissible without a full balancing because it bears the indicia of reliability that establishes good cause for not allowing confrontation.

Dated: December 10, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

ROCHELLE C. EAST
Supervising Deputy Attorney General

VICKIE P. WHITNEY
Supervising Deputy Attorney General
Attorneys for Defendants

EXHIBIT C

## Ginny Morrison

| | |
|---|---|
| **From:** | Jessica Devencenzi [Jessica.Devencenzi@doj.ca.gov] |
| **Sent:** | Tuesday, January 22, 2008 4:53 PM |
| **To:** | Ginny Morrison; 'Chase Riveland' |
| **Cc:** | Katherine' 'Nelson; Vickie Whitney; 'Ernest Galvan'; 'Loren G. Stewart' |
| **Subject:** | Re: Comito document still needed |

**Attachments:** RD 2.pdf; RD1.pdf; RD3.pdf

Good Afternoon,

In response to the Deputy Special Master's·inquiry, attached please find the portions of the DC manual that pertain to *Comito* to which Ms. Cassady referred at page 69 of the first hearing transcript. The attachments include Resource Document #1, Resource Document #2 and Resource Document #3. Moreover, a copy of the *Comito* case was distributed in 2004 with these materials but since all have a copy of *Comito*, we are not reattaching it at this time. Please let us know if you need anything further.

Thank you,

Jessica R. Devencenzi
Deputy Attorney General
Correctional Law Section
Office of the Attorney General
(916)322-6104

>>> Ginny Morrison <gmorrison@collaboration-specialists.com> 1/18/2008 10:43 AM >>>
Dear All,

In the notice concerning the second hearing, we requested the document described below. We will still need that document and intend to make it part of the record underlying the upcoming Report and Recommendations.

- The policies and procedures concerning the application of *Comito* and related case law that were distributed to Defendants' staff in July 2004 (as mentioned on page 69 of the first hearing's transcript)

Please provide a copy by email at your earliest opportunity.

Thank you,

Ginny Morrison
Deputy Special Master, *Valdivia*
415-456-5038 / 415-449-6377 (FAX)

1/29/2008

RESOURCE DOCUMENT # 1

## ASSESSING EVIDENCE IN REVOCATION PROCEEDINGS

### INTRODUCTION

Determining the truth of the charge and appropriate disposition at a revocation hearing is often a simple process. When the evidence is clear a conclusion is not difficult to reach, but when the evidence is not so clear the process can require careful analysis. Most, if not all, Deputy Commissioners have had difficulty arriving at a decision and/or doubts as to the appropriateness of their findings. It's inherent in the process.

Many times there is no amount of evidence that will eliminate all doubt in all cases. However, any reasonable person with the ability to gather facts, analyze the relevance of those facts, and arrive at a conclusion can be successful as a hearing officer. Because revocation proceedings are administrative in nature the rules and procedures differ from those that are used in courts of law. Fairness is the most important factor. The hearing officer is given wide discretion and is allowed to receive many forms of relevant, material, trustworthy and reliable evidence, including hearsay.

The process of assessing evidence presented during the revocation proceedings will be approached differently by each Deputy Commissioner (DC) depending on the individual. Those who have practiced law will put their experience to good use, as will those who have spent long careers working with offenders. Although there are some rules that must be followed the primary goal is to hear, read or see all the available and relevant evidence and arrive at a conclusion based on that evidence.

This Resource Document will not provide a comprehensive knowledge of the rules or evidence nor is it suggested that such knowledge is required to fulfill the responsibilities of the Deputy Commissioner. This document is intended to provide a general understanding of what should and should not be considered and the reasons why.

#### What is Evidence?

The California Evidence Code at §140 defines evidence as:

"Evidence" means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact.

Evidence is defined in Black's Law Dictionary as:

Any species of proof, or probative matter, legally presented at the trial of an issue, by the act of the parties and through the medium of witnesses, records, documents, concrete objects, etc., for the purpose of inducing belief in the minds of the court or jury as to their contention.

The rules of evidence regulate what evidence is admissible in the different judicial and administrative settings and when they are admissible.

## Evidence in Administrative Hearings

The technical rules of evidence contained in the California Evidence Code do not apply to Administrative Hearings. The California Code of Regulations states:

CCR Title 1 §1147 (c) states:

(c) The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over the objection civil actions. Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but shall not be sufficient in an of itself to support
 finding unless it would be admissible over objection in civil actions. The rules of privileges shall be effective to the extent that they are otherwise required by statute to be recognized at the hearing. Irrelevant and unduly repetitious evidence shall be excluded.

CCR Title 15 § 2665 states:

General. All evidence relevant to the charges or disposition is admissible in parole postponement, rescission and revocation hearings.

The court in In re Carroll (1978) 80 Cal App: 3d 30 held that all evidence is admissible in Administrative Hearings. The Court's comment was that "The Adult Authority, in considering a parole revocation, is generally permitted to consider all relevant evidence...[including hearsay]." In the case the officers testified as to

the absent victim's statements about the burglary and assault. The officers had been on the scene, had seen the condition of the victim, including bruises and chain marks, and had seen the entry window with a screen removed. In other words, there was significant corroborating evidence (In re Douglass (1988) 206 Cal.App.3d 866). Evidence suppressed in the criminal proceeding is admissible unless the method shocks the conscience.

Physical evidence is ordinarily not brought to the hearing unless there is no other means to present the evidence. CCR 15 §2667.

The standard of proof is preponderance of evidence. Even if a criminal case is dismissed or there is an acquittal, the hearing officer may still find good cause. See In re Dunham (1976) 16 Cal.3d 63, 66.

## Assessment and Evaluating Evidence in the Revocation Process

In the revocation process the question regarding evidence is not usually whether it is admissible, but rather what weight it will be given. As stated above, all evidence that is relevant is admissible.

Relevant evidence is defined in Black's Law Dictionary as evidence: "Applying to the matter in question; affording something to the purpose" In determining whether the evidence is relevant the DC must determine if directly or by inference the evidence will help decide if the parolee committed the violation.

Once the DC has determined that the evidence is relevant the next step is to decide what weight to give to the evidence, the weighing process discussed more thoroughly under "Hearsay" applies to all admitted evidence. Briefly the DC must determine if how trustworthy and reliable the evidence is and how important is it in determining the elements of the violation. The more trustworthy and reliable the evidence the more weight it should be given toward determining good cause on the charge or one of the elements of the charge.

## New information

On occasion new information on a charge(s) will be discovered by P&CSD after the parolee has been served, but prior to the hearing. Every attempt will be made to get the new information to the attorney prior to the hearing. If this is not possible and P&CSD attempts to present the information at the hearing the DC shall, before reviewing

the information, ask the representative of P&CSD to explain why the information was not included in the revocation packet. The DC will then give counsel and the parolee an opportunity to review the information privately. If counsel requests a postponement with a time waiver to prepare a defense of the new information the DC will review the new information to determine if it significant enough to warrant a postponement. If so a postponement with a time waiver will be granted. If not the DC will deny the request for postponement, but will not use the new information in determining good cause.

## Written Briefs

Written briefs submitted by the parolee's attorney should be submitted in timely manner. Allowing for due consideration and a response by all appearing parties and the hearing officer. Matters not submitted in a timely manner will either, not be received into evidence or will result in a continuance of the proceedings to give an opportunity to review and respond. The appropriate determined of how the evidence will be handled will be made by the Deputy Commissioner.

## Confidential Information

No decision shall be based on information that is not available to the prisoner [parolee] unless the information has been designated confidential the rules of the department and is necessary to the decision (CCR Title 15, Div. 2 § 2235). The determination of whether the information is confidential is within the discretion of CDC under CCR Title 15, Div. 3 § 3321. When using information that has been designated confidential the DC shall inform parolee and/or counsel that the confidential information is being used. If the information is relied on in reaching a decision it shall be documented and the parolee shall be notified of the reports on which the hearing officer relied. (See Resource Document 3, Witness Selection and Approval).

## Hearsay Evidence

Hearsay evidence is by far the most common type of evidence a DC will come across and it is the most difficult to understand. Relevant hearsay evidence is admissible in administrative hearings. Again the question will be how much weight to give the evidence. The following will attempt to clarify as much as possible the use of hearsay evidence in the parole revocation hearing process by using and analyzing the most recent case, Comito.

The California Evidence Code at §801 (c) defines hearsay as:

**(c) Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Hearsay is defined in Black's Law Dictionary as:

Evidence not proceeding from the personal knowledge of the witness, but from the mere repetition of what he has heard others say. That which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons. The very nature of the evidence shows its weakness, and it is admitted only in specified cases from necessity.

The issue with the use of hearsay evidence is the conflict between the use of the hearsay evidence and the parolee's Sixth Amendment right to confront adverse witnesses.

The rule is simple, but the application can be somewhat complex. In court, in order for hearsay to be admissible, even though very probative, it must fall under one of the many exceptions to the hearsay rule. The reason that the hearsay evidence is inadmissible in court is that it is considered unreliable and untrustworthy. The reason that hearsay that falls under one of the exceptions is admissible in court is that the hearsay under the circumstances of the exceptions is considered reliable and trustworthy. In the revocation hearing all hearsay is admissible and the issue is what weight to give to the hearsay evidence. In determining the weight to give the evidence the hearing officer must decide if the evidence is trustworthy. The more trustworthy the evidence the more weight it should receive and the more likely to outweigh the right to confront adverse witnesses. Therefore unlike court where the hearsay evidence can not even be heard in the parole revocation hearings the evidence can be heard and the hearing officer is responsible to determine its reliability, trustworthiness and weight it is given.

Case law has over the decades has discussed the appropriate weight to give to hearsay testimony, all confirming that it is admissible in parole revocation proceedings. The most recent case that addressed the hearsay issue set forth the clearest guidelines regarding weight given to hearsay testimony in parole revocation hearings.

<span style="background:#000;color:#000"></span>

RESOURCE DOCUMENT # 1 6

*U.S. v. Comito* (9th Cir. 1999) 177 F. 3d 1166

Summary of the facts of the case: (although the statement of facts are lengthy, in order to understand the reasoning and balancing the court sets forth it is necessary to know the facts of the case). Italics have been added to points to be covered in discussion.

The *Comito* case involved a parolee that was under federal supervision. There were three violations involved. Mr. Comito admitted to two of the violations, but denied the *Fraud charge which carried significantly more return to custody time.* The basis of the alleged fraud violation was the accusation made by Deirdre Connell, Comito's former girlfriend and roommate, to Comito's probation officer, Officer Perdue, that Comito had used her bankcards, credit cards and checks without her permission. Connell was not present to testify at the initial revocation hearing. *Her evidence was expected to be critical to the determination of that violation,* the district court granted a continuance so that the government could subpoena her. However, Connell still was not present at the continued hearing. At the beginning of the hearing, counsel for the government stated his intent to offer the testimony of Officer Perdue regarding what Connell had said to him concerning Comito's use of her cards and checks. Comito's lawyer strenuously objected to the use of this hearsay testimony to prove the violation and forcefully asserted that its admission would violate his client's confrontation rights.

*When the government was asked about the witness's absence they indicated that they were unsuccessful in subpoenaing her and that based on what she had told the parole agent she was fearful of physical harm by Comito's associates if she were to testify. Comito's counsel stated that he had personally spoken to Connell a half an hour prior to the hearing, and she had told him that the only reason she had made the allegations was because she and Comito had broken up. She stated to him that she would not repeat the allegations at the hearing. She had indicated to counsel that her reluctance to testify was due to fear of perjury charges or other repercussions should she change her story.* Comito's counsel stressed that, to the best of his knowledge, Connell was not afraid of his client that she had been visiting him almost daily and making telephone calls to Comito at the Detention Center. *The District Judge ruled that the hearsay in this case was going to be considered that if this was the only violation it may insist on Connell being present to testify.*

Officer Perdue then testified as to what Connell had told him about the alleged fraud (*hearsay*). According to Officer Perdue, Connell contacted him in early January 1998, and accused Comito and an

1096

unknown associate of taking her credit cards from her wallet and using and then replacing them. She also claimed that checkbooks from two different bank accounts had been stolen, and checks had been forged and sent to her credit card companies to cover some of the unauthorized transactions. *Officer Perdue did not testify as to any efforts to subpoena Connell or try to get her to come to the hearing. Nor did he provide any explanation for her absence, or restate under oath the statements attributed to him earlier in the proceeding by counsel for the Government.*

In addition to Officer Perdue's testimony regarding Connell's allegations, *the government offered four other pieces of evidence concerning the transactions: stipulated testimony of a Las Vegas Police Detective that Connell had reported unauthorized bank card transactions, that no charges had been filed, and that the case remained open; a memorandum written by Connell, apparently at Officer Perdue's request, listing the dates and amounts of the transactions in question; several of Comito's unemployment compensation documents and his December 1997 bank statement; and, Officer Perdue's testimony regarding his discussion with a credit card fraud investigator about the investigator's conversations with Connell and Comito.* Only Officer Perdue's testimony regarding what Connell purportedly told him is at issue in this appeal. Comito then testified to the following: *Throughout his relationship with Connell, each had used the other's credit cards, and Connell had given him her ATM PIN number* so that he could have access to her bank accounts. Toward the end of 1997 Connell noticed that one of her credit cards was missing, and he believed she had lost it in a move a few months earlier. *In early January of 1998, he moved out of the house he shared with Connell because they were not getting along.* Shortly thereafter, he became aware of Connell's concerns regarding unexpectedly large charges on her credit cards and some missing checks. While he *did make some purchases with Connell's credit cards during December, he had her consent for these transactions; he took responsibility for these charges, but testified he was not responsible for the other charges or the missing checks. Other individuals, who had used Connell's cards in the past, may have had access to those cards.* Following his arrest for the alleged supervised release violations, *he and Connell had reconciled and she then told him that she was sorry that she had made the accusations and would withdraw them. She also told him that the unauthorized charges were "still on-going" and that as he was then in jail, she knew that he was not the guilty party.*

In the closing argument Comito's counsel again objected to the hearsay as a violation of Comito's right to confront. The District Judge did not rule on the objections, but did find good cause on the charges.

Comito appealed the finding.

The Court indicates in its ruling that a hearing officer in order to use hearsay must determine the trustworthiness and reliability of the hearsay. In the Court's ruling it sets forth a balancing test which balances the parolee's right to confrontation against the use of the hearsay evidence. The weight to be given the right to confrontation in a particular case depends on two primary factors: the importance of the hearsay to the ultimate finding and the nature of the facts to be proven by the hearsay evidence." (Comito, 177 F.3d at 1171.)

In analyzing the Comito court decision the following need to be considered in determining that the parolee's right to confront is outweighed by the trustworthiness of the evidence:

1. Is there good cause shown for the alleged victim's absence even when there were statements regarding her failure to appear that were contrary to the government's statements for her absence?

The Comito Court indicates in it's ruling that the Gagnon v. Scarpelli (1973) 411 U.S. 778 and Morrissey (1972) cases allow for testimony from absent witnesses if the government can show that there was a diligent attempt to have the witness present and reason for the absence is not the government's fault.

Comments: The government's counsel (not under oath) offered the information regarding the alleged victim's absence. When Officer Perdue took the witness stand he did not confirm, under oath, any conversation with the alleged victim regarding her absence, or any attempt to subpoena her. You had unsworn information from the government. You also had unsworn information from Comito's attorney, which directly contradicted the government's information. Both pieces of information were hearsay; both without corroboration could not be given much weight or equal weight at best. Nonetheless the court carried on to the next issues in the case.

2. Could good cause have been found on the charge without the hearsay testimony?

The Comito Court stated in its decision "Here, the hearsay testimony was, indisputably, important to the finding of the violation. He (Comito) admitted to using the financial instruments, but testified that he had her authorization to do so. Thus, the contested element of the violation was whether Connell authorized Comito to use her cards and checks. The hearsay testimony consisted of the alleged victim's purported

statements regarding that critical question: Officer Perdue testified as to what Connell told him regarding her consent or lack of consent to the use by Comito of her cards and checks. Thus, Comito had a very strong interest in demonstrating that the hearsay testimony did not reflect 'verified fact.'" The weight to be given the right to confrontation in a particular case depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence Martin, 984 F.2d at 310-11. "Unsworn verbal allegations are, in general, the least reliable type of hearsay, and the particular utterances at issue here bore no particular indicia of reliability.

Comments: The Comito Court ruled that if the hearsay testimony will be the main (and here the only) factor in a good cause finding then the hearsay evidence must be deemed highly reliable in order to sustain a finding of good cause. The more weight attached. to the evidence means the more reliable and trustworthy the evidence must be to outweigh the parolee's right to confrontation. The unsworn, uncorroborated hearsay is the least reliable hearsay. The more corroboration the hearsay evidence has the more reliable and trustworthy it because and the more weight it can be given. Corroboration can be through other testimony (including the parolee's), documents or physical evidence. Again, we have hearsay testimony without corroboration on both sides. Comito's testimony contradicts the testimony of Officer Perdue. In order for the Officer's hearsay testimony to carry more weight it would need to be shown more reliable with corroboration. The court did not believe that contrary hearsay information outweighs the parolee's right to confrontation. The court in its decision further indicates that the governments hearsay testimony is unreliable taken the circumstances—the statements were unsworn by the victim and made after a breakup in a relationship with the parolee.

3. Does the significance of the consequences of a good cause finding weigh in determining weight of hearsay testimony?

The district court revoked Comito's supervised release, finding four separate violations of the conditions of his release: the unauthorized use of his former girlfriend's bank cards, credit cards and checks (a "grade B violation") and three lesser violations ("grade Cs"). Comito admitted the grade C violations, but contested the grade B violation. Three admitted grade C violations support revocation of his supervised release, but Comito argues persuasively that because they constitute a lower grade of violation than the alleged fraud, the finding of the fraud violation led to imposition of a far longer sentence. ·

Comments: The court in Comito indicates the more severe the punishment as a result of the hearsay evidence is also a factor in how trustworthy and reliable the evidence need be and how much weight it can be given. The implication in the Comito case is that if the use of the hearsay evidence will not make a difference or very little difference in the outcome of the proceedings then less reliable and trustworthy hearsay can be given more weight.

4. Will corroboration make hearsay evidence trustworthy and reliable?

The Court stated, "In addition to Officer Perdue's testimony regarding Connell's allegations, the government offered four other pieces of evidence concerning the transactions, which to varying degrees provided corroboration for certain aspects of the charge, but which collectively fell far short of the quantum of proof required to support a finding of the charged violation. This evidence consisted of: stipulated testimony of a Las Vegas Police Detective that Connell had reported unauthorized bank card transactions, that no charges had been filed, and that the case remained open; 3 a memorandum written by Connell, apparently at Officer Perdue's request, listing the dates and amounts of the transactions in question; 4 several of Comito's unemployment compensation documents and his December 1997 bank statement; and, Officer Perdue's testimony regarding his discussion with a credit card fraud investigator about the investigator's conversations with Connell and Comito."

Comments: Again, the court discusses Given the substantial nature of Comito's interest in confrontation and the absence of good cause for the Government's failure to produce the adverse witness, the supporting or corroborative evidence noted by the Government cannot suffice to deprive Comito of his constitutional right to confrontation. The court points out that in order for corroborating evidence to give the hearsay testimony more reliability you need to look at what it is corroborating. The first piece of evidence "stipulated testimony of a Las Vegas Police Detective that Connell had reported unauthorized bank card transactions, that no charges had been filed, and that the case remained open does not corroborate any part of Officer Perdue's testimony that was at issue. It does not corroborate that Comito was the one that used the cards, but simply that they were used without her permission, that is not disputed. The second piece of evidence used for corroboration a memorandum written by Connell, apparently at Officer Perdue's request, listing the dates and amounts of the transactions in question. Again, this does not corroborate that Comito was responsible or would it appear the memorandum written by Connell indicates Comito was responsible just that unauthorized transactions took place on certain dates. The third piece of

corroboration, several of Comito's unemployment compensation documents and his December 1997 bank statement. This may corroborate that Comito had funds in his accounts that he can not account for through earnings, but Comito testified that during the month of December he still had authorized permission to use Connell's bankcards. This does not contribute to the reliability of Officer Perdue's hearsay testimony that Connell stated Comito did not have permission during December. There is no information offered that Comito had unaccounted for money in his accounts after he moved out in early January. The last bit of evidence used to corroborate Officer Perdue's testimony of what Connell told him is Officer Perdue's testimony regarding his discussion with a credit card fraud investigator about the investigator's conversations with Connell and Comito. This testimony provides us with two problems: why wasn't that investigator called as a witness and multiple hearsay. The first problem is covered under the same issues as why Connell wasn't present, but the second issue of multiple hearsay goes to the reliability of the hearsay testimony. If hearsay is unreliable then it stands to reason that multiple hearsay is less reliable and would need more corroboration to make it trustworthy. Multiple hearsay occurs when the person testifying (Officer Perdue) is testifying to statements made to him by another (investigating officer) that someone else (Connell) made to that person (investigating officer). It would appear that the statements to the investigator were not contained in a report, but rather verbal statements relayed from the investigator to Officer Perdue. Multiple hearsay must be weighed carefully against the parolee's right to confront. You now have the parolee being denied not only the accuser, but also the investigator that took her statement. Corroboration is extremely important in determining the reliability of hearsay testimony. The more corroboration the more trustworthy the evidence becomes. If you have no victim, but five witnesses that talked to the victim and the victim told each of the five the same version of events the hearsay testimony will increase in reliability. If you have documents to support the testimony or observations by witnesses that support the testimony these pieces of evidence will increase the reliability and trustworthiness of the hearsay testimony.

In summary, the Court ruled that the hearing officer (DC), when determining the admissibility of hearsay must weigh the parolee's right to confrontation against the Government's good cause for denying it. The two major factors are the significance of the hearsay to the finding, and how, subject to question, is the accuracy and reliability of the hearsay. The greater the importance of the evidence or the less reliable, the greater is the parolee's interest in confrontation. DCs need to understand that if hearsay is the only evidence they have and it is very important to the case, then it probably is not admissible.

## Exceptions to the Hearsay Rule

All hearsay is admissible in a parole violation hearing therefore knowing the exceptions to the rule that are recognized by the court and their applications are not necessary, but the exceptions are what the courts have decided make the evidence more reliable, credible and trustworthy. Some of the exceptions that DCs may encounter are listed below:

### Physical Abuse (Cal. Evi. Code § 1370)

(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:

 (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

 (2) The declarant is unavailable as a witness pursuant to § 240.

 (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.

 (4) The statement was made under circumstances that would indicate its trustworthiness.

 (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.

(b) For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:

 (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.

 (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

 (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section.

(c) A statement is admissible pursuant to this section only if the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement.

## Admissions and Confessions (Cal. Evi. Code §§1220 –1228)

An admission is a self-incriminating statement connecting the parolee with the violation, but not amounting to guilt.
A confession is an admission of guilt.

## Business and Official Records (CEC § 1271)

Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: (a) The writing was made in the regular course of a business; (b) The writing was made at or near the time of the act, condition, or event; (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness.

It is important to note that although police reports fit the criteria of a business or official record the court in Downie v. Klincar (1991) 759 F.Supp. 428 citing United States v. Bell, 785 F.2d. 640 (8th /cur, 1986) states "eyewitness police reports cannot be considered conventional substitutes for live testimony, and their reliability is therefore neither automatic nor presumed. Police reports of any kind are 'inherently more subjective than laboratory reports of chemical tests'" "...they may be demonstrably reliable evidence of the of the fact that an arrest was made, [but] they are significantly less reliable evidence of whether the allegations of criminal conduct they contain are true." The reasoning of the court is "because of the adversarial nature of the confrontation between the police and the defendant in criminal cases and that the reports are 'frequently prepared for use of prosecutors, who use such reports in deciding whether to prosecute." "The presence of other indicia of reliability, such as corroboration by the parolee himself or by collateral sources, a highly detailed description in the report, or a conviction on the crimes alleged in the report may render the reports admissible. This determination must be made on a case-by-case basis."

**Evidence of the absence of a business record or entry**. (CEC § 1272)

This is when a notation would normally be present in a business record and is mysteriously missing.

**Prior Inconsistent statements** (CEC §1235)

Statements by a witness that are inconsistent with the statements being made at the hearing.

**Prior Consistent statements** (CEC §1236)

Statements by a witness that are consistent with the statements being made at the hearing.

**Spontaneous Statements** (CEC §1240)

Made spontaneously while the declarant was under the stress of excitement caused by such perception.

**Declarations against Interest** (CEC 1230)

Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, if the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.

**Dying declarations** (CEC § 1242)

Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death.

**Evidence of a judgment of conviction** for certain purposes (CEC §1300) (felonies)

Court conviction on same behavior. (In revocation hearings it is not exclusively felonies any court conviction for a felony or misdemeanor may be used).

### Declarant unavailable as witness (CEC § 1350)

If it be shown that the declarant of the hearsay statements is legitimately absent from the hearing and the statements can be corroborated the statements are more reliable. For example the witness moved from the state or in hospital.

The California Evidence Code § 240 defines unavailability as follows:

a) Except as otherwise provided in subdivision (b), "unavailable as a witness" means that the declarant is any of the following:

 (1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant.

 (2) Disqualified from testifying to the matter.

 (3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity.

 (4) Absent from the hearing and the court is unable to compel his or her attendance by its process.

 (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.

(b) A declarant is not unavailable as a witness if the exemption, preclusion, disqualification, death, inability, or absence of the declarant was brought about by the procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the declarant from attending or testifying.

(c) Expert testimony which establishes that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, the term "expert" means a physician and surgeon, including a psychiatrist, or any person described by subdivision (b), (c), or (e) of Section 1010.

It is important for the DC to be familiar with the concepts of the Comito case regarding the determination of the reliability and trustworthiness of hearsay evidence and the weighing of the evidence against and the

parolee's right to confrontation and cross examination of witnesses. In all likelihood the majority of objections that the DC will encounter will be the use of hearsay evidence. Being familiar with the Comito court's ruling will assist in determining the proper ruling to these objections.

RESOURCE DOCUMENT # 2

## PROCEDURAL DUE PROCESS RIGHTS IN THE REVOCATION HEARING

Parolees' are afforded procedural due process rights under Morrissey v. Brewer, (1972) 408 U.S. 471 and Valdivia v. Schwarzenegger (E.D. 2002) 206 F.Supp.2d 1068. Some of these rights attach at all three stages of the revocation process and some at just revocation hearings. It is noted where they attach only at the revocation hearing. Parolees' may waive any of these rights except the right to counsel if they are not competent to represent themselves at any stage in the process. The State and attorneys for the Valdivia class action (Valdivia v. Schwarzenegger, (E.D. 2002) 206 F.Supp.2d 1068. entered into a stipulated agreement, which resulted in the Valdivia Injunction. In order for the Deputy Commissioner (DC) to ensure that parolees' procedural due process rights have been met under Morrissey and the VRP it is important to understand those rights. The following is a list of the parolee's rights:

### Notice of Charges

The prisoner or parolee shall receive written notice of the charges within 3 business days of the placement of the parole hold. The notice will include a short factual summary of the charged conduct and written notice of the parolee's rights regarding the revocation process and time frames. (Valdivia Injunction, Pen. Code, § 3063.5, 15 CCR § 2643(b)).

### Right to counsel

All parolees are entitled to attorney representation (VRP). Representation will be limited to those either admitted to the State Bar of California (and are active members) or who appear under procedures authorized by the State Bar of California. Law students may appear and represent inmates as "certified law students" in accordance with the provisions of the State Bar of California. Parolee's may waive their right to counsel unless it is determined that they are not competent to represent themselves at any stage in the proceedings (Valdivia Injunction ¶ 11(b)(i)).

### Probable Cause Hearing within 10 Business Days after the Parolee has been Served with the Notice of Charges.

A parolee has the right to have the probable cause hearing within 10 business days after the parolee has been served with the notice of

RESOURCE DOCUMENT # 2 2

## Revocation Hearing within 35 Days of Placement of Parole Hold

A parolee has the right to have the revocation hearing within 35 days from the date that the Parole Department places a PC §3056 parole hold (Valdivia Injunction.¶¶ 11(b)(iv) and 23).

## Disclosure of evidence

Prisoner shall receive all documentary evidence against them (Pen. Code, § 3063.5; 15 CCR § 2643(b));

## Right to be present

The right to be present at the hearing, unless incarcerated in another jurisdiction (15 CCR § 2247, in re Shapiro (1975) 14 Cal.3d 711).

Note: The parolee can waive this right as a result of their conduct. If the parolee's behavior is disruptive to the process or poses a risk to the safety or security of the persons in the hearing or the facility the DC may have the parolee removed from the proceedings. A removal and the reasons for the removal must be documented. Removal occurs when the parolee's behavior is disruptive to the proceedings. The DC should warn the parolee about the behavior and instruct the parolee to discontinue the behavior and warn that continuation of the behavior will result in removal. If the parolee continues to be disruptive to the proceedings the DC will instruct the security person to remove the parolee from the boardroom.

## To present documentary evidence

The parolee shall have the right to present any relevant documents to the hearing panel. The documents written by the parolee or counsel should be brief, pertinent, and clearly written. They may cover any relevant matters such as mitigation circumstances, disputed facts or release planning. (15 CCR § 2249; Valdivia Injunction, ¶¶ 21-22; Morrissey v. Brewer, 408 U.S. 471, 489 (1972).

RESOURCE DOCUMENT # 2 3

**To Present Witnesses** (revocation hearing only)

The parolee is entitled to request the presence of evidentiary and/or dispositional witnesses. If denied, the specific reasons for denial shall be documented and a copy of the document given to the parolee. (15 CCR § 2643(d), Valdivia Injunction ¶¶ 21-22; and Morrissey v. Brewer, 408 U.S. 471, 489 (1972)). The right to have witnesses only applies to the Revocation Hearing. Present at the Probable Cause Hearing is the parolee, attorney and DC.

a. **Evidentiary witnesses** – witnesses that will testify to some aspect of the charges in the fact finding phase of the hearing;
b. **Dispositional** – witnesses that will testify to some aspect of the parolees' adjustment on parole in the community.

**To confront and cross-examine adverse witnesses (revocation hearing only)**

The parolee has the right at a Revocation Hearing to confront and cross-examine adverse witnesses unless the hearing officer specifically finds good cause to not allow confrontation (Morrissey v. Brewer (1972) 408 U.S. 471;Valdivia Injunction ¶ 24; Comito, 177 F.3d at 1171). The DC can deny the confrontation of an adverse witness if it is shown that the witness is unavailable for good cause, or determined to be either fearful or confidential. See Resource Document * Witnesses for explanation of fearful and confidential witnesses.

**To receive a written decision**

The parolee is entitled to receive a written decision which includes the evidence relied on in reaching the decision (15 CCR §2255; Valdivia Injunction, Exh. A p. 5; Morrissey v. Brewer, 408 U.S. 471, 489 (1972))

**To receive notice of the hearing**

The parolee is entitled to receive notice of the date of the hearing at least 4 days before the hearing (15 CCR § 2643(e)).

**To have an impartial hearing panel**

## RESOURCE DOCUMENT # 2

The parolee is entitled to an impartial panel. A prisoner is entitled to a hearing by an impartial panel (Morrissey v. Brewer, 408 U.S. 471, 489 (1972)). A parolee or counsel may request the disqualification of a hearing panel member by making an objection to the hearing officer at the beginning of the hearing stating the reasons that the parolee believes the hearing officer cannot render a fair and impartial decision. The hearing panel member may also disqualify themselves. Possible reasons for disqualification are: a close personal relationship with prisoner or prisoner's family, hearing panel member was involved in a past incident with the prisoner which might prejudice the panel member against the prisoner or the hearing panel member is actually prejudice against or biased in favor of the prisoner and can not make an objective decision (15 CCR § 2250).

### To receive, upon request, a tape of the hearing

The parolee is entitled upon request to receive a copy of the record of the revocation hearing. (15 CCR § 2254; Valdivia Injunction ¶ 20)

### To request a continuance or postponement

A parolee may request a continuance or postponement on any ground, including an insufficient time to prepare. A request for a continuance or postponement will be granted for good cause (15 CCR §2253)

### To request an optional waiver

The parolee may sign an optional waiver if court charges are pending. The court charges must be criminal in nature and must be for the same conduct that resulted in one or more of the violation charges. The parolee must be informed of the time constraints for a hearing once an optional waiver has been activated.

### To review nonconfidential documents

The parolee or attorney has the right to review nonconfidential documents in the file and enter a written response to any material in the file ((15 CCR § 2247, Valdivia Injunction ¶¶ 14-16).

a. A parolee is entitled to copies of all non-confidential documents regarding the violation charges (Morrissey v. Brewer, 408 U.S. 471, 489 (1972), In re Love, 11 Cal3d 179 (1974), and Penal Code Section 3063.5). Such reports, even if labeled "Confidential" or "Restricted" by the law enforcement agency supplying the report

## RESOURCE DOCUMENT # 2 5

must be given to the parolee and/or attorney, except information, which may endanger the safety or security of a person or a prison, if disclosed, may be deleted from any report. The PA initiating the violation report shall review all law enforcement reports and make appropriate deletions in the copies. If such information is deleted from reports, the PA will prepare a typewritten memorandum stating the reason for the confidential classification. A copy of the unaltered report will be retained in the unit file. This copy will be available to the DC at the hearing, upon request. The DC at the hearing will determine whether to retain the document's "confidential" designation.

### Right to reasonable accommodation

It is part of the BPT's mission to ensure compliance with the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 as well as other federal and state laws relating to ADA and due process. DCs shall be aware that the BPT is under the mandate of a Federal Court injunction (Armstrong v. Davis, 275 F.3d 849 (9th Cir, 2001).) and that specific policies and procedures have been developed to ensure compliance. As such DCs shall apply those policies as well as those outlined in the Armstrong v. Davis Board of Prison Terms Parole Proceedings Remedial Plan (ARP II) effective March 29, 2002. Accordingly, DCs shall apply relevant policy and procedure regarding notice, reasonable accommodation (including to the right to receive the effect communication throughout the entire revocation process), and grievances.

### To waive hearing

A parolee may waive the revocation hearing by signing an unconditional waiver. The unconditional waiver includes the waiver of a personal appearance. The signing of the unconditional waiver is not an admission of guilt (CCR § 2641).

### To waive counsel

A parolee has the right to waive counsel. When the parolee chooses to waive counsel the Deputy Commissioner will make the final determination as to whether the parolee is competent to effectively represent him or herself at a PCH or Revocation Hearing.

### Expedited Probable Cause Hearing

RESOURCE DOCUMENT # 2 6

Under the VRP if counsel after the RTCA can make a "sufficient offer of proof" that there is a complete defense to all parole violation charges that are the basis of the parole hold the parolee is entitled to an "expedited probable cause hearing" as soon as it can be put on calendar(Valdivia Injunction, ¶ 11(b)(i) and Exh. A p. 4). The offer of proof must be reviewed by an available DC or ACDC to determine sufficiency. The offer of proof may be a declaration, document or any other form of evidence that is convincing.

RESOURCE DOCUMENT # 3

## WITNESSES: CATEGORIES, SELECTION, APPROVAL AND TESTIMONY

### Introduction

Under the Valdivia Injunction California parolee's have a right to call and confront adverse witnesses at a Parole Revocation Hearing. When a pending revocation will proceed to a full revocation hearing, the Deputy Commissioner at a probable cause hearing will review witnesses requested by the State and by the parolee to finalize the witness list. The approval of witnesses is within the sole discretion of the Deputy Commissioner. New regulation presently title 15 section 2668.

### Categories

- Evidentiary witnesses (CCR Title 15 § 2668(b) (1)) are witnesses that can provide information that is probative to the charge(s). Within the category of evidentiary witnesses are two sub-categories: adverse and supportive. Adverse witnesses present evidence that is adverse to the parolee's position and often supportive of the P&CSD's position. Supportive witnesses support the parolee's position and are often adverse to the P&CSD's position. The Morrissey case referred to adverse witnesses and defined them as follows: a person who has given information that supports the parole violation charges against the parolee and upon which the paroling agency is relying to revoke parole. A supportive evidentiary witness on the other hand also has information that is probative to the charges, but supports the parolee's claims. Both sub-categories may be relevant to the ultimate finding of fact.

- Disposition witnesses (CCR Title 15 § 2668(b) (2)) are witnesses that speak to how the parolee has been adjusting to parole. Disposition witnesses may offer testimony or documentary evidence of the parolee's stable residence, participation in programs or steady employment as well as personal character traits and observed changes in the parolee since release.

- Fearful witnesses (CCR Title 15 § 2668 (3) (e)) Evidentiary witnesses who refuse to attend the hearing either because they would be subject to risk of harm if their identity were known or if identity is already know fear for the safety if they attend the hearing. These witnesses shall be interviewed by staff prior to the hearing and their information documented in writing or on tape. The reasons for their fear shall also be documented. The hearing panel shall determine whether there is good cause to excuse a witness' attendance and shall document the decision, including the reasons. The determination of good cause to excuse a witnesses testimony

must the tests set forth in the Comito case (see Assessing Evidence Resource Document), which balances the parolee's right to confrontation against the need for the evidence to the disposition of the case and the trustworthiness of the information. On some occasions the witness does attend the hearing. In these cases the DC will determine whether there is good cause to designate the witness as fearful. If the DC determines good cause exists, the DC may allow the witness to give testimony outside the presence of the parolee.

- In order to take the fearful witnesses testimony the parolee may be removed from the hearing room while the fearful witness testifies. The parolee's attorney will have the opportunity to ask the witness questions on the parolee's behalf. The reasons for declaring a witness fearful must be documented

- Confidential witnesses are witnesses that have relevant information regarding the charge(s), but are unknown to the parolee and are fearful of retaliation from the parolee if they testify. Under Morrissey the court ruled that the parolee's right to confrontation and cross-examination is out-weighed when "the hearing officer specifically finds good cause for not allowing confrontation." The Court states that due process requires confrontation and cross-examination except on a finding of good cause to not allow confrontation. The Court stated, "[h]owever, if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination." (Morrissey, 408 U.S. at 487.) The use of confidential witnesses is subject to the balancing test used in the U.S. v. Comito ((9th Cir. 1999) 177 F. 3d 1166) case regarding unavailability of witnesses. The DC must carefully weight the State's need for the information against the parolee's right to confront and cross-examine adverse witnesses.

- Parolee and parolee's attorney must be informed that confidential information will be used prior to the use of the information. Counsel may object to the use of the information. If the information were designated confidential by the Department the challenge of the designation would go through the Department.

- The parolee may be removed from the hearing room while the confidential witness testifies. The parolee's attorney will have the opportunity to ask the witness questions on the parolee's behalf. The reasons for declaring a witness confidential must be documented.

- The possible risk to the witness can be established by a direct or implied threat, or other circumstances that would lead a reasonable person to believe that the witness could suffer harm as a result of testifying.

Confidential testimony shall be recorded on a separate system (currently an audiotape) marked confidential.

## Selection and Approval of Witnesses

The following is what should be considered when selecting and approving witnesses:

- There shall be no limit on the number of evidentiary witnesses.

- There is no specific number of allowable disposition witnesses, but cumulative testimony is not necessary

- In determining who to call as a witness the DC must review the proposed information that will the witness will provide and determine if the testimony is relevant and material to the charge(s)

- Testimony should not be cumulative or repetitive to other testimony

 Note: great care must be given in denying a requested evidentiary witness on the basis of cumulative testimony. The persons may have observed the same incident, but may have different perceptions of the incident (Title 15 § 2668 (b) (2)).

The DC will have a list of requested witnesses from P&CSD and from the parolee's attorney. After reviewing the documents the DC will determine which of P&CSD's requested witnesses will be called and which of the parolee's requested witnesses will be called. The DC may add to the list if both parties have omitted a witness that the DC considers necessary. The parolee's counsel will be notified of the approved witness list and will be responsible for notification of witnesses designated as the parolee's witnesses.

## Taking witness testimony

The DC may have witnesses, both evidentiary and dispositional, testify in narrative form and/or by question and answer. The DC has the responsibility to keep the witnesses focused on the issues that are

probative to the charges. The DC also has the responsibility to make sure the parolee or his/her attorney's questions stay focused on the issues that are pertinent to the charges. Disposition witness may need more guidance to stay focused on the purpose of their testimony and the DC may need to use a question and answer technique if the witness does not stay on point. The focus of the disposition witnesses testimony should on the parolee's adjustment following the most recent release from custody, but leniency must be shown when the witness is explaining positive changes in the parolee's present parole adjustment from previous parole period adjustments.

## EXHIBIT D

BINGHAM, McCUTCHEN LLP
GEOFFREY THOMAS HOLTZ – 191370
KRISTEN A. PALUMBO – 215857
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

PRISON LAW OFFICE
DONALD SPECTER – 83925
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
HOLLY M. BALDWIN – 191317
ERNEST GALVAN – 196065
315 Montgomery Street; 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA:

OFFICE OF THE SPECIAL MASTER

| JERRY VALDIVIA, et al., Plaintiffs, vs. ARNOLD SCHWARZENEGGER, et al., Defendants. | Case No. Civ. S-94-0671 LKK/GGH DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION |
|---|---|

**HEARING**

Date: November 1, 2007
Time: 10:00 am
Location: Rosen, Bien & Galvan, LLP
Officer: Chase Riveland, Special Master

DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION

I, Loren G. Stewart, declare:

1. I am a member of the Bar of this Court and an associate of the firm Rosen, Bien & Galvan LLP, one of the counsel of record for the plaintiff class of California parolees. I have personal knowledge of the matters set forth herein and could competently testify thereto as a witness if called upon to do so.

2. I have observed two training sessions for Deputy Commissioners ("DCs") on parole confrontation rights, as described in more detail below. Since 2004, other attorneys in my office have attended similar training sessions. These sessions have provided confusing and inconsistent messages regarding the standards and procedures to be followed under the controlling *Comito* case.

3. In September 2006, the Special Master noted that:

> Defendants developed policies and procedures regarding *Comito* and provided training for the Deputy Commissioners and parole field staff. Plaintiffs assert that training content was flawed, that ongoing oversight is insufficient, and that this results in inconsistent application of the *Comito* standard. . . . Defendants acknowledge the need for further training and guidance. . . . Interviews with CDCR parole agents and supervisors reveal that many uncertainties and misinformation regarding hearsay information and *Comito* requirements remain. They also indicated that Deputy Commissioners' application of *Comito* varies depending upon their background and length of tenure. . . . Parole agents and supervisors say they find the variation in how the standard is applied confusing and frustrating.

First Report of the Special Master on the Status of Conditions of the Remedial Order, September 11, 2006, at 33-34. Attached hereto as **Exhibit 1** is a true and correct copy of the pertinent excerpts of this report.

4. On November 28, 2006, I observed defendants' training session for new DCs at 1515 K Street, in Sacramento, California. The *Comito* segment of the training was entitled "Assessing Evidence." The roughly three-hour session, structured around a PowerPoint presentation, was designed to teach the DCs the rules on confrontation under *Comito*. One more experienced DC in the class remarked that, in the field, it is a common mistake for DCs to *admit* evidence because it is central to the finding rather than *exclude* it because the parolee's confrontation clause is heightened in that situation.

1

5. The November 28, 2006, training examined the *Comito* case closely, but provided few practical applications for the DCs. Trainers discussed hearsay exceptions in the training without explaining precisely their relationship—if any—to the *Comito* balancing test.

6. On March 27, 2007, I observed defendants' "Hearsay Refresher" training for DCs in Region II, conducted in Oakland, California. Deputy Special Master Ginny Morrison also attended the session, as did Michael Roldan for CalPAP. Although the training was designed to provide clarification through case law examples, the training revealed that confusion abounds on parolees' confrontation rights and *Comito*. Deputy Commissioners expressed disagreement amongst themselves and with the trainers regarding splitting charges, handling of "priority cases," and when the Board would violate the timeframes in the injunction absent good cause for delay instead of granting a *Comito* objection. There was little agreement amongst ACDCs and DCs regarding how to handle a parolee's confrontation rights. This session that lasted under two hours was confusing and unorganized.

7. One of defendants' recent self-monitoring tour reports confirms that parole agents continue to struggle with *Comito*. Defendants reported that parole agents "do not have a clear understanding of *Comito* and what is expected as far as having witnesses present or not present at a hearing." Defendants' Santa Rita County Jail Self-Monitoring Tour, Aug. 31, 2007 at 9. One parole administrator remarked "that parole agents in the field would benefit from *Comito* training. . . . [M]any parole agents are unaware of the requirements set forth in *Comito*," and then do "not properly attempt to secure the presence of a witness" at revocation hearings. *Id.* at 11. Attached hereto as **Exhibit 2** are relevant excerpts from the August, 31 2007, Santa Rita County Jail Self-Monitoring Tour Report.

8. Defendants' recent Second Compliance Report, dated September 26, 2007, discusses at great length the statewide training that occurred in March and April of 2007 for DCs. *See* Second Compliance Report at 45-46. Attached hereto as **Exhibit 3** are relevant excerpts from Defendants' Second Compliance Report. As defendants acknowledge in the Second Compliance Report, DCs were told that CDCR was "exploring the possibility" of dispensing

2
DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION

with the *Comito* balancing requirement in some cases, further confusing DCs on the proper approach to confrontation issues. *See id.* at 46.

9. Only one hour and fifteen minutes of the March 27, 2007, training was dedicated to *Comito* and confrontation issues. Attached hereto as **Exhibit 4** is a copy of the training agenda for the March 27-28, 2007 training in Region II, sent to plaintiffs' counsel via email by Katherine Nelson on March 21, 2007.

10. Defendants' Second Compliance Report acknowledges that "DAPO has not provided its field staff with any refresher training on *Comito* or the use of hearsay evidence in revocation hearings during the reportable period [June 1, 2006 through September 26, 2007]." *See* Defendants' Second Compliance Report, attached hereto as Exhibit 3 at 46. "Many parole agents have indicated they do not have a clear understanding of the requirements necessary to meet the mandates of *Comito* when preparing a case for hearing and subpoenaing witnesses. Parole agents reported they would benefit from additional training on this issue." *Id.* at 46-47.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October, 2007 in San Francisco, California.

By: /s/ *Loren G. Stewart*
 Loren G. Stewart

---

3

DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION

**EXHIBIT E**

**Ginny Morrison**

| | |
|---|---|
| **From:** | Vickie Whitney [Vickie.Whitney@doj.ca.gov] |
| **Sent:** | Monday, January 07, 2008 3:03 PM |
| **To:** | dylan.sullivan@cdcr.ca.gov; katherine.nelson@cdcr.ca.gov; Ginny Morrison; Jessica Devencenzi |
| **Cc:** | 'Ernest Galvan'; 'Loren G. Stewart'; 'Chase Riveland' |
| **Subject:** | Re: Comito document request |

In response to the request of Deputy Special Master Ginny Morrison, made under paragraph II E of the Joint Statement Regarding Scheduling and Procedures for Briefing of *Comito* Dispute to the Office of the Special Master, attached please find the portion of the agenda for the current Deputy Commissioner training which concerns *Comito*, confrontation rights, and/or hearsay. This portion was included in the full agenda served on Plaintiffs on December 7, 2007. Please note that *Comito* training occurred on December 21st from 8:30 to noon (agenda says 12:00 am, should be pm). Loren Stewart was present for Plaintiffs and Jessica Devencenzi was present for Defendants. Please also be advised that as part of the training, by agreement between the parties, when presented with an impromptu request at the training (obviously not reflected by the agenda), both Mr. Stewart and Ms. Devencenzi provided non-biased, factual examples from the various cases to assist in the training. We are informed that the participants found the presentations to be extremely beneficial.

In regards to the indication that this document will be considered part of the record underlying the Report and Recommendations to the Court, Defendants must respectfully object for the record on the basis of relevancy. As Defendants have noted in objections in the briefing and at the hearing, Defendants believe that matters concerning training are not relevant to a determination of the extent of obligation imposed under the Permanent Injunction's provisions concerning *United States v. Comito* - a matter which is based wholly upon the cases that define the legal obligation. While Defendants are providing the document requested, it is being provided subject to Defendants' objection.

Please let me know if there are any further requests of the Mastership.

Regards,
Vickie

>>> Ginny Morrison <gmorrison@collaboration-specialists.com> 1/4/2008 8:08 AM >>>
Pursuant to the Joint Statement Regarding Scheduling and Procedures for Briefing of *Comito* Dispute to the Office of the Special Master paragraph II.E, which provides, in relevant part, that "the Special Master reserves the right to make additional inquiries...," we request that Defendants provide:

- a copy of the agenda for the current Deputy Commissioner academy for the day(s) on which training is offered concerning *Comito*, confrontation rights, and/or hearsay

Please provide this to the Office of the Special Master, with a copy to Plaintiffs' counsel, by electronic mail by close of business on January 9, 2008. This document will be considered a part of the record underlying the Report and Recommendations concerning this matter.

Ginny Morrison
Deputy Special Master, *Valdivia*
415-456-5038 / 415-449-6377 (FAX)

1120

**BOARD OF PAROLE HEARINGS
DEPUTY COMMISSIONERS TRAINING**

**December 10-21, 2007
January 7-11, 2008**

*Instructors and Times subject to Change*

| WEEK TWO |
| --- |

**FRIDAY,** **December 21, 2007 -- Executive Board Room**

| 8:30 AM | **Hearsay / COMITO Overview** | **A7775** | **3.50** |
|---|---|---|---|
| | **Pat Cassady, Assoc. Chief Deputy Commissioner** | | |

12:00 AM **Conclusion**

1/29/2008 1:13:26 PM
 *AGENDA SUBJECT TO CHANGE*

EXHIBIT F-EXHIBIT 1

BINGHAM, McCUTCHEN LLP
GEOFFREY THOMAS HOLTZ – 191370
KRISTEN A. PALUMBO – 215857
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: (415) 393-2000

PRISON LAW OFFICE
DONALD SPECTER – 83925
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
HOLLY M. BALDWIN – 191317
ERNEST GALVAN – 196065
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA:

OFFICE OF THE SPECIAL MASTER

| | |
|---|---|
| JERRY VALDIVIA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No. Civ. S-94-0671 LKK/GGH<br><br>**REPLY DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE *VALDIVIA* PERMANENT INJUNCTION**<br><br>HEARING<br><br>Date: December 14, 2007<br>Time: 10:00 am<br>Location: Rosen, Bien & Galvan, LLP<br>Officer: Chase Riveland, Special Master |

REPLY DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION

I, Loren G. Stewart, declare:

1. I am a member of the Bar of this Court and an associate of the firm Rosen, Bien & Galvan LLP, one of the counsel of record for the plaintiff class of California parolees. I have personal knowledge of the matters set forth herein and could competently testify thereto as a witness if called upon to do so.

2. On December 15, 2006, I sent a letter via electronic mail to Defendants regarding their *Comito* policies. Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiffs' December 15, 2006 letter to Defendants.

3. On June 8, 2007, defendants sent a letter regarding *Comito* policies to Plaintiffs' counsel via email responding to my letter of December 15, 2006. Attached hereto as **Exhibit 2** is a true and correct copy of Defendants' letter of June 8, 2007.

4. Attached hereto as **Exhibit 3** is a true and correct copy of the PowerPoint presentation I received from ACDC Patricia Cassady at the Deputy Commissioner training on November 28, 2006, in Sacramento, California.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of November, 2007 in San Francisco, California.

By: */s/ Loren G. Stewart*
Loren G. Stewart

1

REPLY DECLARATION OF LOREN G. STEWART IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE
PARAGRAPH 24 OF THE VALDIVIA PERMANENT INJUNCTION

EXHIBIT F—EXHIBIT 2

## Loren G. Stewart

**From:** Ecklund, Carl [Carl.Ecklund@cdcr.ca.gov]
**Sent:** Friday, June 08, 2007. 10:21 AM
**To:** Loren G. Stewart
**Subject:** RE: Comito & Hearsay Exceptions Letter, 720-1
**Attachments:** No Hall Effect on Hearsay Training.doc

Loren,

Here is the answer to your letter on hearsay.

Carl D. Ecklund
Staff Counsel
Court Compliance Team

---

**From:** Loren G. Stewart [mailto:LStewart@rbg-law.com]
**Sent:** Thursday, June 07, 2007 4:25 PM
**To:** Ecklund, Carl
**Subject:** RE: Comito & Hearsay Exceptions Letter, 720-1

Hi Carl,

Thank you for the update. I did not receive your 6/1 telephone message, but don't sweat it.
I look forward to the response, the sooner the better.

Thanks,

**Loren G. Stewart**
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
lstewart@rbg-law.com

*We have moved to our new office.* Please note our new address, 315 Montgomery Street, Tenth Floor.

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Ecklund, Carl [mailto:Carl.Ecklund@cdcr.ca.gov]
**Sent:** Thursday, June 07, 2007 9:51 AM
**To:** Loren G. Stewart
**Subject:** RE: Comito & Hearsay Exceptions Letter, 720-1

Loren,

11/27/2007

I attempted to leave a phone message for you at (415) 433-6830 on 06/01/07 at COB. We are still debating the effect of Hall, if any, on training for the DCs. I apologize for the delay as I have been the lead person on this and have been looking at the Stipulated Permanent Injunction, the Policies and Procedures, and talking with drafters of the Stipulated Permanent Injunction along with BPH counsel to get a comprehensive understanding on the use of hearsay in revocation hearings. This search has taken me longer than I thought it would. I expect a decision no later than 06/15/07. If you have questions, please call me at (916) 324-1986. Thanks.

Carl D. Ecklund
Staff Counsel
Court Compliance Team

---

**From:** Loren G. Stewart [mailto:LStewart@rbg-law.com]
**Sent:** Thursday, June 07, 2007 8:43 AM
**To:** Mahoney, Steven
**Cc:** Katherine Nelson; Boyd, Russa; Ecklund, Carl; Nelson, Katherine
**Subject:** Comito & Hearsay Exceptions Letter, 720-1

HI Steve & Carl,

Please advise of the status of your response to my letter on *Comito* analysis and hearsay exceptions. My letter (5/15) requested a written response by 5/29/07. You indicated on 5/29 that a response was likely by 6/1. Please advise.

Regards,

**Loren G. Stewart**
ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
lstewart@rbg-law.com

*We have moved to our new office.* Please note our new address, 315 Montgomery Street, Tenth Floor.

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Mahoney, Steven [mailto:Steven.Mahoney@cdcr.ca.gov]
**Sent:** Tuesday, May 29, 2007 9:58 AM
**To:** Loren G. Stewart
**Cc:** Katherine Nelson; Boyd, Russa; Ecklund, Carl
**Subject:**

Hi Loren,
I can't remember if I emailed you about this last Friday or not.

Carl Ecklund has been working on a response to your letter regarding whether or not hearsay exceptions require a Comito analysis. Carl was on vacation last week and is returning this week. He should be able to get response out to you by the end of this week. Thanks.

Steve

Steven Mahoney
Staff Counsel

.11/27/2007

Board of Parole Hearings
(916)445-4687
(916)502-4557 cell

11/27/2007

**1126**

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**OFFICE OF LEGAL AFFAIRS**
**LITIGATION MANAGEMENT UNIT**
1515 K Street, Suite 520
Sacramento, CA 95814
www.cdcr.ca.gov

June 8, 2007

Rosen Bien & Galvan, LLP via Email and U.S. Mail
Attorneys at Law
Tenth Floor
315 Montgomery St
San Francisco, CA 94104

> Re: *Valdivia v. Schwarzenegger,*
> *Comito* Balancing and Hearsay Exceptions

Dear Mr. Stewart:

In response to your letter dated December 15, 2006 stating Plaintiff's concern regarding the use of hearsay evidence in parole revocation hearings and the training to be given to Deputy Commissioners, it is Defendant's position that DCs have always been allowed to use hearsay exceptions, both those found in the Federal and California Rules of Evidence. If no hearsay exception from either of these Rules applies, then a <u>Comito</u> balancing test will be applied.

Sincerely,

Carl D. Ecklund
Staff Counsel
Court Compliance Team
(916) 324-1986